# EXHIBIT A

Investor Name: *Louis J. Pearlman Enterprises, LL*

# UP TO $1,500,000 OF MEMBERSHIP INTERESTS IN
# ORLANDO PREDATORS FOOTBALL TEAM, L.L.C.

May 13, 2003

---

## SUBSCRIPTION DOCUMENTS

---

# ORLANDO PREDATORS FOOTBALL TEAM, L.L.C.

## SUBSCRIPTION AGREEMENT

Orlando Predators Football Team, L.L.C.
4901 Vineland Road
Orlando, Florida 32811
Attn: Brett L. Bouchy

### I.   OFFERING AND SALE OF MEMBERSHIP INTERESTS

Orlando Predators Football Team, L.L.C., (the "Company") is offering up to 1,021,925 Membership Interests in the Company (the "Membership Interests") for an aggregate subscription price of $1,500,000 or approximately $1.47 per Interest (the "Membership Interest Offering"). The Company will use the proceeds it receives from the Membership Interest Offering to (i) fund working capital and operating expenses of the Company and (ii) to make a partial return of capital to the existing Members as of March 31, 2003.

The offering price of the Membership Interests has been determined unilaterally by the Company and is not the result of arm's length negotiations. The Membership Interests presently are being offered to persons who are accredited investors, as that term is defined in Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and who are not Members of the Company; however, if the Company does not receive subscriptions for the entire amount of the Membership Interest Offering, the Company reserves the right to offer the Membership Interests to present Members of the Company. The Company has not established any minimum amount of Membership Interests that must be sold before it will accept any subscriptions. As a result, all subscription proceeds will be available immediately to the Company. The Company will terminate the Membership Interest Offering on the earlier to occur of September 30, 2003 or sale of all of the Membership Interests in the Membership Interest Offering. If all Membership Interests are sold in the Membership Interest Offering and assuming full subscription to the Notes Offering described in Section VIII, below, the Company will have outstanding 4,055,258 Membership Interests.

The Company may reject any subscription, in whole or in part, in its sole and absolute discretion. The Company reserves the right to pay customary commissions or fees to broker-dealers or other persons to whom payment of such fees is permitted in connection with the Membership Interest Offering.

### II.   SUBSCRIPTION

The undersigned has submitted his or her check payable to "Orlando Predators Football Team, L.L.C." in an amount equal to amount of Membership Interests for which the undersigned has subscribed.

THE MEMBERSHIP INTERESTS OFFERED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFER AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE MEMBERSHIP INTEREST OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, SOME OF WHICH ARE DESCRIBED IN SECTION VIII OF THIS AGREEMENT ENTITLED "INFORMATION REGARDING INVESTMENT CONSIDERATIONS: RISK FACTORS." THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT OR OF ANY OTHER INFORMATION PROVIDED TO SUBSCRIBERS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

PURCHASERS RESIDING IN THE STATE OF FLORIDA HAVE THE RIGHT TO RESCIND THEIR PURCHASE WITHIN THREE DAYS OF THE PURCHASE WITHOUT ANY PENALTY.

### III. OFFERING MATERIALS

The undersigned hereby acknowledges receipt from the Company of the following offering materials for the Membership Interests (collectively, the "Offering Materials"):

1. This Subscription Agreement;

2. The Purchaser Questionnaire; and

3. The form of Limited Liability Company Agreement of the Company (the "Operating Agreement") as amended to date, which governs certain rights and obligations of the Company's Members.

The Company may provide additional written information concerning the Orlando Predators Football Team, which is the Company's principal asset. Upon request, the Company will provide to the undersigned historical financial information concerning the Orlando Predators Football Team, including the Asset Purchase Agreement used in connection with the purchase by the Company of the Orlando Predators Football Team.

The undersigned acknowledges that the Offering Materials constitute the sole information and materials upon which the undersigned is relying in electing to purchase Membership Interests.

