Exhibit C

This exhibit has been filed separately under seal as part of the sealed document entitled:

**"Confidential- Sealed Document in Action No. 604122/05 (Fried, J.), Supreme Court of the State of New York, County of New York"**

Exhibit D

## STOCKHOLDERS AGREEMENT

STOCKHOLDERS AGREEMENT (the "Agreement") made as of the _17th_ day of _September_, 1993 among BACKSTREET BOYS, INC. (the "Corporation"), a Delaware corporation having an address at 7380 Sand Lake Road, Suite 200, Orlando, Florida 32819, LOUIS J. PEARLMAN ("Pearlman") with an address at 9235 Ridge Pine Trail, Orlando, Florida 32819, Nickolas ("Nick") Carter having an address at _216 W. 131 AVE TAMPA FL 33612_ Alexander _J_ ("A.J.") Mc Lean having an address at _2205 Peachtree De #103, Orlando J._, Howard ("Howie D") Dorough having an address at _121 W. Eola Dr. Orlando FL_ Kevin Richardson having an address at _4733 Walden Cir #1213_ and Brian Thomas Littrell having an address at _4733 Walden Cir. #1213 Orlando FL_ Pearlman, Carter, Mc Lean, Dorough, Richardson and Littrell each being hereinafter referred to as a "Stockholder" and collectively, as the "Stockholders").

## W I T N E S S E T H :

WHEREAS, the Corporation has authorized one thousand (1,000) shares of common stock, par value $.01 per share, ("Common Stock") of which six hundred (600) have been issued are outstanding;

WHEREAS, as of the date hereof, each Stockholder owns 100 shares of Common Stock (the shares of Common Stock owned by each Stockholder respectively are referred as such Stockholder's "Shares"); and

WHEREAS, the Stockholders desire to regulate the transfer of their Shares and to define certain of their rights and obligations with respect to the operation of the Corporation;

NOW THEREFORE, in consideration of the premises hereof and the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **DIRECTORS AND OFFICERS**

(a) The Corporation's Board of Directors shall consist of six (6) individuals. Each Stockholder, for so long as he shall own at least 5% of the outstanding Common Stock, shall have the right to nominate himself to be a director. Each Stockholder, for so long as he remains a stockholder of the Corporation, agrees to vote the shares of Common Stock owned by such Stockholder to elect the nominees of the other Stockholders.

(b) The directors of the Corporation shall use their best efforts to elect and re-elect the following individuals as officers of the Corporation, for so long as said individuals are stockholders of the Corporation:

Pearlman                    -    Chairman,    President    and



EXHIBIT
D

Treasurer                    Robert Fischetti  - Secretary

      (c)  Notwithstanding anything herein to the contrary, if, at any time, any Stockholder shall cease to own any Shares, such Stockholder shall be deemed to have resigned as an officer and director of the Corporation.

      (d)  Each Stockholder hereby grants an irrevocable proxy, coupled with an interest, to Pearlman to vote the Shares of such Stockholder on all matters on which holders of Common Stock are entitled to vote.

2.   **PROFITS OF CORPORATION**

      (a)  If the Corporation's status as an "S" corporation is in effect for a taxable year, the Stockholders and the directors agree that they shall authorize and direct the Corporation to make pro rata distributions of an amount equal to the state and federal tax liability of each Stockholder as a result of being a Stockholder of the Corporation of operating profits for such taxable year, as determined by the Corporation's regular certified public accountants.  Such share of the operating profits shall be distributed to the Stockholders, at least annually and not later than ninety (90) days after the end of each taxable year in accordance with the proportionate ownership of Shares of each Stockholder.

      (b)  If there is an addition, reduction or any other change (other than a complete termination of interest in the Corporation) in the number of Shares of any Stockholder during a taxable year, any allocation and distribution of profits for such taxable year shall be prorated among the Stockholders and any other stockholders of the Corporation based on the number of days in the period their ownership of Shares was outstanding.

      (c)  In the event that any Stockholder shall transfer all of his Shares in accordance with the provisions of this Agreement prior to the end of any taxable year, the Corporation shall make a distribution to the transferor Stockholder equal to the portion of the Corporation's operating profits for the taxable year (and any distributions owing from to the Stockholder for any previous taxable year) that will be (or should have been) allocated to such Stockholder, but only to the extent such profits have not been previously distributed.

3.   **RESTRICTION ON TRANSFER OF SHARES**

      (a)  Each of the Stockholders undertakes with each other during the continuance of this Agreement that he shall not pledge or otherwise encumber all or any portion of his Shares, nor shall

he dispose of all or any portion of his Shares by gift, sale, inheritance or otherwise, except with the prior written unanimous consent of both the Corporation's Board of Directors and all the Stockholders or as otherwise specifically permitted by this Agreement. Any purported pledge, encumbrance or disposition in violation of the terms of this Agreement shall be void ab initio. Upon issuance, the certificates representing the Shares shall have inscribed thereon the following endorsement:

> "THE PLEDGE, TRANSFER, SALE OR ENCUMBRANCE OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS OF A STOCKHOLDERS AGREEMENT DATED AS OF _____, 1993, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION."

(b)  Notwithstanding the foregoing, a Stockholder shall be permitted to transfer any or all of his Shares pursuant to his will or by the laws of intestacy, provided that any Shares so transferred shall remain subject to the rights of the Corporation and the other Stockholders to acquire the same as provided herein, and, provided further, that the transferee executes and delivers an agreement to be bound by the terms and conditions of this agreement.