### IV. ACCREDITATION

The undersigned understands that the Membership Interests to be issued in connection herewith are not being registered under the Securities Act or the securities acts of any state (the "Laws") and are being offered and sold in reliance upon exemptions from registration under the Securities Act and the Laws. To enable the Company to offer and sell the Membership Interests in reliance on these exemptions, each investor must be an "accredited investor" and further

represents that he or she has a net worth (including home, home furnishings and automobiles) of at least $1,000,000. The undersigned has initialed as many of (a) through (g) below which are applicable (and if no initials are provided, by execution of the signature page hereof, the undersigned nonetheless represents and warrants that the undersigned is an accredited investor).

An "Accredited Investor" means any person who comes within any of the following categories, or whom the Company reasonably believes comes within any of the following categories, at the time of sale of Membership Interests to that person:

[ ✓ ] a. A natural person whose individual net worth, or joint net worth with the undersigned's spouse, at the time of purchase, exceeds $1,000,000 (net worth, for purposes of the Membership Interest Offering, unless otherwise noted <u>includes</u> home, home furnishings and automobiles, except for persons who are residents of the State of Illinois where net worth <u>excludes</u> home, home furnishings and automobiles).

[ ] b. A natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

[ ] c. Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Membership Interests offered, with assets in excess of $5,000,000.

[ ] d. Any bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that act; any Small Business Investment Company licensed by the U.S. Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

[ ] e. Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

[ ] f. Any manager or executive officer of the Company.

[ ] g. Any entity in which all of the equity owners are accredited investors.

3

**PLEASE INITIAL THE STATEMENT(S) ABOVE WHICH ARE TRUE AS TO YOU OR THE ENTITY IN THE BRACKETS TO THE LEFT THEREOF. ONE OR MORE STATEMENTS MUST BE INITIALED BY THOSE WISHING TO INVEST. BY EXECUTION HEREOF, THE UNDERSIGNED WARRANTS THAT THE UNDERSIGNED HAS MET AT LEAST ONE OF THE TESTS SET FORTH IN (a) THROUGH (g) ABOVE. IF THE MEMBERSHIP INTERESTS ARE BEING PURCHASED ON BEHALF OF AN INDIVIDUAL RETIREMENT ACCOUNT ("IRA"), KEOGH PLAN OR SIMILAR FIDUCIARY ACCOUNT, THE REPRESENTATIONS BELOW SHOULD BE MADE ON BEHALF OF THE BENEFICIARY OR DONOR WHO DIRECTLY OR INDIRECTLY SUPPLIES THE FUNDS FOR INVESTMENT.**

V.   **REPRESENTATIONS AND WARRANTIES**

The undersigned hereby represents, warrants and understands that:

1. if any of the information contained in the Subscription Documents is or becomes incorrect with respect to the undersigned, the undersigned will promptly notify the Company;

2. the undersigned is an "accredited investor" as defined in Article IV above;

3. the Membership Interests subscribed for herein will be purchased solely by and for the account of the undersigned for investment, and are not being purchased for subdivision, fractionalization, resale or distribution; the undersigned has no contract, undertaking, agreement or arrangement with any person to sell, transfer or pledge all or any part of the Membership Interests for which the undersigned hereby subscribes, and the undersigned has no plan or intent to enter into any such contract, undertaking or arrangement;

4. the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Membership Interests by anyone but the undersigned;

5. the Membership Interests have not and will not be registered under the Securities Act or the Laws, and must be held indefinitely unless they are subsequently registered under the Securities Act and the Laws, or exemptions from such registration are available and the undersigned may not transfer the Membership Interests, or any interest therein, unless and until the Company shall have consented thereto (which consent may be withheld in the absolute discretion of management of the Company), provided further that the undersigned shall provide, if the Company so requires, an opinion of counsel satisfactory to the Company, that the intended disposition will not violate the Securities Act or the Laws or the rules and regulations of the Securities and Exchange Commission or of any state securities commission promulgated thereunder;