4.    RIGHT OF FIRST REFUSAL

(a)  In the event a Stockholder (herein, the "Selling Stockholder") desires, at any time, to transfer all (but not less than all) of his Shares or to otherwise withdraw as a Stockholder of the Corporation, and/or if a Stockholder during his lifetime obtains a bona fide written offer (an "Offer") from a third party (the "Offeror") to acquire all but not less than all of Shares which Offer he desires to accept, the Selling Stockholder shall give written notice to the Corporation ("Notice of Intention") and such Notice of Intention shall disclose the identity of the Offeror and the terms of the Offer. If the Corporation shall not have responded to the Notice of Intention within twenty (20) days after receipt that the Corporation desires to purchase the Shares of the Selling Stockholder on the same terms as the Offer ("Notice of Acceptance") or if the Corporation does not actually purchase such Shares within the time period set forth below, then the Selling Stockholder may accept the Offer. In no event shall any Stockholder offer or agree to sell all, but not less than all, of the Shares to anyone at a price less than the Book Value (as defined in Paragraph 7 below) thereof as of the last day of the month immediately preceding the month during which such Offer occurs (the "Purchase Price").

(b)  If the Corporation shall accept the offer to purchase all of the Shares provided for in this paragraph, a Closing shall take place as provided in Paragraph 8 hereof.

(c)  If the Corporation fails to exercise its right to

purchase the shares of the Selling Stockholder pursuant to subparagraph (a) of this Paragraph, the Selling Stockholder shall be free for a period not exceeding two (2) months to sell the Shares to the Offeror upon the terms and conditions contained in the Offer, provided that there shall be delivered to the Corporation an agreement executed by the Offeror acknowledging that the Shares are and remain subject to the terms and provisions of this Agreement and agreeing to be bound hereby.

(d)   All exercises of options hereunder are binding upon all parties with any direct or indirect interest in any Shares unless options are not exercised with respect to all of the Shares held by the Selling Stockholder within the time limits provided. If options are not exercised with respect to all of said Shares, all exercises of options shall be null and void.

5.   EVENTS OF SEPARATION

(a)   Event of Separation-Defined.   In the event that:  (i) any Stockholder dies, (ii) any Stockholder is deemed to have a permanent disability (which "permanent disability" shall be deemed to exist when, by reason of a physical or mental condition or both, person is incapable of properly performing his or her usual and customary duties and responsibilities for the Corporation or otherwise for a consecutive six (6) month period, or for any nine (9) months out of a twelve (12) month period, and if requested by another Stockholder, such person or his legal representative has provided the Corporation with a written opinion from a qualified physician that such permanent disability exists), or (iii) any Stockholder shall be adjudicated a bankrupt, file a voluntary bankruptcy petition or a petition for an arrangement with creditors, make an assignment for the benefit of creditors, or seek to avail himself of any provision of law for the relief of debtors; or a receiver or trustee is appointed for his property and such appointment is not vacated or withdrawn prior to the sale of his property thereunder; or any of his Shares shall pass or devolve upon any other person in any involuntary manner, including, but not limited to, judicial order, legal process, execution or attachment (the events set forth in this subparagraph (iii) are hereinafter collectively referred to as "Bankruptcy") then, in each of those cases, an "Event of Separation" shall be deemed to have occurred with respect to such person.  The Stockholder with respect to whom an Event of Separation shall occur (or the legal representative of his estate) or any transferee from the Stockholder and persons to whom Shares of such Stockholder may pass or upon whom they may devolve, hereinafter shall be referred to as a "Selling Stockholder."

(b)   Death or Permanent Disability.  In the event of a Stockholder's death or permanent disability, the Selling Stockholder shall be required to sell all of the Stockholder's Shares to the Corporation and the Corporation shall be required to purchase said Shares from the Selling Stockholder.   The purchase

price for the Shares (the "Purchase Price"), payable at the Closing shall be equal to the Book Value (as defined in Paragraph 7 below) of the Shares plus any accumulated operating profits owing to such Selling Stockholder pursuant to Paragraph 2(c) hereof.

(c) Other Events of Separation. In the event that a Stockholder desires to voluntarily terminate his relationship with the Corporation or is the subject of a Bankruptcy, then the Corporation shall have option to buy all of such Shares from the Selling Stockholder and said event shall be treated as if the Selling Stockholder had tendered a Notice of Intention pursuant to Paragraph 4 of this Agreement for the purpose of determining the Purchase Price and how the option to purchase shall devolve upon and shall be exercisable by the Corporation.

6.    Take-Along Right.

(a) Take-Along. If a Selling Stockholder proposes to sell Shares to a third party, each of the other Stockholders (each, a "Potential Take-Along Participant") shall have the right to require the third party purchase from him the number of Shares derived by multiplying the total number of Shares to be purchased by the third party by a fraction, the numerator of which is the number of Shares owned by such Potential Take-Along Participant and the denominator of which is the total number of Shares owned by all Potential Take-Along Participants electing to participate and the Selling Stockholder. The number of Shares to be sold to a third party by the Selling Stockholder shall be reduced by the number of Shares subject to the Take-Along Right and included in such sale by the Potential Take-Along Participants; unless the third party agrees to purchase all the Shares offered by the Selling Stockholder and the Potential Take-Along Participants.