6. the Company does not have any obligation or intention to register the Membership Interests under any federal or state securities act or law or to file the reports to make public the information required by Rule 144 under the Securities Act;

4

7. the undersigned must generally hold the securities comprising the Membership Interests for a minimum period of two years and may not sell, transfer, pledge or otherwise dispose of the Membership Interests except in compliance with the Securities Act and the Laws or exemptions therefrom;

8. the undersigned alone or with his or her Purchaser Representative (if applicable), has knowledge and experience in financial and business matters, in general, and in investments in limited liability companies, in particular;

9. the undersigned has participated in other privately placed investments and/or he or she has the capacity to protect his or her own interest in investments like the subject investment and that he or she is capable of evaluating the merits, risks and other facets of the subject investment;

10. the undersigned's financial condition is such that he or she has no need for liquidity with respect to an investment in the Membership Interests;

11. the undersigned is able to bear the economic risk of the investment in the Membership Interests for an indefinite period of time, including the risk of losing all of his or her investment, and the loss of his or her entire investment in the Membership Interests would not materially adversely affect the standard of living of the undersigned and his or her family;

12. the undersigned has either secured independent tax advice with respect to an investment in the Membership Interests, upon which he or she, alone or with his or her Purchaser Representative (if applicable), is relying, or he or she is sufficiently familiar with the income taxation of limited liability companies that he or she deemed such independent advice to be unnecessary. No advice has been given to the undersigned by the Company or its Managers concerning the tax consequences of the Membership Interests described above;

13. the undersigned, either alone or with the assistance of his or her purchaser representative (as that term is defined under Rule 501(h) of Regulation D), if any, has had an opportunity to ask questions of and receive answers from duly designated representatives of the Company concerning the terms and conditions of the Membership Interest Offering and the Company, generally, and has been afforded an opportunity to examine those documents and other information which the undersigned or his or her representative, if any, has requested for the purpose of evaluating an investment in the Membership Interests and for the purpose of answering any questions the undersigned or his or her representative, if any, may have concerning the business and affairs of the Company;

14. in evaluating the suitability of an investment by the undersigned in the Company, the undersigned has relied solely upon the materials made available to the undersigned at the undersigned's request and independent investigations made by the undersigned in making the decision to purchase the Membership Interests subscribed for herein, and acknowledges that no representations or warranties (oral or written), have been made to the undersigned with respect thereto;

15. the undersigned was not induced to invest by any form of general solicitation or general advertising including, but not limited to (a) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over the television or radio or (b) any seminar or meeting whose attendees had been invited by any general solicitation or general advertising;

16. the undersigned is aware of the fact that (a) the Company is a development stage company with a limited operating history and (b) investment in the Membership Interests is very speculative and involves a high degree of risk of loss of the undersigned's entire investment;

17. no federal or state agency has reviewed or passed upon the adequacy of the Membership Interest Offering, made any finding or determination as to the fairness for investment, or any recommendation or endorsement of the Membership Interests or the Membership Interests as an investment; and

18. all information provided by the undersigned is true and accurate as of the date set forth on the subscription page hereof, and if there should be any change in such information prior to the acceptance of his or her subscription for the Membership Interests that he or she is purchasing, the undersigned will immediately provide such information to the Company.

## VI. INDEMNIFICATION

The undersigned hereby agrees to indemnify each of the Company and its members, managers, officers, employees and agents and to hold each of them harmless against any and all loss, damage, liability or expense, including reasonable attorneys' fees, which they or any of them may suffer, sustain or incur by reason of or in connection with any misrepresentation or breach of warranty or agreement made by the undersigned.

## VII. ACCEPTANCE AND REVOCATION

The undersigned understands and agrees that this subscription may be accepted or rejected by the Company, in whole or in part, in its sole and absolute discretion, and if accepted, the Membership Interests purchased pursuant hereto will be issued only in the name of the undersigned. The undersigned hereby acknowledges and agrees that the undersigned may not cancel, revoke or withdraw this Subscription Agreement, and that this Subscription Agreement and the documents submitted herewith shall survive (a) changes in the transactions, documents and instruments provided to or explained to the undersigned that are not material and (b) the death or disability of the undersigned.