(b) Take-Along Notice. The Take-Along Right may be exercised by a Potential Take-Along Participant by delivery of a notice (a "Take-Along Notice") to the Selling Stockholder and the Corporation (which in turn will promptly notify the Potential Take-Along Participants) within ten days following receipt by the Corporation of a Notice of Intention. The Take-Along Notice shall state the maximum number of Shares that such Potential Take-Along Participant wishes to include in such sale to the third party purchaser. Any Shares purchased from a Potential Take-Along Participant pursuant to this Paragraph 6 shall be at a price and upon terms no less favorable to such Potential Take-Along Participant than that contained in the Notice of Intention, and shall be purchased only by the third party specified in such Notice of Intention. After expiration of the applicable periods referred to in Paragraph 4, the Selling Stockholder, together with any electing Potential Take-Along Participant, shall have the right for thirty days to transfer the Shares upon the terms and conditions contained in the Notice of Intention, provided that, in each case, that such transfer shall be made to the third party specified in the Notice of Intention on the terms set forth therein.

(c) <u>Notification of Take-Along Rights</u>.    The Corporation hereby acknowledges its obligation to deliver a copy of the Notice of Intention and the Take-Along Notice to each of the Potential Take-Along Participants promptly upon its receipt thereof, unless such Notice of Intention or Take-Along Notice, as the case may be, appears on its face to have been delivered directly to such Potential Take-Along Participants.

7.    DEFINITION OF BOOK VALUE.

(a)    The "Book Value" of the shares shall be equal to the product of the net worth per share of the Corporation as computed by the Corporation's certified public accountant's in accordance with generally accepted accounting principles, applied consistently with past practice, times the number of shares to be purchased, subject to the following:

(i)    Adjustments shall be made for mathematical errors, omissions and for any other allowances necessary to correctly reflect assets and liabilities in accordance with generally accepted principles of accounting.

(ii)    Trade fixtures, equipment, furniture and furnishings shall be valued at cost less straight-line depreciation.

(iii)    All merchandise, inventory, works in process and raw materials shall be valued at cost or fair market value, whichever is lower.

(iv)    Accounts receivable shall be valued at the face amount thereof, less customary trade discounts, and less a reserve of bad debts, determined in accordance with the Corporation's customary practice.

(v)    Life insurance policies owned by the Corporation shall be valued at the cash surrender value thereof, and in the event that the valuation relates to the shares of any Stockholder upon his death, then only the cash surrender value of such life insurance policy on the day immediately preceding the date of death shall be included in the valuation of Book Value and not the proceeds thereof.

(vi)    Corporate income taxes and other taxes allocable to the period up to the date for which Book Value is to be determined, if any, shall, if not otherwise provided for on the books of the Corporation, be estimated in accordance with generally accepted accounting principles consistently applied.

(vii)    No consideration shall be given to any tax carry-forward which may result in a refund for any period after the date for which Net Book Value is to be determined.

(viii) All assets and liabilities of the Corporation shall be valued according to their current fair market value.

The aforesaid determination of Book Value shall be binding upon and conclusive against all persons, firms and corporations (including the Stockholders, the Selling Stockholder, the Corporation and their representatives) subject to this Agreement, unless written notice of any objection is delivered to the Corporation within ten (10) days after receipt by such persons of the accountants' written determination in which event such determination shall be subject to arbitration pursuant to this Agreement.

(b) Promptly after the occurrence of an Event of Separation or the acceptance by the Corporation or the other Stockholders of an offer to purchase the Shares pursuant to Paragraph 4, the Corporation shall cause the Corporation's accountants to compute the Book Value of the Selling Stockholder's Shares in accordance herewith and to deliver written copies of such computation to the Corporation, the remaining Stockholder and the Selling Stockholder as promptly as possible.

8.    PAYMENT AND CLOSING. With respect to the sale and purchase of Shares hereunder pursuant to Paragraph 4, 5 or 6 hereof, a closing (the "Closing") will take place at the principal office of the Corporation, its attorneys or a lending institution, on the business day and at the time set forth by the purchaser in a notice delivered at least ten (10) days prior to the Closing. In no event shall the Closing occur more than thirty (30) days after the receipt of the accountant's report provided for in paragraph 7(b), except that if the Event of Separation is the death of a Stockholder, the Closing may occur up to the later of ninety (90) days after the receipt of the accountant's report or fifteen (15) days after a personal representative has been appointed and qualified. If the Corporation is not permitted to purchase or redeem any Shares that it is entitled to purchase or redeem pursuant to this Agreement, by either state corporation law or any debt instrument, Pearlman shall have the personal right to purchase such Shares on the same terms and conditions as the Corporation.

(viii) All assets and liabilities of the Corporation shall be valued according to their current fair market value.

The aforesaid determination of Book Value shall be binding upon and conclusive against all persons, firms and corporations (including the Stockholders, the Selling Stockholder, the Corporation and their representatives) subject to this Agreement, unless written notice of any objection is delivered to the Corporation within ten (10) days after receipt by such persons of the accountants' written determination in which event such determination shall be subject to arbitration pursuant to this Agreement.

(b) Promptly after the occurrence of an Event of Separation or the acceptance by the Corporation or the other Stockholders of an offer to purchase the Shares pursuant to Paragraph 4, the Corporation shall cause the Corporation's accountants to compute the Book Value of the Selling Stockholder's Shares in accordance herewith and to deliver written copies of such computation to the Corporation, the remaining Stockholder and the Selling Stockholder as promptly as possible.