## VIII. INFORMATION REGARDING INVESTMENT CONSIDERATIONS; RISK FACTORS

In addition to the other factors that may impact upon an investment in the Company, investors should consider the following important information. THIS INFORMATION DOES NOT CONSTITUTE A COMPLETE DESCRIPTION OF ALL OF THE FACTORS THAT MAY IMPACT AN INVESTMENT IN THE MEMBERSHIP INTERESTS. INVESTORS ARE

URGED TO CONDUCT THEIR OWN INVESTIGATION AND TO REQUEST WHATEVER INFORMATION THEY DEEM NECESSARY FROM THE COMPANY TO EVALUATE AN INVESTMENT IN THE MEMBERSHIP INTERESTS.

An investment in the Membership Interests involves a high degree of risk. In evaluating the Company and its business, prospective investors should carefully consider the following risk factors. The order in which the following risks are presented is not intended to represent the magnitude of the risks described. The Company's actual results may differ materially from the results anticipated in any statements which are considered forward-looking statements as a result of certain factors set forth below and elsewhere in the Offering Materials.

**Investors are encouraged to obtain a copy of and to review carefully the terms of the Asset Purchase Agreement for the Company's purchase of the Orlando Predators Football Team.**

The Company purchased the Orlando Predators Football Team with the proceeds of an offering of Membership Interests which recently concluded. The Company made this purchase pursuant to the terms of an Asset Purchase Agreement with Orlando Predators Entertainment, Inc. ("OPE"). The Asset Purchase Agreement was subsequently amended by an Amendment to Asset Purchase Agreement dated February 6, 2003 and by an additional Amendment dated on or about April 30, 2003 (the "Amendments"). Copies of the Asset Purchase Agreement and the Amendments are available for review by the investors. If the investors have not previously received and reviewed the Asset Purchase Agreement or the Amendments, the Company encourages them to do so.

**Since the beginning of 2003, the Company has made separate offerings of Membership Interests and promissory notes and may make additional offerings in the future.**

In early 2003, the Company concluded an offering of Membership Interests (the "Early 2003 Membership Interest Offering") which was offered in two parts: (i) $1,200,000 of Membership Interests for which subscribers made payment in the form of promissory notes previously issued by OPE; and (ii) $1,530,000 of Membership Interests for which subscribers made payment in cash. The proceeds of this offering were used, in principal part, to purchase the Orlando Predators Football Team. Subsequent to the Early 2003 Membership Interest Offering, the Company initiated an offering of $1,000,000 in principal amount of Series A Secured Promissory Notes (the "Notes Offering") to existing Members. The proceeds of the Notes Offering will be used for general working capital purposes. The Notes Offering is currently in progress. The Notes included in the Notes Offering provide for the issuance of Membership Interests in an amount equal to 10% of the then outstanding Membership Interests, not including the Membership Interests which are being sold in the Membership Interest Offering. As a result, the percentage ownership interest in the Company of all investors in the Membership Interest Offering will be reduced. Assuming full subscription of the Notes Offering and the Membership Interest Offering, the total Membership Interests to be issued as part of the Membership Interest Offering will, upon completion of the Membership Interest Offering, constitute 25.2% of the issued and outstanding Membership Interests in the Company.

The Company cannot provide any assurances that it will not need to obtain additional capital in the future, which capital may be obtained by issuing additional Membership Interests. Any additional issuances of Membership Interests by the Company in the future would result in dilution of the undersigned's ownership interest in the Company.