8.    PAYMENT AND CLOSING.  With respect to the sale and purchase of Shares hereunder pursuant to Paragraph 4, 5 or 6 hereof, a closing (the "Closing") will take place at the principal office of the Corporation, its attorneys or a lending institution, on the business day and at the time set forth by the purchaser in a notice delivered at least ten (10) days prior to the Closing.  In no event shall the Closing occur more than thirty (30) days after the receipt of the accountant's report provided for in paragraph 7(b), except that if the Event of Separation is the death of a Stockholder, the Closing may occur up to the later of ninety (90) days after the receipt of the accountant's report or fifteen (15) days after a personal representative has been appointed and qualified.  If the Corporation is not permitted to purchase or redeem any Shares that it is entitled to purchase or redeem pursuant to this Agreement, by either state corporation law or any debt instrument, Pearlman shall have the personal right to purchase such Shares on the same terms and conditions as the Corporation.

9.   LIFE INSURANCE

(a)   During the term of this Agreement, the Corporation shall have the right to maintain life insurance on the life of each Stockholder with a death benefit payable to the Corporation in such amount as the Corporation shall determine.

(b)   If any Stockholder shall cease to be a Stockholder for any reason other than his death, the Corporation shall, upon receipt from such Stockholder of an amount equal to the cash value of the life insurance maintained on his life, less any loan balance plus an adjustment to reflect any pre-paid premiums, transfer all of its right, title and interest in such policy to such Stockholder.

10.   RESTRICTIVE COVENANTS

(a)   Upon the occurrence of an Event of Separation or upon a sale of Shares subsequent to delivery of a Notice of Intention pursuant to Paragraph 4 above, each of the Stockholders hereby agrees that he will not, without the written consent of the Corporation, directly or indirectly, solicit or accept, on behalf of another record label or distributor, the services of any recording artist, composer or other artist under contract with the Corporation at the time of the Event of Separation (including any services that may be provided by the Stockholder), and will not, directly or indirectly, assist or be employed by any other party in soliciting or accepting the services of any recording artist, composer or other artist under contract with the Corporation at the time of the Event of Separation.

(b)   Each Stockholder hereby acknowledges that should he breach the restrictive covenant contained herein, the Corporation's remedy at law will be inadequate. Therefore, in addition to any remedy otherwise available to the Corporation, and notwithstanding the provisions herein for arbitration, each Stockholder agrees that the Corporation shall be entitled to an injunction restraining it from any such violation. Moreover, if it shall be determined by any arbitration panel or court, that any covenant herein is not enforceable due to its geographic area or duration, then it is the intention of the parties that such covenant shall be enforceable to the greatest extent possible, and will be deemed amended so as to reduce the geographic area or duration, as the case may be, to the extent necessary to secure enforceability.

11.   INJUNCTIVE RELIEF.

Due to the fact that the Shares cannot be readily purchased or sold in the open market, and for other reasons, the parties hereto recognize and acknowledge that irreparable damage

will result in the event this Agreement shall not be specifically enforced. If any dispute arises concerning disposition of any Shares hereunder, the parties hereto agree that the other parties hereto shall be entitled, without showing any actual damage, to a temporary or permanent injunction restraining such disposition pending determination of such controversy, and that no bond or other security may be required in connection therewith. If any dispute arises concerning the rights or obligations of any party hereto to purchase or sell any of the Shares, such right or obligation shall be enforceable by a decree of specific performance. Such remedies shall, however, not be exclusive and shall be in addition to any other remedies which the parties may have.

12. DURATION.

This Agreement shall continue in full force and effect until terminated by the occurrence of any of the following events:

(i)    Discontinuance of the Corporation's business or its liquidation;

(ii)    A petition in bankruptcy is filed by the Corporation or an adjudication of bankruptcy is made against the Corporation;

(iii)    A receiver is appointed for the Corporation and such appointment is not vacated within sixty (60) days;

(iv)    An unconditional assignment is made for the benefit of creditors by the Corporation;

(v)    There is only one stockholder of the Corporation except that any payout provisions, if any, would survive; or

(vi)    The expiration of a ten-year period commencing of the date hereof except that this Agreement shall be automatically renewed for successive ten-year periods unless the parties hereto agree otherwise in writing.

13. ARBITRATION.

All questions concerning this Agreement, including but not limited to, its execution, interpretation and performance shall be governed by the laws of the State of Delaware without regard to any law which would result in the selection or application of the law of any other jurisdiction. Any dispute or controversy arising out of or in connection with this Agreement shall be submitted to arbitration before a panel of three arbitrators in Orlando, Florida in accordance with the Commercial Arbitration Rules then obtaining of the American Arbitration Association provided, however, that at least one of such arbitrators shall be a practicing attorney licensed in the State of Florida and at least one of such arbitrators shall be a certified public accountant

licensed in the State of Florida. The arbitrators' powers shall
include the power to award specific performance, injunctive relief
and reasonable attorneys' fees and expenses to any party in any
such arbitration. The arbitrators shall not, however, have the
power to change, modify, alter, set aside or ignore any express
condition, item or provision hereof, and to that extent the scope
of their authority is limited. The arbitration award shall be
final and binding upon the parties and judgment may be entered
thereon in the Supreme Court of the State of Florida or in any
other court of competent jurisdiction. This agreement to arbitrate
all disputes and controversies shall not prevent either party from
seeking judicial injunctive relief in aid of any such arbitration.
The service of any notice, process, motion or other document in
connection with any dispute may be effected in the manner in which
notices are to be given to a party pursuant to Paragraph 14 below.

        14.    COMPLETE AGREEMENT; GOVERNING LAW;
             ORAL MODIFICATION.

      This Agreement contains the full and complete
understanding and agreement of the parties with respect to the
subject matter hereof and supersedes all prior agreements, either
oral or written, between the parties with respect to the subject
matter hereof.