**The Company competes for sports entertainment dollars with other sports and entertainment venues.**

The Orlando Predators compete for sports entertainment dollars with other professional sports teams and with college teams and with other sports-related entertainment. During portions of the arena football season, the Predators compete for attendance and fan support with a professional basketball team in the Orlando area and with professional hockey and baseball teams in other parts of Florida. In addition, the colleges and universities in central Florida, as well as public and private secondary schools, offer a full schedule of athletic events throughout the year. The Orlando Predators also compete for attendance and advertising revenue with a wide range of other entertainment and recreational activities available in central Florida, such as Walt Disney World and Universal Studios. On a broader scale, Arena Football League ("AFL") teams compete with football teams fielded by high schools and colleges, the National Indoor Football League, the National Football League, the Canadian Football League and the National Football League Europe.

**The Company is subject to League obligations.**

The membership agreements with the AFL generally make the Company and other teams of the AFL liable on a pro rata basis for the debts and obligations of the AFL. Any failure of other members of the AFL to pay their pro rata share of any such debts or obligations could adversely affect the Company by requiring the Company to make additional payments on behalf of failing or defaulting teams. During the time that OPE owned the Predators, it was not required to pay any material debts or obligations of the AFL. The success of the AFL and its members depends, in part, on the competitiveness of the teams in the AFL and their ability to maintain fiscally sound operations. Certain AFL teams have encountered financial difficulties in the past, and there can be no assurance that the AFL and its teams will continue to operate. If the AFL is unable to continue operations, the Predators and the other teams forming the AFL would be unable to continue their own operations. In addition, the Predators and their personnel are bound by a number of rules, regulations and agreements imposed upon them by the AFL as well as by national television contracts. Any change in these rules, regulations and agreements will be binding upon the team and its personnel, regardless of whether it agrees with such changes, and it is possible that any such change could adversely affect the team.

**The Company depends upon the competitive success of the team for ticket and merchandise sales.**

The Company's financial results depend, in part, upon the team achieving game winning success. By achieving and maintaining such success, the Company expects to (i) generate greater fan enthusiasm, resulting in higher ticket and merchandise sales throughout the regular season and (ii) capture a greater share of local television and radio audiences. Failure to participate in the AFL playoffs would deprive the team of additional revenue that may result from sales of tickets for home playoff games and from media contracts. Revenue is, therefore, significantly adversely affected by a poor game winning performance, especially involving losses of home games.

**Player's salaries may increase in the future, thereby increasing our operating expenses.**

Although the Company's player salaries are low compared to salaries currently paid by other professional sports teams, there can be no assurance that such salaries will not increase significantly in the future, thereby increasing the Company's operating expenses and adversely affecting the Company's financial condition and results of operations.

**There are League restrictions on the purchase of the Company's securities.**

The AFL Charter and Bylaws contain provisions that may restrict a person from acquiring the Company's Membership Interests and affect the value of the Membership Interests or the value of any team, including the Predators. In general, any acquisition of Membership Interests that will result in a person or group of persons holding 5% or more of the Company's outstanding Membership Interests requires the prior approval of the AFL, which may be granted or withheld in the sole discretion of the AFL. Failure by a holder of a 5% or more interest to comply with these restrictions may result in a forced sale of such holder's interest in the Company or the repurchase of such interests by the Company.

**A failure by the AFL to renew broadcast contracts would significantly reduce the Company's revenue.**

The AFL has entered into a two year contract with the National Broadcasting Company ("NBC") to televise certain AFL games. A percentage of the revenue generated from this contract and any other future national or network media contracts after payment of AFL expenses is divided equally among the members of the AFL. There can be no assurance that NBC or any other national broadcaster will enter into broadcast contracts with the AFL upon the expiration of the current contract. The Company's radio contracts for the local broadcast of the Predators' pre-season, regular season and certain post-season games are also subject to periodic renewal. The failure to renew television or radio contracts would significantly reduce the Company's revenue.

**The Company's cash flow is seasonal, limiting our cash resources.**

The arena football season begins in February and ends in May. As a result, the Company realizes a significant portion of its revenue and incurs a significant portion of its expenses during that period. This seasonality can create cash flow difficulties for the Company outside of the arena football season.