        15.    NOTICES.

      All notices, requests, demands or other communica-
tion required or permitted to be given hereunder shall be in
writing, and shall be deemed duly given, upon receipt, if personal-
ly delivered or, three days after deposit in a facility of the
United States mails, if mailed by registered or certified mail,
return receipt requested, to the address of the intended recipient
set forth above, or to such other addresses as may be designated by
notice given to the other Stockholder in accordance with this
Paragraph, with, in the case of the Corporation, a copy to:

                Phillips, Nizer, Benjamin,
                  Krim & Ballon
                31 West 52nd Street
                New York, New York  10019
                Attn:  Kendall A. Minter, Esq.

        16.    SEVERABILITY.

      If any provision of this Agreement is determined to
be legally invalid, inoperative or unenforceable, only that
particular provision shall be affected, and the determination shall
have no effect whatsoever on any other provision of this Agreement,
and all other provisions shall remain in full force and effect and
fully enforceable.

17.  NON WAIVER.

No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right or acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature. All rights and remedies herein conferred shall be in addition to and not exclusive of any and all other rights or remedies now or hereafter existing at law or in equity.

18.  SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.  If ownership of the shares of any of the Stockholders shall be transferred to a third party in accordance with the terms hereof, the Corporation shall not be obligated to recognize such individual as a stockholder unless and until such individual shall have executed and delivered an agreement wherein such individual agrees to be bound by the terms hereof.  Further, upon delivery of such an instrument of assumption, such individual shall be entitled to all of the benefits hereof.

19.  HEADINGS.

The heading and captions contained in this Agreement are for the convenience of reference only and shall have no bearing on the interpretation or enforcement of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

BACKSTREET BOYS, INC.

By: Louis J. Pearlman
     President

Louis J. Pearlman

Nickolas ("Nick") Carter

Alexander J. ("A.J.") Mc Lean

Howard ("Howie D") Dorough

Kevin Richardson

Brian Thomas Littrell

Doc # 113147.1

12

## PARENTAL/GUARDIAN CONSENT

I, *Jane E. Carter*, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor *Nickolas G. Carter* and that I have read and am familiar with the Shareholder's Agreement attached hereto.

I hereby guarantee my son's performance of his obligations under said Shareholder's Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

*Jane E. Carter*

Dated: *9/24/93*, 1993

## PARENTAL/GUARDIAN CONSENT

I, _Denise I. McLean_, hereby
represent and acknowledge that I am the natural parent and/or
legal guardian of the minor _Alexander James McLean_
and that I have read and am familiar with the Share-
holder's Agreement attached hereto.

I hereby guarantee my son's performance of his
obligations under said Shareholder's Agreement and agree to be
secondarily liable in the event he should breach or improperly
terminate same.

_Denise I. McLean_

Dated: _September 17_, 1993

Exhibit E

## STOCKHOLDERS AGREEMENT

STOCKHOLDERS AGREEMENT (the "Agreement") made as of the 9th day of November, 1993 among BACKSTREET PRODUCTIONS, INC. (the "Corporation"), a Delaware corporation having an address at 7380 Sand Lake Road, Suite 200, Orlando, Florida 32819, LOUIS J. PEARLMAN ("Pearlman") with an address at 9235 Ridge Pine Trail, Orlando, Florida 32819, Nicholas ("Nick") Carter having an address at 216 West 131 Avenue Tampa Alexander J. ("A.J.") Mc Lean having an address at 2905 Pilot Club Dr. Kee Ft. Howard ("Howie D") Dorough having an address at 821 N Eola Dr. 1 fla Kevin Richardson having an address at 4732 Walden Cir. 91 Fl Brian Thomas Littrell having an address at 4732 Walden Cir. 91 Fl Johnny Wright having an address at 1279 Palm Bluff Dr. Apopka Fl ("J. Wright") and Donna Wright having an address at 1279 Palm Bluff Dr. Apopka Fl ("D. Wright") (Pearlman, Carter, Mc Lean, Dorough, Richardson, Littrell, J. Wright and D. Wright each being hereinafter referred to as a "Stockholder" and collectively, as the "Stockholders").

### W I T N E S S E T H :

WHEREAS, the Corporation has authorized one thousand (1,000) shares of common stock, par value $.01 per share, ("Common Stock") all of which have been issued are outstanding;

WHEREAS, as of the date hereof, Pearlman owns 510 shares of Common Stock, each of Carter, Mc Lean, Dorough, Richardson and Littrell own 80 shares of Common Stock and each of J. Wright and D. Wright own 45 shares of Common Stock (the shares of Common Stock owned by each Stockholder respectively are referred as such Stockholder's "Shares"); and

WHEREAS, the Stockholders desire to regulate the transfer of their Shares and to define certain of their rights and obligations with respect to the operation of the Corporation;

NOW THEREFORE, in consideration of the premises hereof and the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### 1. DIRECTORS AND OFFICERS

(a) The Corporation's Board of Directors shall consist of eight (8) individuals. Each Stockholder, for so long as he shall own at least 5% of the outstanding Common Stock, shall have the right to nominate himself to be a director. Each Stockholder, for so long as he remains a stockholder of the Corporation, agrees to vote the shares of Common stock owned by such Stockholder to elect the nominees of the other stockholders.



(b)  The directors of the Corporation shall use their best efforts to elect and re-elect the following individuals as officers of the Corporation, for so long as said individuals are stockholders of the Corporation:

Pearlman        - Chairman and President
Jo Wright       - Vice President
Robert Fischetti - Secretary

(c)  Notwithstanding anything herein to the contrary, if, at any time, any Stockholder shall cease to own any Shares, such Stockholder shall be deemed to have resigned as an officer and director of the Corporation.