**The Company can give no assurance as to its future results.**

Prospective purchasers of the Membership Interests should carefully consider the information contained in the Offering Materials before purchasing Membership Interests. Information contained in the Offering Materials may be considered "forward-looking statements," which can be identified by the use of forward-looking terminology such as "believes," "expects," "may," "should" or "anticipates" or the negative thereof or other variations thereon or comparable terminology, or by discussions of strategy. As a result of many factors, including those discussed herein under "Information Regarding Investment Considerations; Risk Factors," no assurance can be given that the future results discussed by the forward-looking statements will be achieved.

9

**One of the Company's Managers has been sanctioned by the SEC, the National Association of Securities Dealers and the State of Arizona for violations of the federal securities laws, NASD rules and the Arizona securities laws.**

In December 1996, the Commission filed a complaint in the United States District Court in Arizona wherein it requested a permanent injunction and other relief against Brett Bouchy, one of the Company's managers. The Commission alleged that Mr. Bouchy violated the anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 in connection with transactions involving the offer and sale of securities. After a bench trial, on April 2001 the Court permanently enjoined Mr. Bouchy from any future violations of the federal securities laws and ordered Mr. Bouchy to pay a $50,000 fine.

After this decision, the Commission instituted an administrative proceeding against Mr. Bouchy requesting that Mr. Bouchy be permanently barred from registration and association with a securities broker or dealer on the basis of the permanent injunction issued against him by the Arizona court. After a hearing on the matter, in July 2002 an administrative law judge ordered that Mr. Bouchy be banned from association with any broker or dealer.

In 1995, the National Association of Securities Dealers ("NASD") instituted a disciplinary proceeding against Mr. Bouchy as a result of which Mr. Bouchy was fined, censured and suspended for five days. In January 1996, Mr. Bouchy's registration with the NASD was revoked for failure to pay the NASD fine. Mr. Bouchy did not pay the fine because he had no intention to retain his registration with the NASD.

In 1995, the Arizona Corporations Commission instituted an administrative proceeding against Mr. Bouchy, alleging that he manipulated stock prices for two companies and filed misleading information with the Arizona Corporation Commission. After a hearing on this matter, Mr. Bouchy was fined $10,000 and his securities license in the state of Arizona was revoked permanently.

The proceedings described in this section were all parallel proceedings arising out of the same violations. These violations arose in the early 1990's and no violations have been alleged since.

**One of the Company's Managers is affiliated with OPE.**

Brett Bouchy, one of the Company's Managers, is the beneficial owner of approximately 1,061,070 shares of the outstanding common stock of OPE, which includes an option to purchase 787,080 shares of OPE common stock at $2.50 per share. Until January 2000, Mr. Bouchy was Chief Executive Officer of OPE.

**Limited operating history.**

The Company began operations in 2003; however, the Orlando Predators Football Team began its thirteenth season in Spring 2003. The Company is still in the early stages of implementing its business plan. The revenue and income potential of the Company's business and market is unproven. The Company's limited operating history makes an evaluation of the Company and its prospects difficult and highly speculative.

10

**Failure to raise sufficient capital.**

The Company may not be able to succeed unless it is able to raise amounts of capital to meet its business needs. Ongoing operations of the Company prior to achievement of break-even must be funded either by additional contributions to the capital of the Company or extensions of additional credit. There can be no assurances that the Company will be able to raise sufficient funds from current or new sources, as necessary, to enable the Company to achieve break-even operations. A portion of the proceeds of the Offering will be used to fund a return of capital to the original members of the Company. To the extent offering proceeds are used to fund a return of capital, these proceeds will not be available to fund operating expenses and the Company may require additional capital quicker than otherwise.