(d)  Each Stockholder hereby grants an irrevocable proxy, coupled with an interest, to Pearlman to vote the Shares of such Stockholder on all matters on which holders of Common Stock are entitled to vote.

2.   PROFITS OF CORPORATION

(a)  If the Corporation's status as an "S" corporation is in effect for a taxable year, the Stockholders and the directors agree that they shall authorize and direct the Corporation to make pro rata distributions of an amount equal to the state and federal tax liability of each Stockholder as a result of being a Stockholder of the Corporation of operating profits for such taxable year, as determined by the Corporation's regular certified public accountants.  Such share of the operating profits shall be distributed to the Stockholders, at least annually and not later than ninety (90) days after the end of each taxable year in accordance with the proportionate ownership of Shares of each Stockholder.

(b)  If there is an addition, reduction or any other change (other than a complete termination of interest in the Corporation) in the number of Shares of any Stockholder during a taxable year, any allocation and distribution of profits for such taxable year shall be prorated among the Stockholders and any other stockholders of the Corporation based on the number of days in the period their ownership of Shares was outstanding.

(c)  In the event that any Stockholder shall transfer all of his Shares in accordance with the provisions of this Agreement prior to the end of any taxable year, the Corporation shall make a distribution to the transferor Stockholder equal to the portion of the Corporation's operating profits for the taxable year (and any distributions owing from to the Stockholder for any previous taxable year) that will be (or should have been) allocated to such Stockholder, but only to the extent such profits have not been previously distributed.

3. <u>RESTRICTION ON TRANSFER OF SHARES</u>

(a) Each of the Stockholders undertakes with each other during the continuance of this Agreement that he shall not pledge or otherwise encumber all or any portion of his Shares, nor shall he dispose of all or any portion of his Shares by gift, sale, inheritance or otherwise, except with the prior written unanimous consent of both the Corporation's Board of Directors and all the Stockholders or as otherwise specifically permitted by this Agreement. Any purported pledge, encumbrance or disposition in violation of the terms of this Agreement shall be void <u>ab initio</u>. Upon issuance, the certificates representing the Shares shall have inscribed thereon the following endorsement:

"THE PLEDGE, TRANSFER, SALE OR ENCUMBRANCE OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS OF A STOCKHOLDERS AGREEMENT DATED AS OF _____, 1993, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION."

(b) Notwithstanding the foregoing, a Stockholder shall be permitted to transfer any or all of his Shares pursuant to his will or by the laws of intestacy, provided that any Shares so transferred shall remain subject to the rights of the Corporation and the other Stockholders to acquire the same as provided herein, and, provided further, that the transferee executes and delivers an agreement to be bound by the terms and conditions of this agreement.

4. <u>RIGHT OF FIRST REFUSAL</u>

(a) In the event a Stockholder (herein, the "Selling Stockholder") desires, at any time, to transfer all (but not less than all) of his Shares or to otherwise withdraw as a Stockholder of the Corporation, and/or if a Stockholder during his lifetime obtains a bona fide written offer (an "Offer") from a third party (the "Offeror") to acquire all but not less than all of Shares which Offer he desires to accept, the Selling Stockholder shall give written notice to the Corporation ("Notice of Intention") and such Notice of Intention shall disclose the identity of the Offeror and the terms of the Offer. If the Corporation shall not have responded to the Notice of Intention within twenty (20) days after receipt that the Corporation desires to purchase the Shares of the Selling Stockholder on the same terms as the Offer ("Notice of Acceptance") or if the Corporation does not actually purchase such Shares within the time period set forth below, then the Selling Stockholder may accept the Offer. In no event shall any Stockholder offer or agree to sell all, but not less than all, of the Shares to anyone at a price less than the Book Value (as defined in Paragraph 7 below) thereof as of the last day of the month immediately preceding the month during which such Offer occurs (the "Purchase Price").

(b)  If the Corporation shall accept the offer to purchase all of the Shares provided for in this paragraph, a Closing shall take place as provided in Paragraph 8 hereof.

(c)  If the Corporation fails to exercise its right to purchase the shares of the Selling Stockholder pursuant to subparagraph (a) of this Paragraph, the Selling Stockholder shall be free for a period not exceeding two (2) months to sell the Shares to the Offeror upon the terms and conditions contained in the Offer, provided that there shall be delivered to the Corporation an agreement executed by the Offeror acknowledging that the Shares are and remain subject to the terms and provisions of this Agreement and agreeing to be bound hereby.

(d)  All exercises of options hereunder are binding upon all parties with any direct or indirect interest in any Shares unless options are not exercised with respect to all of the Shares held by the Selling Stockholder within the time limits provided. If options are not exercised with respect to all of said Shares, all exercises of options shall be null and void.

5.   EVENTS OF SEPARATION

(a)  Event of Separation-Defined.  In the event that:  (i) any Stockholder dies, (ii) any Stockholder is deemed to have a permanent disability (which "permanent disability" shall be deemed to exist when, by reason of a physical or mental condition or both, person is incapable of properly performing his or her usual and customary duties and responsibilities for the Corporation or otherwise for a consecutive six (6) month period, or for any nine (9) months out of a twelve (12) month period, and if requested by another Stockholder, such person or his legal representative has provided the Corporation with a written opinion from a qualified physician that such permanent disability exists), or (iii) any Stockholder shall be adjudicated a bankrupt, file a voluntary bankruptcy petition or a petition for an arrangement with creditors, make an assignment for the benefit of creditors, or seek to avail himself of any provision of law for the relief of debtors, or a receiver or trustee is appointed for his property and such appointment is not vacated or withdrawn prior to the sale of his property thereunder; or any of his Shares shall pass or devolve upon any other person in any involuntary manner, including, but not limited to, judicial order, legal process, execution or attachment (the events set forth in this subparagraph (iii) are hereinafter collectively referred to as "Bankruptcy") then, in each of those cases, an "Event of Separation" shall be deemed to have occurred with respect to such person. The Stockholder with respect to whom an Event of Separation shall occur (or the legal representative of his estate) or any transferee from the Stockholder and persons to whom Shares of such Stockholder may pass or upon whom they may devolve, hereinafter shall be referred to as a "Selling Stockholder."