The Company could suffer significant dilution with the raising of additional capital and/or conversion of existing debt to capital, which may be brought in on terms substantially dilutive to the undersigned. The current state of the equity markets for early stage companies is extremely difficult; institutional investors, if any, could require significant realignment of debt and/or equity as a condition precedent to any future funding. The undersigned acknowledges that an investment in the Company is extremely risky and there is a substantial possibility that the undersigned's entire investment could be lost in the near future. The limited operating history of the Company makes the prediction of future operating results difficult or impossible, and there can be no assurance that the Company's revenues will increase or even continue at their current level, or that the Company will achieve or maintain profitability or generate sufficient cash from operations in future periods. For these and other reasons, there can be no assurance that the Company will ever achieve profitability or, if profitability is achieved, that it can be sustained.

**No public market; the Membership Interests not marketable or transferable.**

There is no public market for any of the Company's securities, and no such market is expected to develop in the near future. The Membership Interests will be subject to restrictions on transfer and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws, pursuant to registration or qualification or exemption therefrom. Consequently, investors' ability to liquidate their investment in the Company on a timely basis is severely limited. Investors should be prepared to hold their Membership Interests indefinitely.

**Determination of offering terms.**

There is no public market for the Membership Interests. The offering price of the Membership Interests were determined by the Company without the benefit of arms length negotiations. The factors considered include the Company's present assets, liabilities, book value, net worth, projected earnings, the present state of the Company's development, the history and prospects for the industry in which the Company competes and proposes to compete, the quality of the Company's management, the market for private securities of companies at similar states of development and certain other information generally described in the Offering Materials. No assurance is, or can be, given that the Membership Interests, if transferable, could be sold for the amount of the subscription price, or for any amount at all. Investment in the Membership Interests is speculative and involves a high degree of risk.

**Indemnification of officers and Managers.**

11

The Company intends to indemnify its Managers and its officers to the fullest extent permissible under the law. Under most circumstances, the Company's Managers and officers may not be held liable to the Company or its equity owners for errors in judgment or other acts or omissions in the conduct of the Company's business unless such errors in judgment, acts or omissions constitute fraud, gross negligence or malfeasance.

## IX. POWER OF ATTORNEY

The undersigned (and each of them, if more than one) hereby gives each of the Company, and each Manager of the Company, and their respective designees (each, an "Attorney") the power of attorney contained in this Article IX and constitutes and appoints each such person or entity with full power of substitution and resubstitution, as his, her or their attorney-in-fact with full power and authority to act in his, her or their name on his, her or their behalf with respect to the completion and/or correction, in a manner consistent with the Subscription Documents executed and delivered by the undersigned and with respect to the execution, acknowledgment, swearing to and filing of the following documents:

(a) The Limited Liability Company Agreement and all amendments thereto; and

(b) Any documents which may be required in connection with any filings with state securities commissions or other state authorities.

**Characteristics of Power of Attorney**

The power of attorney hereby granted by the undersigned to each Attorney:

(a) is a special power of attorney coupled with an interest which is irrevocable and shall survive the death or incapacity of the undersigned;

(b) may be exercised by any of the aforesaid attorneys either by signing separately as attorney in fact for the undersigned, or, after listing all of the Members, executing any instrument, by signature of said attorney acting as attorney-in-fact for all of them; and

(c) shall survive the delivery of an assignment by the undersigned of the whole or any portion of his, her or its Membership Interests.

## X. MISCELLANEOUS

The undersigned hereby intends that the undersigned's signature hereon shall constitute a subscription to the Company for the Membership Interests specified on the signature page of this Subscription Agreement.

This Subscription Agreement, and the representations, warranties and agreements contained herein shall be binding upon the heirs, executors, administrators and other successors of the undersigned. If there is more than one signatory hereto, the representations, warranties and agreements of the undersigned are made jointly and severally. This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

The undersigned understands that this Subscription Agreement is not binding upon the Company until accepted in writing by an authorized representative of the Company. The undersigned also understands that the subscription funds will not otherwise be returned to the undersigned if this subscription is accepted.

The undersigned agrees not to transfer or assign this Agreement, or any of the undersigned's interest herein.

The Subscription Documents constitute the entire agreement among the parties hereto with respect to the subject matter hereof and may be amended only by a written execution of all parties.