(b) _Death or Permanent Disability_. In the event of a Stockholder's death or permanent disability, the Selling Stockholder shall be required to sell all of the Stockholder's Shares to the Corporation and the Corporation shall be required to purchase said Shares from the Selling Stockholder. The purchase price for the Shares (the "Purchase Price"), payable at the Closing shall be equal to the Book Value (as defined in Paragraph 7 below) of the Shares plus any accumulated operating profits owing to such Selling Stockholder pursuant to Paragraph 2(c) hereof.

(c) _Other Events of Separation_. In the event that a Stockholder desires to voluntarily terminate his relationship with the Corporation or is the subject of a Bankruptcy, then the Corporation shall have option to buy all of such Shares from the Selling Stockholder and said event shall be treated as if the Selling Stockholder had tendered a Notice of Intention pursuant to Paragraph 4 of this Agreement for the purpose of determining the Purchase Price and how the option to purchase shall devolve upon and shall be exercisable by the Corporation.

6.    _Take-Along Right_:

(a) _Take-Along_. If a Selling Stockholder proposes to sell Shares to a third party, each of the other Stockholders (each, a "Potential Take-Along Participant") shall have the right to require the third party purchase from him the number of Shares derived by multiplying the total number of Shares to be purchased by the third party by a fraction, the numerator of which is the number of Shares owned by such Potential Take-Along Participant and the denominator of which is the total number of Shares owned by all Potential Take-Along Participants electing to participate and the Selling Stockholder. The number of Shares to be sold to a third party by the Selling Stockholder shall be reduced by the number of Shares subject to the Take-Along Right and included in such sale by the Potential Take-Along Participants; unless the third party agrees to purchase all the Shares offered by the Selling Stockholder and the Potential Take-Along Participants.

(b) _Take-Along Notice_. The Take-Along Right may be exercised by a Potential Take-Along Participant by delivery of a notice (a "Take-Along Notice") to the Selling Stockholder and the Corporation (which in turn will promptly notify the Potential Take-Along Participants) within ten days following receipt by the Corporation of a Notice of Intention. The Take-Along Notice shall state the maximum number of Shares that such Potential Take-Along Participant wishes to include in such sale to the third party purchaser. Any Shares purchased from a Potential Take-Along Participant pursuant to this Paragraph 6 shall be at a price and upon terms no less favorable to such Potential Take-Along Participant than that contained in the Notice of Intention, and shall be purchased only by the third party specified in such Notice of Intention. After expiration of the applicable periods referred to in Paragraph 4, the Selling Stockholder, together with any

electing Potential Take-Along Participant, shall have the right for thirty days to transfer the Shares upon the terms and conditions contained in the Notice of Intention, provided that, in each case, that such transfer shall be made to the third party specified in the Notice of Intention on the terms set forth therein.

(c) <u>Notification of Take-Along Rights</u>.    The Corporation hereby acknowledges its obligation to deliver a copy of the Notice of Intention and the Take-Along Notice to each of the Potential Take-Along Participants promptly upon its receipt thereof, unless such Notice of Intention or Take-Along Notice, as the case may be, appears on its face to have been delivered directly to such Potential Take-Along Participants.

7.    DEFINITION OF BOOK VALUE.

(a)    The "Book Value" of the shares shall be equal to the product of the net worth per share of the Corporation as computed by the Corporation's certified public accountant's in accordance with generally accepted accounting principles, applied consistently with past practice, times the number of shares to be purchased, subject to the following:

(i)    Adjustments shall be made for mathematical errors, omissions and for any other allowances necessary to correctly reflect assets and liabilities in accordance with generally accepted principles of accounting.

(ii)    Trade fixtures, equipment, furniture and furnishings shall be valued at cost less straight-line depreciation.

(iii)    All merchandise, inventory, works in process and raw materials shall be valued at cost or fair market value, whichever is lower.

(iv)    Accounts receivable shall be valued at the face amount thereof, less customary trade discounts, and less a reserve of bad debts, determined in accordance with the Corporation's customary practice.

(v)    Life insurance policies owned by the Corporation shall be valued at the cash surrender value thereof, and in the event that the valuation relates to the shares of any Stockholder upon his death, then only the cash surrender value of such life insurance policy on the day immediately preceding the date of death shall be included in the valuation of Book Value and not the proceeds thereof.

(vi)    Corporate income taxes and other taxes allocable to the period up to the date for which Book Value is to be determined, if any, shall, if not otherwise provided for on the books of the Corporation, be estimated in accordance with generally

will result in the event this Agreement shall not be specifically
enforced.  If any dispute arises concerning disposition of any
Shares hereunder, the parties hereto agree that the other parties
hereto shall be entitled, without showing any actual damage, to a
temporary or permanent injunction restraining such disposition
pending determination of such controversy, and that no bond or
other security may be required in connection therewith.  If any
dispute arises concerning the rights or obligations of any party
hereto to purchase or sell any of the Shares, such right or
obligation shall be enforceable by a decree of specific
performance.  Such remedies shall, however, not be exclusive and
shall be in addition to any other remedies which the parties may
have.

12.  DURATION.

        This Agreement shall continue in full force and
effect until terminated by the occurrence of any of the following
events:

        (i)    Discontinuance of the Corporation's business or
its liquidation;

        (ii)   A petition in bankruptcy is filed by the
Corporation or an adjudication of bankruptcy is made against the
Corporation;

        (iii)  A receiver is appointed for the Corporation and
such appointment is not vacated within sixty (60) days;

        (iv)   An unconditional assignment is made for the
benefit of creditors by the Corporation;

        (v)    There is only one stockholder of the Corpora-
tion except that any payout provisions, if any, would survive; or

        (vi)   The expiration of a ten-year period commencing
of the date hereof except that this Agreement shall be
automatically renewed for successive ten-year periods unless the
parties hereto agree otherwise in writing.

13.  ARBITRATION.

        All questions concerning this Agreement, including
but not limited to, its execution, interpretation and performance
shall be governed by the laws of the State of Delaware without
regard to any law which would result in the selection or applica-
tion of the law of any other jurisdiction.  Any dispute or contro-
versy arising out of or in connection with this Agreement shall be
submitted to arbitration before a panel of three arbitrators in
Orlando, Florida in accordance with the Commercial Arbitration
Rules then obtaining of the American Arbitration Association
provided, however, that at least one of such arbitrators shall be
a practicing attorney licensed in the State of Florida and at least
one of such arbitrators shall be a certified public accountant

licensed in the State of Florida.  The arbitrators' powers shall
include the power to award specific performance, injunctive relief
and reasonable attorneys' fees and expenses to any party in any
such arbitration.  The arbitrators shall not, however, have the
power to change, modify, alter, set aside or ignore any express
condition, item or provision hereof, and to that extent the scope
of their authority is limited.  The arbitration award shall be
final and binding upon the parties and judgment may be entered
thereon in the Supreme Court of the State of Florida or in any
other court of competent jurisdiction.  This agreement to arbitrate
all disputes and controversies shall not prevent either party from
seeking judicial injunctive relief in aid of any such arbitration.
The service of any notice, process, motion or other document in
connection with any dispute may be effected in the manner in which
notices are to be given to a party pursuant to Paragraph 14 below.

      14.   COMPLETE AGREEMENT; GOVERNING LAW;
           ORAL MODIFICATION.

         This Agreement contains the full and complete
understanding and agreement of the parties with respect to the
subject matter hereof and supersedes all prior agreements, either
oral or written, between the parties with respect to the subject
matter hereof.

      15.   NOTICES.

         All notices, requests, demands or other communica-
tion required or permitted to be given hereunder shall be in
writing, and shall be deemed duly given, upon receipt, if personal-
ly delivered or, three days after deposit in a facility of the
United States mails, if mailed by registered or certified mail,
return receipt requested, to the address of the intended recipient
set forth above, or to such other addresses as may be designated by
notice given to the other Stockholder in accordance with this
Paragraph, with, in the case of the Corporation, a copy to:

               Phillips, Nizer, Benjamin,
                 Krim & Ballon
               31 West 52nd Street
               New York, New York  10019
               Attn:  Kendall A. Minter, Esq.

      16.   SEVERABILITY.

         If any provision of this Agreement is determined to
be legally invalid, inoperative or unenforceable, only that
particular provision shall be affected, and the determination shall
have no effect whatsoever on any other provision of this Agreement,
and all other provisions shall remain in full force and effect and
fully enforceable.

17.  NON-WAIVER.

No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right or acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature. All rights and remedies herein conferred shall be in addition to and not exclusive of any and all other rights or remedies now or hereafter existing at law or in equity.

18.  SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.  If ownership of the shares of any of the Stockholders shall be transferred to a third party in accordance with the terms hereof, the Corporation shall not be obligated to recognize such individual as a stockholder unless and until such individual shall have executed and delivered an agreement wherein such individual agrees to be bound by the terms hereof.  Further, upon delivery of such an instrument of assumption, such individual shall be entitled to all of the benefits hereof.

19.  HEADINGS.

The heading and captions contained in this Agreement are for the convenience of reference only and shall have no bearing on the interpretation or enforcement of this Agreement.

17.   NON-WAIVER.

       No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right or acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature. All rights and remedies herein conferred shall be in addition to and not exclusive of any and all other rights or remedies now or hereafter existing at law or in equity.

18.   SUCCESSORS AND ASSIGNS

       This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns. If ownership of the shares of any of the Stockholders shall be transferred to a third party in accordance with the terms hereof, the Corporation shall not be obligated to recognize such individual as a stockholder unless and until such individual shall have executed and delivered an agreement wherein such individual agrees to be bound by the terms hereof. Further, upon delivery of such an instrument of assumption, such individual shall be entitled to all of the benefits hereof.

19.   HEADINGS.

       The heading and captions contained in this Agreement are for the convenience of reference only and shall have no bearing on the interpretation or enforcement of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

PRODUCTIONS
BACKSTREET BOYS, INC.


By: _____
    Louis J. Pearlman
    President


_____
Louis J. Pearlman


_____
Nicholas ("Nick") Carter


_____
Alexander J. ("A.J.") Mc Lean


_____
Howard ("Howie D") Dorough


_____
Kevin Richardson


_____
Brian Thomas Littrell


_____
Johnny Wright


_____
Donna Wright

Doc # 1171163.1

12