# EXHIBIT D

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NO.:

AARON CARTER,

     Plaintiff,

vs.

LOUIS J. PEARLMAN and
TRANS CONTINENTAL RECORDS,
INC., and LOUIS J. PEARLMAN
ENTERPRISES, INC.,

     Defendants.

_____/

## COMPLAINT

Plaintiff, AARON CARTER, by and through the undersigned counsel,
hereby files the following complaint against Defendants, LOUIS J. PEARLMAN,
TRANS CONTINENTAL RECORDS, INC., and LOUIS J. PEARLMAN
ENTERPRISES, INC., and alleges:

## SUBJECT MATTER JURISDICTION

1.     The amount in controversy in this action exceeds $15,000, exclusive
of interest, court costs and attorney's fees. The Court also has subject matter
jurisdiction by virtue of the claims asserted and the remedies requested, both at law
and in equity.

## PERSONAL MATTER JURISDICTION

2.     Plaintiff, AARON CARTER (hereinafter "CARTER" or "Plaintiff") is a successful multi-talented pop singer and actor. For the majority of his life, CARTER has dedicated himself to perfecting his craft of singing, dancing, entertaining, and both film and television acting.

3.     Robert Carter was, until CARTER reached the age of majority on December 7, 2005, the parental guardian of CARTER.

4.     Defendant, LOUIS J. PEARLMAN (hereinafter "PEARLMAN") is a resident of Orange County, Florida.

5.     Defendant, TRANS CONTINENTAL RECORDS, INC. (hereinafter referred to as "TRANS CONTINENTAL"), is a Florida corporation having its principal place of business at 127 West Church Street, Suite 350, Orlando, Florida 32801.

6.     Defendant, LOUIS J. PEARLMAN ENTERPRISES, INC., (hereinafter referred to as "LJPE"), is a Florida corporation having its principal place of business at 127 West Church Street, Suite 350, Orlando, Florida 32801.

7.     The parties to this proceeding have submitted themselves to the jurisdiction of the courts of the State of Florida for all claims, disputes or disagreements arising out of the interpretation, performance or breach of the Exclusive Artist Recording Agreement (hereinafter "Recording Agreement")

2

entered into by the parties, at Paragraph 13(a). The Recording Agreement is attached as Exhibit A.

8.    PEARLMAN is, or was, an officer, director, agent and/or controlling shareholder of TRANS CONTINENTAL and LJPE, which PEARLMAN utilized for the purpose of conducting the business of, and contracting for and on behalf of, CARTER.

9.    CARTER is informed and believes, and thereon alleges that Defendants PEARLMAN, TRANS CONTINENTAL, and LJPE (hereinafter collectively referred to as "Defendants") are and, at all times material hereto, were the alter egos of each other and that there now exists and, at all times material hereto, has existed a unity of interest and ownership among such Defendants such that any separateness has ceased to exist in that PEARLMAN, TRANS CONTINENTAL, and LJPE, and each of them, used assets of the other for his, its or their separate and individual purposes, and caused assets to be transferred to each other without adequate consideration.

10.    CARTER is informed and believes, and thereon alleges that PEARLMAN completely owned, controlled, dominated, used, managed, and operated TRANS CONTINENTAL, LJPE, and other companies, and intermingled assets of said alter egos for his convenience. Any obligation, duty and liability of TRANS CONTINENTAL and/or LJPE as alleged herein shall be deemed to

3

similarly be an obligation, duty and liability of the alter-ego PEARLMAN, and vice versa.

11.    CARTER is informed and believes, and thereon alleges that adherence to the fiction of the separate existence of PEARLMAN, TRANS CONTINENTAL, and LJPE, and each of them, as parties distinct from each other would permit abuse of the corporate privilege and would sanction fraud and promote injustice.

12.    From practically his first meeting with CARTER, PEARLMAN ingratiated himself with him and his parents and earned their trust by repeatedly stating, among other things, that they were "family" and that he was an experienced, educated businessman who would protect them and look after CARTER'S best interests.

13.    The core of PEARLMAN'S design was a web of interrelated companies and contracts by which PEARLMAN siphoned off the vast majority of CARTER'S earnings.

14.    By 2004, PEARLMAN simultaneously owned and controlled CARTER'S management, record label, merchandising, and touring, and also exercised dominion over CARTER'S personal life. Consequently, PEARLMAN'S duties to CARTER were both contractual and fiduciary in nature.

15.    In or about 2004 PEARLMAN induced CARTER to enter into an Exclusive Management Agreement (hereinafter "Exclusive Management

4

Agreement") pursuant to which PEARLMAN would, as CARTER'S agent, co-manage all the affairs of CARTER with CARTER'S father, Robert Carter.

16. Various disputes arose between PEARLMAN, CARTER and CARTER'S parents, which resulted in CARTER initiating litigation against PEARLMAN and TRANS CONTINENTAL.

17. The litigation was settled by the execution of a settlement agreement. Prior to and at the time of the settlement, PEARLMAN fraudulently represented to CARTER and to Robert Carter that there were no outstanding liabilities to or royalties due to CARTER. PEARLMAN concealed and/or failed to disclose the improper actions that he had taken in order to induce Robert Carter to enter the settlement agreement on behalf of his son and ward, CARTER.

18. Among the many terms of the settlement, Jane Carter, co-manager with Robert Carter, was terminated as CARTER'S manager, but CARTER was obligated to continue making payments to PEARLMAN, TRANS CONTINENTAL, and Robert Carter, and PEARLMAN continued to manage CARTER.

19. PEARLMAN and TRANS CONTINENTAL falsely represented to CARTER that there were no outstanding monies owed to CARTER, a representation that was a material inducement to CARTER in order for CARTER to enter the settlement with PEARLMAN and TRANS CONTINENTAL, and as an

5

inducement for CARTER to take no action to mitigate and/or pursue potential claims against Defendants.

20.    PEARLMAN repeatedly told CARTER that he had not yet realized much profit because CARTER was in an un-recouped position, and because any money that CARTER might have been due was tied up in the "pipeline," and therefore, had not yet been received. PEARLMAN made these statements in order to induce CARTER to refrain from taking further legal action against him, and to induce CARTER to agree to PEARLMAN'S ongoing management. CARTER reasonably relied on the statements to his detriment.

21.    PEARLMAN was at fault for committing wrongful acts against CARTER and for not acting in CARTER'S best interest while acting as CARTER'S manager, agent, and without full disclosure to CARTER, to wit:

a.    creating multiple corporations including TRANS CONTINENTAL and LJPE, with the intent to usurp, divert and misappropriate certain rights, property, revenues, income, profits, royalties, and opportunities due to CARTER without the knowledge, consent, agreement or vote of CARTER;

b.    incorporating and/or using business entities, including TRANS CONTINENTAL and LJPE, to appropriate and procure for himself, directly or indirectly, royalties, business opportunities, contracts, property rights, revenues, income and profits generated by the promotion, merchandising, recording and touring of CARTER, while fraudulently representing to CARTER that CARTER was not generating revenues, income and/or profits or, alternatively, that monies owed CARTER were "tied up in litigation";

c.    concealing from and/or refusing to provide timely and accurate accountings and royalties to CARTER.

6

22.     Acting both as CARTER'S manager as well as CARTER'S record label, PEARLMAN occupied a position of confidentiality and trust, and owed a fiduciary duty to CARTER, which includes all of the following duties:

      a.    to act in good faith;

      b.    to discharge his duties with the highest degree of care to his fiduciary;

      c.    to act in a manner he reasonably believed was in the best interest of CARTER;

      d.    to refrain from entering into transactions from which PEARLMAN would derive an improper personal benefit, either directly or indirectly;

      e.    to maintain and provide timely and accurate accounting records;

      f.    to make full disclosure of any and all facts before inducing CARTER to enter agreements.

23.     PEARLMAN breached his fiduciary duty to CARTER, by using multiple corporations including TRANS CONTINENTAL and LJPE for the sole purpose of usurping certain opportunities, property, revenues, income, royalties, and profits due to CARTER, for PEARLMAN'S own benefit without providing notice and/or obtaining the vote and/or consent and/or ratification of CARTER, and by ignoring contractual requirements, and corporate formalities, and by failing to disclose information. PEARLMAN'S breaches were concealed from CARTER.

24.     PEARLMAN, while a manager of CARTER, breached his fiduciary duty to CARTER by actively arranging for CARTER'S royalties, corporate opportunities and assets to be usurped and diverted from CARTER to himself and his corporations, including TRANS CONTINENTAL and LJPE. He did this, upon

7

information and belief, with the intention of wrongfully enriching himself far beyond industry standards and/or the contractual provisions of the Recording Agreement, and outside of any understanding of or agreement with CARTER. These breaches were concealed from CARTER.

25.    On or about December 7, 2004, PEARLMAN exerted financial pressure and undue influence to induce CARTER, a minor with no legal capacity, and his father Robert Carter to enter the Recording Agreement.

26.    The Recording Agreement was executed by CARTER, PEARLMAN on behalf of LJPE, and TRANS CONTINENTAL.

27.    At the time of the execution of the Recording Agreement, CARTER was represented by PEARLMAN and by his parental guardian, Robert Carter. At the time of the execution of the Recording Agreement, Robert Carter and PEARLMAN were co-managers of CARTER.

28.    PEARLMAN exerted undue influence upon CARTER to induce him to enter the Recording Agreement, to wit:

      a)    CARTER was a minor, and was subject to influence;
      b)    PEARLMAN had the opportunity as CARTER'S co-manager with CARTER'S father to exert undue influence;
      c)    PEARLMAN was disposed to exert undue influence; and
      d)    as a result, CARTER entered into an unconscionable Recording Agreement without the available protections of Florida court approval promised by PEARLMAN.

8

29.    The term of the Recording Agreement was one (1) year with six (6) consecutive options for a total of seven (7) years.   The Recording Agreement required CARTER to pay TRANS CONTINENTAL unconscionable royalty rates far exceeding industry standards, i.e. fifty percent (50%) of CARTER'S net advances and royalties, among other things.

30.    The Recording Agreement provides at Paragraph 13(b) that provisions requiring Defendants to provide accountings may be held enforceable; notwithstanding a finding of invalidity of provisions requiring CARTER'S performance, or the termination of the Recording Agreement.

31.    The effect of the Recording Agreement was expressly conditioned "upon and subject to the approval of the state courts of Florida having jurisdiction in the premises," at Paragraph 10(n) of the Recording Agreement, which additionally stated that CARTER was not a resident of the State of California.

32.    The Recording Agreement provides at Paragraph 13(a) that the Recording Agreement was entered into in the State of Florida and that its validity, interpretation and legal effect shall be governed by the laws of the State of Florida.

33.    The Defendants did not obtain the required approval of Florida courts, nor did they file a petition for the removal of nonage disability in Florida pursuant to § 743, Fla. Stat., notwithstanding that Florida was the choice of law and forum

9

for all matters relating to CARTER'S minority and the Recording Agreement and the requirements of Paragraph 10(n).

34.   § 743, Fla. Stat. requires, among other things, that in order for Florida courts to remove the nonage disability of a minor to enter contracts, certain protections are available to the minor, including, but not limited to:

> a.  no contract with the minor exceed three years;
> b.  the minor have a guardian ad litem appointed by the court;
> c.  the minor, parental or legal guardian, and the guardian ad litem appear in court as a procedural safeguard for the minor's best interest;
> d.  a guardianship plan be approved by the court to set aside the minor's earnings.

35.   On or about February 20, 2005, Defendants, notwithstanding the requirement that the Recording Agreement be submitted to a Florida court for approval, petitioned the Superior Court of the State of California for approval of the Recording Agreement, which was a material breach of the Recording Agreement, and Defendants made false and/or erroneous statements in the petition, including that "the recording agreement is fair and reasonable and in the best interest of the minor," and that "the appointment of a different individual is not required in the best interest of the minor."

36.   Earlier, on February 8, 2005, CARTER was induced by PEARLMAN to sign a waiver of notice of any hearing on Defendants' California petition, and a consent to the issuance of an order approving the Recording Agreement.

10

37.    The California petition was improper because CARTER, who was a minor at the time, did not have an independent guardian ad litem to protect his best interest, nor did CARTER reside in California, nor did Defendants have their principal office in the State of California.

38.    On or about April 20, 2005, the Superior Court of the State of California entered an order (hereinafter "California order") approving the Recording Agreement.

39.    In early 2005, upon information and belief, the California court denied PEARLMAN'S and TRANS CONTINENTAL'S motions for approval of the Exclusive Management Agreement with CARTER.

40.    Pursuant to the California order at Paragraph 5(b), Defendant PEARLMAN'S co-manger, Robert Carter, who simultaneously acted as CARTER'S guardian, was obligated to pay the taxes on the 15% of CARTER'S gross earnings which were to be set aside in a trust pursuant to California Family Code § 6752(e) and pursuant to the petition at page 3, Paragraph 2 submitted by the petitioner, Defendant TRANS CONTINENTAL.

41.    In or about September 2005, CARTER terminated the Exclusive Management Agreement with PEARLMAN.

42.    On December 7, 2005, CARTER reached the age of majority.

11

43.     On January 25, 2006 counsel for CARTER, Holland & Knight, sent a letter to Defendants informing them of CARTER'S attaining majority and requesting all of CARTER'S agreements and documents. (Exhibit B, Holland & Knight letter).

44.     On or about March 6, 2006 counsel for CARTER, Holland & Knight, sent another letter to Defendants requesting documents and information relative to the Recording Agreement and disaffirming agreements entered into between CARTER and the Defendants while CARTER was a minor. (Exhibit C, Holland & Knight letter No. 2).   The entreaties of CARTER'S counsel were ignored by PEARLMAN and the other Defendants.

45.     PEARLMAN, TRANS CONTINENTAL, and LJPE have refused to provide documents, including royalty statements, to CARTER that evidence Defendants' wrongful actions taken against CARTER without the knowledge, approval or consent of CARTER.

46.     As a result of PEARLMAN'S breaches of his statutory and fiduciary duties owed to CARTER, CARTER has been damaged.

## Count I
## INJUNCTIVE RELIEF
## Against All Defendants

CARTER realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 46 above.

12

47.     CARTER will suffer irreparable harm and injury by performing any purported obligations under the Recording Agreement, or by TRANS CONTINENTAL continuing to act as CARTER'S record label, unless the parties are enjoined from performing thereunder.

48.     The Recording Agreement expressly provides that CARTER may seek relief under Florida law and in a Florida forum for disputes arising from the Recording Agreement, and CARTER will suffer irreparable harm if Defendants are not enjoined from filing actions arising from, or related to, the Recording Agreement in forums other than Florida.

49.     CARTER is entitled to an injunction because he has a likelihood of success on the merits of his claims as to the invalidity and unenforceability of the Recording Agreement, and as to the choice of law and forum.

50.     The irreparable injury to be sustained by CARTER is more burdensome to CARTER than any potential harm that could be caused to the Defendants through the imposition of the injunction, in that the Defendants are currently not performing any duties for CARTER, or any terms of the Recording Agreement.

51.     Defendants should be specifically enjoined from pursuing any purported rights under Paragraph 13(g) to assign or license the Recording Agreement to major record labels or any other party; or to enter any other

13

agreement on behalf of CARTER without the prior written consent of CARTER or order of this Court; or to demand performance by CARTER of any of the conditions of the Recording Agreement.

WHEREFORE, CARTER requests that this Court grant, where appropriate, preliminary, and/or permanent injunctive relief as follows:

a)    that any and all arbitral, judicial, quasi-judicial, administrative, contractual, or other proceeding which depends, requires, or assumes as a condition precedent that the Recording Agreement is valid be enjoined until such time as the validity of the Recording Agreement is determined by this Court;

b)    that, until such time as the validity of the Recording Agreement is determined by the Court, Defendants be enjoined from executing upon any award, judgment, or similar instrument which results from an arbitral, judicial, quasi-judicial, administrative, contractual, or other proceeding which depends, requires, or assumes as a condition precedent that the recording agreement is valid;

c)    that the forum selection provisions in the Recording Agreement are presumptively valid and should be enforced, and that Defendants be enjoined from prosecuting any other action regarding the Recording Agreement in any forum other than the State of Florida;

14

d)    that Defendants should be specifically enjoined from pursuing any purported rights under Paragraph 13(g) to assign or license the Recording Agreement to major record labels or any other party, or to enter any other agreement on behalf of CARTER without the prior written consent of CARTER, or without order of this Court.

e)    such other relief as the Court deems just and proper.

## Count II

## DECLARATORY RELIEF: THE RECORDING AGREEMENT
## Against All Defendants

CARTER realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 46 above.

52.    This is an action brought pursuant to Chapter 86, Fla. Stat., for declaratory relief.

53.    There exists between or among the parties to this action a dispute as to the validity of the Recording Agreement and as to the proper law and forum.

54.    CARTER contends that the Recording Agreement is void and unenforceable as to CARTER because of the invalidity and unenforceability of the Recording Agreement, in that the Recording Agreement was entered into when CARTER was a minor without legal capacity to enter contracts; and because Defendants never satisfied the express contractual condition requiring Florida court

15

approval under § 743, Fla. Stat., regarding the removal of nonage disability which would have provided statutory protections to CARTER; and because the choice of law and forum provision are express and clear.

WHEREFORE, CARTER requests that this Court declare the parties' respective rights as follows:

a)      that any provision in the Recording Agreement that purports to obligate CARTER be declared invalid and void ab initio;

b)      that the Defendants receive no monies, collect no revenues, nor enter any agreements on behalf of CARTER pursuant to the Recording Agreement;

c)      that the Defendants immediately produce to CARTER any and all contracts, agreements, documents, property, or any other items obtained through or arising from the Recording Agreement with CARTER,

d)      that any and all disputes regarding the Recording Agreement be governed by the laws of and in the courts of the State of Florida

e)      any and all other and further relief that the Court deems just and proper.

16

## Count III

### FRAUD IN THE INDUCEMENT
### Against All Defendants

CARTER realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 46 above.

55.   PEARLMAN, TRANS CONTINENTAL and LJPE fraudulently induced CARTER to enter into the Recording Agreement of December 7, 2004.

56.   PEARLMAN, TRANS CONTINENTAL, and LJPE represented to CARTER in the Recording Agreement at Paragraph 6 that CARTER would be provided periodic accountings, that the validity of the Recording Agreement would be conditioned upon, and adhere to, Florida law and Florida court approval; that CARTER was owed no royalties or that monies were "tied up"; that the Recording Agreement was fair and within industry standards.

57.   PEARLMAN made these representations to CARTER, knowing they were false, and knowing that CARTER would rely on them as an inducement to sign the Recording Agreement.

58.   PEARLMAN knew at the time that these representations were false.

59.   CARTER reasonably relied upon PEARLMAN'S misrepresentations, and was damaged in that CARTER was induced to enter the Recording Agreement with PEARLMAN, TRANS CONTINENTAL, and LJPE.

17

WHEREFORE, CARTER demands judgment against PEARLMAN, TRANS CONTINENTAL, and LJPE for damages resulting from the Defendants' fraudulent actions, which damages include, *inter alia*, unpaid royalties, compensatory damages, including lost profits, fees, revenues, and consequential damages, together with an award of pre-and post-judgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate. CARTER demands a jury trial on all issues so triable.

## Count IV

## ACCOUNTING
## Against All Defendants

CARTER realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 46 above.

60.    Defendants were obligated by Paragraph 6 and 8 of the Recording Agreement to provide periodic and timely accountings to CARTER. Pursuant to Paragraph 11(c), Defendants duty to pay royalties was continuing, even if, or after, the Recording Agreement was terminated.

61.    Defendants have failed to do so.

62.    CARTER'S counsel, Holland & Knight, LLP, sent letters to PEARLMAN on January 25 and March 6, 2006 asking for all documents relating to CARTER, without any response from Defendants.

18

63.    CARTER believes there may be other transactions about which CARTER has not been informed by Defendants, under which additional royalties are due to CARTER.

64.    CARTER has not received timely and accurate accountings of royalties which CARTER was to be paid under the Recording Agreement.

65.    Because of the number and complexity of the transactions in dispute, the time period over which those transactions occurred, and the lack of adequate written records of many of those transactions, CARTER'S remedy at law is inadequate and will not be as expeditious as his remedy in equity.

66.    By virtue of their acts and omissions, Defendants caused damages to CARTER.

WHEREFORE, CARTER demands judgment against Defendants for an accounting of all revenue, including royalties, due to CARTER under the Recording Agreement, compensatory damages, including lost profits, fees, revenues, and consequential damages, together with an award of pre-and post-judgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate. CARTER demands a jury trial on all issues so triable.

19

## Count V

## BREACH OF CONTRACT
### Against All Defendants

CARTER realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 46 above.

67.    Defendants and CARTER were parties to the Recording Agreement.

68.    The provisions of the Recording Agreement have been breached by Defendants, to wit:

      a.    Paragraph 6 required periodic statements and payments of royalties which have not been provided by Defendants;

      b.    Paragraph 8 as to mechanical royalties, including the failure to issue statements pursuant to Paragraph 8(e).

WHEREFORE, CARTER demands judgment against Defendants for damages for breach of contract, compensatory damages, including lost profits, fees, revenues, and consequential damages, together with an award of pre-and post-judgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.  CARTER demands a jury trial on all issues so triable.

## Count VI

## BREACH OF FIDUCIARY DUTY
### Against Pearlman

CARTER realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 46 above.

20

69.    PEARLMAN and CARTER have been, and/or are, participants in a confidential business enterprise, and reposed trust in each other.

70.    PEARLMAN acted as CARTER'S personal manager at the time of the signing of the Recording Agreement, and had acted as CARTER'S manager for years before, and PEARLMAN owed CARTER the highest level of fiduciary duty.

71.    TRANS CONTINENTAL, as the wholly owned and controlled record company of PEARLMAN, together with PEARLMAN, formed a confidential business relationship with CARTER, and they owed CARTER the highest level of fiduciary duty arising from the parties' close and confidential business relationship with each other.

72.    PEARLMAN, along with TRANS CONTINENTAL, induced CARTER to grant PEARLMAN authority to act as his manager and record label, and to share, control, manage and/or approve the business affairs of CARTER, including inducing CARTER to enter into the Recording Agreement.

73.    PEARLMAN voluntarily undertook and owed CARTER a fiduciary duty to act in good faith for, on behalf of, and, in the best interests of CARTER, as his manager, and as the controlling decision maker in the business enterprise.

74.    PEARLMAN voluntarily undertook and owed CARTER a fiduciary duty to act in good faith for, on behalf of, and in the best interests of CARTER because of the confidential, trusting, and business relationship between them.

21

75.    CARTER reasonably and justifiably relied upon PEARLMAN'S fiduciary position, representations and promises by agreeing to PEARLMAN'S decisions and directions and by investing significant effort.

76.    PEARLMAN violated his fiduciary duties to CARTER by engaging in multiple acts and/or omissions including, but not limited to, the following:

> a.    concealing from CARTER the accurate and timely statements of all revenue owed to CARTER;
> b.    failing to provide accountings to CARTER under the Recording Agreement;
> c.    advising CARTER to enter the Recording Agreement, which was unconscionable and outside industry standards; and
> d.    placing pressure on CARTER to enter the Recording Agreement and exerting undue influence on CARTER.

77.    PEARLMAN also breached his fiduciary duties to CARTER by concealing from and failing to disclose to CARTER the acts and omissions described in Paragraphs (a) through (d) and other fraudulent actions, conflicts of interest and self-dealing.

78.    CARTER has suffered damages as a result of PEARLMAN'S breach of his fiduciary duty to CARTER.

WHEREFORE, CARTER demands judgment against PEARLMAN for damages for breach of fiduciary duty, compensatory damages, including lost profits, fees, revenues, and consequential damages, together with an award of pre- and post-judgment interest, attorneys' fees and costs, and for such other and further

relief that this Court deems appropriate.   CARTER demands a jury trial on all

issues so triable.

DATED this _26_ day of May, 2006

**CLAY M. TOWNSEND, ESQUIRE**
Florida Bar No.: 363375
**KEITH R. MITNIK, ESQUIRE**
Florida Bar No.: 436127
**MORGAN & MORGAN, PA.**
20 North Orange Avenue, 16th Floor
P.O. Box 4979
Orlando, Florida 32802-4979
PH:   (407) 420-1414
Fax:   (407) 425-8171
        Attorneys for Plaintiff

23

## **EXHIBIT LIST**

Exhibit A:   Exclusive Recording Artist Agreement

Exhibit B:   Holland and Knight Letter #1

Exhibit C:   Holland and Knight Letter #2

24

# EXHIBIT A

*Exclusive Recording Artist Agreement*

# EXCLUSIVE RECORDING ARTIST AGREEMENT

AGREEMENT made as of the 7th day of December, 2004, by and between **TRANS CONTINENTAL RECORDS, INC.**, a Florida corporation with its main place of business located at 127 West Church Street, Suite #350, Orlando, Florida 32801 ("hereinafter referred to as Company") and **AARON CARTER**, an individual minor with a mailing address c/o Robert Carter 9300 Overseas Highway, Marathon, Florida 33050, (hereinafter referred to as "Artist").

In consideration of the mutual promises and covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Term.

(a)    The term of this agreement (hereinafter, the "Term") shall begin on the date set forth above and continue for an initial period ending on the date twelve (12) months following the initial commercial release of the First Album Delivered in complete satisfaction of the Delivery Obligation for such initial period (the "Initial Period").

(b)    Artist grants to Company six (6) consecutive separate options (each an "Option Period") to extend the Term for additional periods on the same terms and conditions applicable to the Initial Period. The Initial Period and each Option Period are each sometimes referred to herein as a "Contract Period". Company may exercise its option for a particular Option Period by written notice to Artist prior to the expiration of the Contract Period, which is then in effect (the "Current Period"). If Company exercises its option to extend the Term, the Option Period concerned shall begin immediately after the end of the Current Period and shall continue until the date twelve (12) months following the initial commercial release of the Album Delivered in complete satisfaction of the Delivery Obligation for that Option Period.

(c)    Notwithstanding anything contained in this agreement, neither the Term nor any Contract Period will end unless and until Artist delivers to Company a notice expressly referring to this paragraph 1(c) and indicating that Company has theretofore failed during the Current Period to exercise its option to extend the Term for the next Contract Period. If Company fails to exercise its option on or before the date that is thirty (30) business days after Company's receipt of such notice from Artist, then the Term will end on such thirtieth $(30^{th})$ day, as if that date were the original expiration date of the Term, without Company having any liability or additional obligations to Artist in connection therewith.

2.    Delivery Obligation/Television Special.

(a)    (i)    During each Contract Period, Artist shall produce and Deliver to Company one (1) LP (sometimes referred to herein as an "LP" or "Album") solely embodying Artist's performances, it being understood and agreed that Artist shall Deliver a minimum of ten (10) Sides and a maximum of twenty (20) Sides recorded during the Current Period in connection with each Album except that during the Initial Period only, Artist shall produce and Deliver to Company at Company's sole option up to and including three (3) "single" recordings in lieu of an Album. The Delivery of such single(s); each consisting of not more than two (2) individual masters, each embodying one (1) musical

1

EXH A

composition ("Singles"), satisfying what would otherwise be the Delivery obligation otherwise pertaining to an Album during and for the Initial Period. During such Initial Period only and on or about November 18, 2004 Company shall produce a television special (the "Special") featuring Artist and other guests mutually selected by Company and Artist, to appear with Artist on the Special. All other technical, creative and business matters connected with, related to or derived from the Special shall be treated, as between Artist and Company, as any other Master Delivered by Artist to Company hereunder.

(ii) Each Album shall be Delivered to Company prior to the date (the "Due Date") mutually agreed upon by the parties, but in no event later than one hundred fifty (150) days after the commencement of the Current Period. If Artist is delinquent in the Delivery of any Masters hereunder, the next Delivered Masters shall be deemed to satisfy the most delinquent requirements first. Company's exercise of an option shall not constitute a waiver of any of Company's rights to prior recordings hereunder.

(b) Subject to your prior written consent, and good faith negotiations between the parties for an advance, during the Term, Company shall have one (1) option (a "Greatest Hits Sides Option"), to require Artist to record and Deliver up to two (2) Sides recorded after Company's exercise of the Greatest Hits Sides Option (the "New Greatest Hits Masters"). Each such New Greatest Hits Master shall embody a Composition not previously recorded by Artist and shall be intended for initial release on the "Greatest Hits" or "Best Of" LP (a "Greatest Hits LP"). Artist shall Deliver such New Greatest Hits Masters on a date mutually agreed upon by the parties, but in no event later than ninety (90) days after Company's exercise of a particular Greatest Hits Sides Option. New Greatest Hits Masters shall not be deemed to fulfill any of Artist's obligations hereunder with respect to Committed LPs.

(c) Neither Multiple LPs, "theme" Masters (e.g., Christmas Masters), nor Masters consisting of "live", instrumental or joint recordings shall be Delivered hereunder without Company's prior written consent, which may be withheld by Company in good faith. If Artist Delivers and Company accepts Masters constituting a Multiple LP, such Masters shall be deemed to be one LP for the purposes of Artist's Delivery obligations under this agreement. If Artist Delivers and Company accepts Masters consisting of "live", "theme", instrumental or joint recordings, then such Masters shall not be deemed to be in partial or complete fulfillment of any of Artist's obligations hereunder.

3. General Procedures.

(a) Each Master Delivered hereunder shall be subject to the approval of Company as being commercially and technically satisfactory. At Company's request, Artist shall (and/or Company, at its election, may) re-record Masters in order to obtain Masters satisfactory to Company in its reasonable commercial judgment.

(b) Company shall determine and prepare, in meaningful consultation with Artist, the recording budget for each prospective Album hereunder and shall inform Artist of the amount of said budget prior to commencement of recording. Notwithstanding the foregoing, the recording budget shall be no less than the following amounts with respect to the corresponding Album:

2

| Album Number | Minimum Recording Budget |
|---|---|
| 1 | $100,000.00 |
| 2 | $100,000.00 |
| 3 | $100,000.00 |
| 4 | $100,000.00 |
| 5 | $100,000.00 |
| 6 | $100,000.00 |

Company and Artist shall mutually designate each Composition to be recorded under this agreement. Company and Artist shall designate, after meaningful consultation with Artist, the producer of each Master (each, a "Producer") and the studio(s) to be used for recording and mastering. Company shall be responsible for engaging and paying all Producers. Company shall have the right to have a representative attend each recording session, at Company's sole cost and expense.

(c) . (i)    Artist shall at all times cooperate with producers so that producers are able to provide Company with union contract forms, all necessary payroll forms and such other required documents on a timely basis.

(ii)    Company shall own and control from the inception of their creation, each and every original session tape, each multi-track master, a non-equalized copy of the Masters and each and every mother, master, acetate copy or other derivative of the Masters.

(d)    Nothing in this agreement shall obligate Company to permit the continuation of any recording project, even if previously approved hereunder, if Company reasonably anticipates that (i) the Recording Costs will exceed the Approved Budget; or (ii) the Masters being produced will not be satisfactory to Company.

4.    Recoupable and Reimbursable Costs.

(a)    All recording costs incurred by Company at any time in connection with the Recording of Committed LP's, Singles (if recorded during the Initial Period separate and apart from any Committed LP) and the Television Special hereunder will be deemed Recording Costs hereunder and shall be recoupable from any and all royalties accruing to Artist, excluding mechanical royalties, under this agreement.

(b)    Upon Company's receipt of invoices therefore, Company shall pay all Recording Costs incurred in connection with the Masters required to be Delivered as well as the Television Special, subject to this agreement in accordance with an approved written recording budget

3

[and in the case of the Television Special; the Television Special production budget] (each, the "Approved Budget"), all of which shall be deemed Recording Costs hereunder. Company shall have no obligation to pay any Recording Costs incurred, which, exceed such Approved Budget, if such excess costs are solely Artist's fault ("Excess Costs"). Company shall have the right, in its sole discretion, to pay such Excess Costs, which shall be recoupable from any and all sums due Artist, excluding mechanical royalties.

(c)    One hundred percent (100%) of all out of pocket third party costs paid or incurred by Company in connection with (i) Recording Costs hereunder (it being understood that Company shall re-credit to Artist's royalty account hereunder any Recording Costs so recouped from royalties otherwise payable to Artist if and to the extent same are subsequently recouped from royalties otherwise payable to an individual producer of a Master) and (ii) "deficit tour support" and personal appearance costs, shall constitute Advances. Fifty percent (50%) of all out of pocket third party costs paid or incurred by Company in connection with (y) the production of Videos (it being acknowledged and understood that the Television Special is not a Video for purposes hereof) embodying Artist's performances and (z) independent promotion shall constitute Advances. Company shall be entitled to recoup as Advances hereunder any amounts that are recoupable against Company by Distributor under any Distribution Agreement. Company may recoup Advances from any and all record royalties accruing to Artist under this agreement.

5.    Advances/Royalties.

(a)    Company agrees to pay Artist fifty percent (50%) of each Net Advance paid to Company under a Distribution Agreement, if any. "Net Advance" shall mean a gross advance paid to Company under a Distribution Agreement during the term of this agreement less (i) all costs incurred by Company in promoting Artist for purposes of securing a Distribution Agreement as well as all costs incurred by Company in securing a Distribution Agreement, including the costs of showcasing Artist and reasonable outside legal fees in connection with the negotiation of a potential Distribution Agreement, (ii) all Recording Costs paid by Company or the Distributor to the extent such costs have not been previously deducted by Company from a prior Advance paid by a Distributor or recouped from royalties otherwise payable to Artist hereunder, and (iii) all other charges and costs deducted from Advances payable by the Distributor to the extent such charges and costs have not been previously deducted by Company from a prior Advance paid by a Distributor or recouped from royalties otherwise payable to Artist hereunder. "Distribution Agreement" shall mean each agreement entered into by Company to effectuate the distribution of one (1) or more Records through normal retail channels;

(b)    With respect to Net Sales for which Company receives royalties or is credited with royalties against an advance under a Distribution Agreement, Company agrees to credit to Artist's account hereunder a royalty in the amount of fifty percent (50%) of the Net Receipts paid or credited to Company under a Distribution Agreement, or otherwise. "Net Receipts" shall mean all gross monies actually received by or credited to Company in connection with the exploitation of Artist's services hereunder under a Distribution Agreement or otherwise. "Net Sales" shall mean Records sold by Company or by a Distributor (or its distributor(s)) to independent third parties, for which Company has been paid or credited, less records returned and reserves against returns.

(c)    Company will accrue to Artist's royalty account the royalties set forth in this paragraph 5. Such royalties shall include all royalties due Artist (but excluding mechanical royalties, except as otherwise set forth herein or royalties due to third parties such as record producers,

4

who shall be paid separately and directly by Company, which payments shall not reduce or otherwise effect Artist' royalties hereunder).

      6.     <u>Accounting</u>.

      (a)     Royalties will be accrued semi-annually and paid, less all Advances and any other recoupable costs charges, within ninety (90) days following the last day of February and August, in accordance with Company's regular accounting practices. Company shall have the right to establish reasonable reserves for returns and exchanges not to exceed thirty percent (30%). After the first full semi-annual accounting period following the release of a Album, the royalty reserve established for the particular Album shall not be in excess of thirty percent (30%) (fifty percent [50%] with respect to Singles) of the aggregate number of units of that Album [or Single] shipped. Each royalty reserve will be liquidated no later than the end of the fourth (4th) full semi-annual accounting period following the period during which such reserve is initially established. If Company makes any overpayment of royalties (e.g., by reason of an accounting error or by paying royalties on Records returned later), Company shall have the Offset Right with respect to such overpayment.

      (b)     Royalties shall be computed in the same national currency as Company is accounted to, at the rate of exchange in effect at the time of payment to Company for such Records, and shall not accrue until payment has been received by Company in the United States or credited to Company against an earlier advance made to Company. If Company is paid for exploitations outside the United States but cannot receive such payment in the United States, then Company's only royalty obligation to Artist in respect of any such exploitations shall be to deposit, but only at Artist' written request and expense, subject to prior notice by Company to Artist, the royalties payable to Artist for such exploitations in the currency in which Company receives payment, and such deposit shall be made to Artist' account in a depository selected by Artist and located in the country in which payment to Company is made for such exploitations.

      (c)     Each royalty payment shall be accompanied by a statement in accordance with Company's regular accounting practices. Each statement shall become binding on Artist and Artist shall not make any claim against Company with respect to such statement, unless Artist advises Company, in writing, of the specific basis of such claim within two and one-half ($2^{1}/_{2}$) years after the date the statement is received by Artist.

      (d)     Artist shall not have the right to sue Company in connection with any royalty accounting or to sue for royalties accrued by Company during the period a royalty accounting covers, unless Artist commence the suit within three (3) years after the date when the statement in question was received by Artist. If Artist commences suit with respect to any royalty accounting due Artist, the scope of the proceeding shall be limited to determination of the amount of royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Artist' recovery of any such royalties will be the sole remedy available to Artist by reason of any claim related to Company's royalty accountings. Without limiting the generality of the preceding sentence, Artist shall not have any right to seek termination of this agreement or avoid the performance of their obligations by reason of any such claim.

(e)    Royalties accruing hereunder shall be less any taxes the laws of any applicable jurisdiction require to be withheld in connection with such royalties.

(f)    If, on any date, the performances embodied on any Master become property of the public domain in any territory of the world so that Persons may reproduce and/or exploit in such territory Records of such performances without license from and payment to Company, then, notwithstanding anything herein to the contrary, no monies whatsoever shall accrue hereunder in connection with Records Sold in such territory on and after said date insofar as such performances are concerned.

(g)    Artist may only once during any calendar year, and only once with respect to any statement due hereunder, audit Company's books and records to determine the accuracy of Company's statements. Artist shall notify Company at least thirty (30) days prior to the date Artist' plans to commence the audit. Company shall have the right to postpone the commencement of Artist' audit by notice to Artist no later than five (5) days prior to the commencement date specified in Artist' notice; if Company does so, the running of the time within which the audit may be made will be suspended during the postponement. If an audit is not completed within thirty (30) days from the time it began, Company shall have the right to require Artist to terminate it on five (5) days' notice to Artist at any time; Company will not be required to permit Artist to continue the examination after the end of that five (5) day period. Artist shall not be entitled to examine any manufacturing records or any other records which do not specifically report sales of Records or calculation of net receipts on which royalties are accruable hereunder. All audits shall be made during regular business hours, and shall be conducted by an independent Certified Public Accountant, but not if he or his firm has begun an examination of Company's books and records for any Person (except Artist), unless the examination has been concluded and any applicable audit issues have been resolved. Each examination shall be made at Artist' own expense at Company's regular place of business in the United States where the books and records are maintained.

7.    Videos. Company shall pay, as an Advance, the production costs of the Television Special (the "Television Special Costs") as well as each Video (the "Video Costs") Company shall produce the Television Special pursuant to a written budget (the "Television Special Budget") and may elect to produce, pursuant to a written budget (the "Video Budget") each approved by Company prior to each production. Costs paid by Company in excess of such Television Special Budget and/or such Video Budget, to the extent such excess costs are caused solely by Artist, as determined by Company in its sole discretion, shall result in Company having an Offset Right (including, but not limited to, the right to recoup such costs from any and all sums payable to Artist under this or any other agreement) with respect thereto. Company and Artist shall mutually approve the Compositions to be embodied in the Television Special and each Composition to be embodied in each Video (any Composition embodied on a Single is hereby deemed approved by Artist insofar as Videos are concerned), the director, concept and storyboard of each Video, however, in the event of a dispute Company's decision shall be final. All decisions of Company in regard to the Television Special other than the selection of support acts (if any) and the songs to be performed, shall be in the sole discretion of Company. Company shall recoup fifty percent (50%) of all Video Costs from audio-only Record royalties accruing hereunder, and one hundred percent (100%) of such costs from Video royalties accruing hereunder, except that the Video Costs for any Video in excess of Fifty Thousand Dollars ($100,000) shall be one hundred percent (100%) recoupable from audio-only Record royalties. Artist warrant that Artist shall (a) be available to perform for Videos on such dates and at such locations selected by Company and (b) fully cooperate with all production personnel in the

6

production of any Video. Company shall recoup one hundred percent (100%) of the Television Special Costs prior to dividing all net sums derived therefrom, evenly (50/50) with Artist on the same basis as any other royalties, as if received from the sale and exploitation of sound recordings derived from Masters hereunder except that Television Special Costs shall not be cross-collateralized with or recouped against any other sums advanced by Company in connection with any matter of thing other than the Television Special. Accountings and payments of any sums owing to Artist by Company in connection with, arising out of or resulting from the Television Special, shall be furnished to Artist concurrent with all other royalty statements to be otherwise furnished to Artist under paragraph 6 hereinabove and except as otherwise specifically provided for herein, Artist's and Company's rights and obligations concerning the Television Specials, shall be identical to such rights and obligations as pertain to Videos hereunder.

8.    Mechanical Royalties. Artist hereby grant to Company an irrevocable license under copyright to reproduce each Controlled Composition on Records and distribute such Records in the United States and Canada, subject to the following terms:

(a)    (i) Mechanical royalties for Controlled Compositions in the United States and Canada will be payable at one hundred percent (100%) of the Statutory Rate at the time of recording of such Controlled Composition, with respect to Top-line Records sold through normal retail distribution channels ("NRC Sales") as defined in paragraph 13. It is understood and agreed that solely for the purposes of this paragraph 8(a)(i), Multiple LP Albums and Audiophile Records shall not be excluded from NRC Sales if all other requirements of paragraph 13(l) are met. All Compositions shall be published fifty percent (50%) by Artist's designated publishing firm and fifty percent (50%) by Company's designated publishing firm; net of any third party interests mutually agreed upon by Artist and Company, each of which shall reduce their interests on a pro-rata basis.

(ii)    (A) Mechanical royalties for Controlled Compositions in the United States and Canada will be payable at seventy five percent (75%) of the Statutory Rate with respect to Records Sold through record clubs.

(B)    Mechanical royalties for Controlled Compositions in the United States will be payable at seventy five percent (75%) of the Statutory Rate with respect to Mid-Price Records.

(iii)    For all exploitations of Records other than those described in paragraphs 8(a)(i) or (ii) above and 8(c) and (d) below, mechanical royalties will be payable at one hundred percent (100%) of the Statutory Rate.

(b)    Artist warrant and represents that all Compositions will be available for licensing hereunder and that the maximum amount that Company shall pay with respect to any Record will be one hundred percent (100%) of the Statutory Rate multiplied by the following applicable amounts: (A) LPs, ten (11); (B) EPs, five (5); (C) Long-Play Singles, three (3) and (D) other Singles and other Records not specified herein, two (2). Without limiting Company's rights, it is agreed that Company may exercise its Offset Right with respect to mechanical royalties in excess of the above amounts.

7

(c)    Controlled Compositions are hereby licensed to Company at no cost for use in and in connection with all exploitations of promotional, non-commercial Videos.

(d)    No copyright payments shall be payable for any more than one use of any Composition on a particular Record or for Controlled Compositions which are (A) non-musical; (B) arrangements of selections in the public domain; and/or (C) embodied in Records which are not Records Sold.

(e)    Company shall issue statements with respect to all mechanical copyright royalties payable hereunder on a quarterly basis within forty-five (45) days after the end of the applicable three-month period. Company shall withhold a portion of such royalties, not to exceed twenty five percent (25%) as a reasonable reserve for returns and exchanges. The provisions of subparagraphs (c) through (g) of paragraph 6 shall be applicable to accountings rendered pursuant to this subparagraph 8(e).

(f)    During the Term, neither Artist nor any Person deriving rights from Artist will authorize the use of any Controlled Composition in a radio or television commercial, a motion picture or television production or any other advertising or promotion unless the licensor first requires the licensee to agree, in writing, for Company's benefit, that the Composition will not be used in a "sound-alike" Master. A "sound alike" Master is a Master embodying the performance of a Composition embodied on a Master Delivered hereunder that imitates or simulates the performances embodied on the Master concerned hereunder by using a substantially similar music arrangement, vocal performance or otherwise. If Artist or any Person deriving rights from Artist shall determine to grant any rights in any Controlled Composition to any music publisher or any other Person or to authorize the use of any music or lyrics written by Artist in a Composition together with material written by anyone else, or if Artist shall determine to collaborate with any other Person in the authorship of any Composition, Artist will first require the other parties to the transaction or collaboration concerned to enter into a written agreement, for Company's benefit, requiring compliance with this paragraph.

9.    Rights.

(a)    All Masters furnished to Company hereunder or created during the Term, including without limitation the First Album hereunder, are hereby deemed "works made for hire" and Company shall own all right, title and interest in and to the Masters and all copies thereof and the performances contained thereon throughout the Territory in perpetuity from the inception of their creation, including the worldwide copyrights thereto and all renewals thereof. If, for any reason, any Master is not deemed a work made for hire, Artist hereby assign to Company in perpetuity all rights in and to each such Master, including, without limitation, all copyrights and renewal rights thereto. Company shall have the exclusive right to use the Masters hereunder in perpetuity in any manner, including, without limitation, the exclusive right to:

(i)    Manufacture, distribute and exploit all and/or any portions of the Masters, in any or all fields of use, by any method and through any media and by any means now or hereafter known, upon such terms and conditions and under any trademark or label as Company may elect or, in its sole discretion, to refrain therefrom;

(ii)    Use the approved names (including all professional, assumed or fictitious names), approved likenesses, approved photographs and approved biographical material of

8

Artist rendering services in connection with the Masters (sometimes referred to herein as "Artist' Identification") for the purpose of publicizing, exploiting and marketing Masters hereunder and in general goodwill advertising for Company in the entertainment industry; and

(iii)    Publicly perform or permit the public performance of the Masters by means of radio broadcast, television broadcast or any other method of public performance now or hereafter known.

(b)    Company's payment of any monies shall not constitute a waiver of any of Company's rights hereunder or of any of Artist' obligations, including but not limited to, the obligation to Deliver Masters. In addition, Company's acceptance and/or use of Masters, materials or other items delivered by Artist shall not constitute a waiver of any of Artist' representations, warranties or agreements in respect thereof.

(c)    It is understood and agreed that during the Term, in the United States.

(i)    No Side delivered hereunder shall be released on any Record sold embodying Sides recorded hereunder coupled with Sides not recorded hereunder ("Coupled Records(s)"), without Artist' prior written consent, not to be unreasonably withheld, provided, however, that the foregoing restriction shall not apply with respect to (A) up to two (2) Sides delivered hereunder with respect to each Album and (B) so-called "sampler Records", the coupling of Masters hereunder for jukeboxes or "Personics®"-type uses, or use of Masters in Videos or Records used in connection with public transportation carriers or facilities or promotional Records.

(ii)    The provisions of paragraphs 9(c)(i) above shall not apply if Artist have not fulfilled Artist' Delivery obligations with respect to any Masters hereunder within the time periods set forth herein, or any of Artist' other material obligations hereunder.

(d)    It is understood and agreed that, without limitation of the license set forth in paragraph 8 above, that nothing contained in paragraph 9(a) above shall be deemed to grant Company any ownership interest in the Compositions embodied on Masters hereunder.

(e)    During the Term, Company shall submit to Artist or Artist's representative (whom Artist shall designate in writing for this purpose), for Artist's prior written approval, any photographs, likenesses or biographical material of Artist not furnished by Artist to Company, which Company intends to use in the United States. Such approval shall not be unreasonably withheld, and shall be deemed granted unless Company is advised in writing to the contrary within ten (10) business days after submission of such photographs, likeness or biographical material to Artist or Artist' representative, specifying the reasons for such disapproval. Any inadvertent failure of Company to comply with this sub-paragraph shall not be deemed a breach of this agreement, provided, however, that Company shall use reasonable best efforts to cure such failure after notice from Artist.

(f)    (i) Provided Artist has fulfilled all of Artist' material obligations under this agreement, Company shall commercially release each Album in the United States within five (5) months after the date of Delivery in accordance with the provisions hereof of such Album. If Company fails to do so Artist may notify Company that Artist intends to terminate the Term unless Company releases such Album within sixty-(60) days (the "Cure Period") after Company's receipt of Artist' notice. If Company fails to release such Album before the end of the Cure Period, Artist shall have the

9

right, by giving Company notice thereof (the "Termination Notice"), to terminate the Term. On receipt by Company of the Termination Notice, and provided that Company has not released the applicable LP prior to the end of the Cure Period, the Term will end and all parties will be deemed to have fulfilled all of their obligations under the agreement except those obligations which survive the Term (c.g., warranties, audit rights, re-recording restrictions and obligation to pay royalties and other monies). Artist' only remedy for failure by Company to release an Album in the United States will be termination in accordance with this subparagraph 9(f)(i).

(ii)     The running of the five (5) month and sixty (60) day periods referred to in this paragraph 10(f) will be suspended (and the expiration date of each of those periods will be postponed) for the period of any suspension or extension of the Term.

10.     Warranties and Representations.

Artist warrants and represents the following:

(a)     Artist is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to (i) Artist's right to enter into this agreement, and (ii) Artist's right to grant the rights granted to Company hereunder, to fully perform each and every term and provision hereof, and to record each and every Master hereunder. Artist's shall cause his father and guardian Robert Carter to execute and deliver to Company herewith, the letter of parental consent attached hereto and incorporated herein by reference as Exhibit "A".

(b)     (i) During the Term: (A) Artist shall record Masters exclusively for Company embodying Compositions not previously recorded by Artist and (B) Artist warrants that Artist will not perform or render any recording services for the purpose of making, promoting, or marketing Masters or Records for any Person other than Company.

(ii)     Notwithstanding anything to the contrary contained in subparagraph 10(b)(i) above, Artist shall be permitted to perform as a non-featured "sideman" at recording sessions for other record company(ies), provided that:

(A)     Neither the Records embodying such performances nor the exploitation of said Records shall feature Artist's likenesses;

(B)     Artist shall receive credit only as sidemen on the back cover and/or in the liner notes of such Record(s), provided that Artist's name shall not appear on the cover of any Record if Artist is performing as a sidemen;

(C)     Such credit shall not be larger than the credit accorded to other non-featured sidemen or producers (as applicable), but in no event shall any such credit be larger than that customary in the recording industry;

(D)     A courtesy credit shall be included where Artist appear as sidemen to the effect that Artist "appears courtesy of [Company]"; and

(E)     Such performances do not interfere with the timely completion of Artist's services rendered hereunder.

10

(iii)    Without limiting the generality of the provisions of paragraph 10(a)(i) above, Company agrees that Artist may perform in theatrical and/or television motion pictures and in other television productions, provided that such performances are substantially non-musical and that the agreement pursuant to which such performances are rendered expressly prohibits the release by any Person of Videos (other than Videos embodying substantially the entire motion picture or television production, unless such Videos embody promotion, marketing or a different version, or "cut" of the Picture or is related to the Picture, i.e., a prequel, sequel, remake, etc.).

(c)    (i) Artist will not perform for the recording or production of any Master embodying any Restricted Composition for any Person prior to the later of: (A) five (5) years after the date of Delivery to Company of the last Master embodying the Restricted Composition concerned or (B) two (2) years after the expiration of the Term.

(d)    Artist has not entered into and will not enter into, any agreement, which will interfere in any manner with the full and prompt performance of Artist' obligations under this agreement. Artist is not and shall not come under or subject to, any disability, restriction or prohibition with respect to Artist's rights to enter into, and to fulfill all of Artist' obligations under this agreement. Neither Artist nor any other Person deriving any rights from Artist shall at any time do, or authorize any Person to do, anything inconsistent with, or which might diminish, impair or interfere with any of Company's rights hereunder or the full and prompt performance of Artist's obligations hereunder.

(e)    Artist hereby irrevocably and unconditionally waives any and all moral and like rights that Artist have or may have in the Master Recordings and the performances and/or the material embodied therein, and Artist hereby agrees not to make any claim against Company or any of Company's assignees, Licensees or designees based on moral or like rights.

(f)    Artist has the right to grant to Company the right to use Artist's Identification. During the Term, neither Artist nor any other Person deriving rights from Artist, shall use Artist's Identification, or authorize or permit any Person other than Company to use Artist's Identification, in connection with the exploitation of Masters.

(g)    (i) Artist, is the sole owner of any professional name and such mark as is used by Artist. Artist is now and shall be the sole owner of such name at any time hereafter (the "Name"), and no other Person has or will have the right to use the Name in connection with Records during the Term. During the Term, Artist shall not change the name by which Artist is professionally known without Company's prior written consent, such consent not to be unreasonably withheld. If any Person challenges Artist's right to use a professional name or mark, Company may, at it its election and without limiting its rights, require Artist to adopt another professional name approved by Company, such approval not to be unreasonably withheld, without awaiting a determination of the validity of such challenge.

(ii)    During the Term, Artist shall at all times maintain a valid registration for the Name or any other name used by Artist hereunder in the Patent and Trademark Office of the United States, and promptly following the complete execution of this agreement, Artist shall furnish Company with a certified copy of such registration. In the event that such registration is not filed, Company shall have the right to conduct a trademark or other related search with respect to the Name and may register the Name on behalf of Artist with the Patent and Trademark Office or any

11

other applicable authority, the costs of which shall be treated as recoupable expenses hereunder. If, in Company's discretion, the search indicates that the Name should not be used, Company and Artist will mutually agree upon a substitute name for Artist. Nothing contained herein shall release Artist from its indemnification of Company in respect of Company's use of the Name.

(h)     During the Term, Artist shall, in connection with the release of each Album, (A) reasonably render musical performance before live audiences and/or on television and (B) shall, upon Company's reasonable request, appear at photo sessions, interviews and perform other promotional activities in support of Albums released hereunder. Company shall reimburse Artist for all reasonable and direct expenses incurred by Artist in connection with the items set forth in this paragraph 10(h)(B), provided such expenses are properly documented.

(i)     Subject to this agreement, no Person other than Company has any right to use, and during the Term no Person other than Company will be authorized to use, any Masters of Artist's performances for making, promoting, or marketing Records.

(j)     The Masters made and/or Delivered hereunder shall be produced in accordance with the rules and regulations of the American Federation of Musicians, the American Federation of Television and Radio Artist and all other unions or guilds having jurisdiction. All Persons, including Artist, rendering services in connection with such Masters shall fully comply with the provisions of the Immigration Reform Control Act of 1986 and complete and execute all forms as may be prescribed by the United States Immigration and Naturalization Service or other government agency regarding citizenship, permanent residency or so-called "documented worker" status.

(k)     Neither the Materials supplied by Artist nor any use thereof will violate any law or infringe upon the rights of any Person and Artist have (or shall have at all times herein mentioned) shall have obtained all necessary licenses, approvals, consents and permissions with respect to the same. All Personnel Lists furnished by Artist hereunder are and will be true, accurate and complete.

(l)     (i) Company shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Company pursuant to this agreement, except as specifically provided herein.

(ii)     Without limitation of the foregoing provisions of paragraph 10(l)(i) above, it is understood and agreed that Artist shall promptly make all payments as set forth in this agreement and in the event that Company exercises the Offset Right, Artist shall immediately make the reimbursement pursuant to Company's exercise of the Offset Right or allow Company to withhold other monies due Artist hereunder.

(m)     If Artist owns or controls, as of the date hereof, any Masters of Artist' performances recorded prior to the date hereof ("Prior Masters") or if Artist shall, during the Term, acquire ownership of any Prior Masters, Artist hereby warrants and represents that Artist shall not exploit any such Prior Masters, and no exploitation rights in or to such Prior Masters shall be assigned, transferred, conveyed or otherwise granted to any third party, during the Term. Additionally, in the event that Company exploits any Prior Masters, such Prior Masters shall be deemed recorded during the Initial Period. Artist hereby warrants and represents that there are no Prior Masters except as specifically set forth in Exhibit "C", which is attached hereto and incorporated herein by this reference.

12

(n)     As of the date hereof, Artist warrants that Artist is not a resident of the State of California.. Artist shall notify Company immediately in the event that any of Artist becomes a resident of the State of California. As of the date hereof, Artist is a minor and this agreement, is acknowledged by both Artist and Company as being conditioned upon and subject to the approval of the state courts of Florida having jurisdiction in the premises.

Company warrants and represents the following:

(o)     Company is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to (i) Company's right to enter into this agreement, and (ii) Company's right to grant the rights granted to Artist hereunder and to fully perform each and every term and provision hereof.

(p)     The parties hereto hereby indemnify, save and hold harmless the other from any and all loss and damage (including reasonable outside attorneys' fees and costs) arising out of or connected with any claim by any third party or any act by the indemnifying party which is inconsistent with any of the warranties, representations or agreements made by the indemnifying party in this agreement, provided the said claim has been dismissed, settled with the indemnifying party's consent, not to be unreasonably withheld, or reduced to a final judgment by a court of competent jurisdiction, and agree to reimburse the indemnified party on demand for any payment made or loss suffered with respect to any claim or act to which the foregoing indemnity applies. Notwithstanding anything to the contrary contained herein, the indemnified party shall have the right to settle without the indemnifying party's consent any claim involving sums of Five Thousand Dollars ($5,000) or less, and this indemnity shall apply in full to any claim so settled; if the indemnifying party does not consent to any settlement proposed by the indemnified party for an amount in excess of Five Thousand Dollars ($5,000), the indemnified party shall have the right to settle such claim without the indemnifying party's consent, and this indemnity shall apply in full to any claim so settled, unless the indemnifying party obtains a surety bond acceptable to the indemnified party in its sole discretion, with the indemnified party as a beneficiary, to assure the indemnified party of prompt payment of all expenses, losses and damages (including reasonable outside attorneys' fees and costs) which the indemnified party may incur as a result of said claim. If the amount of any such claim or loss has not been determined, Company, as the indemnified party in a particular instance, may withhold sums due Artist hereunder in an amount consistent with such claim or loss pending such determination, unless Artist obtains a surety bond to Company in its sole discretion, with Company as a beneficiary, to assure Company for Artist' full potential liabilities hereunder. If no action is filed within one (1) year following the date on which such claim was first received by Company, Company shall release all sums withheld in connection with such claim, unless Company, in its reasonable business judgment, believes an action will be filed. Notwithstanding the foregoing, if after such release by Company of sums withheld in connection with a particular claim, such claim is reasserted, then Company's rights under this paragraph 10(p) will apply *ab initio* in full force and effect. The indemnified party shall notify the indemnifying party promptly in writing of any such claim and the indemnifying party shall have the right to participate in the defense of any such claim with counsel of the indemnifying party's own choice and at the indemnifying party's own expense; provided that the indemnified party shall have the right at all times, in its sole discretion, to retain or resume control of the conduct thereof.

13

11.   Company's Rights and Remedies.

(a)   (i)  In the event of any material breach or default by Artist in the
performance of any obligations, warranties or representations hereunder, including, without limitation,
a Default Event, or in the event Artist is unable to perform her obligations hereunder due to illness of
Artist or Artist fails or refuse to perform their obligations hereunder, Company may, by notice to
Artist: (A) terminate the Term; (B) suspend Company's obligations hereunder; and/or (C) extend the
Term for the duration of Artist's breach or default, or Artist's inability to perform hereunder.

(ii)   Company may also extend the Term for the duration of an act of
God or a "force majeure" contingency, including, without limitation, labor disputes, earthquakes, fire·
or the unavailability of materials. If any of the foregoing contingencies shall affect Company and if
Company suspends its obligations for a period in excess of six (6) months, then, provided that such
contingency does not affect the entire music industry as a whole, at any time after such six (6) month
period, Artist may request Company in writing to terminate such suspension. If Company shall not
within thirty-(30) days following its receipt of such request notify Artist in writing of its termination of
such suspension, Artist may at  any time during the continuance of such suspension terminate the
Term.  If Artist terminates the Term, only those obligations of the parties, which would have continued
after the Term, shall survive such termination. Company shall be obligated to continue to pay royalties
to Artist pursuant to this agreement unless the cause of such suspension shall affect Company's ability
to make such payments.

(iii)   Without limitation of the foregoing, any incapacity preventing
Artist from fully performing hereunder or any material change in Artist's physical appearance or voice
from those which existed on the date of execution hereof shall be deemed a breach by Artist of this
agreement for purposes of this subparagraph 11(a).

(b)   Artist acknowledges that Artist's services rendered hereunder are unique
and extraordinary and that Company may be entitled to equitable relief to enforce the provisions of this
agreement.

(c)  ·  Company shall have the right during any Contract Period, by written
notice to Artist, to elect without cause not to record any or all of the Master Recordings constituting
the Album for such Contract Period, and the Term shall automatically terminate as of the date of any
such notice pursuant to this subparagraph 11(c), and Company shall have no further obligation to
Artist; other than it's continuing obligation to pay royalties if any, which may become due and owing,
and the balance of the reasonably calculated "in-pocket" portion of the applicable Advance in
connection with such Album.

(d)   If any Default Event shall occur, then, without limitation of Company's
rights at law, in equity, under this agreement or otherwise, that portion of monies which would
otherwise have become due and payable to Artist hereunder shall be held in escrow pending resolution
of any matters, which gave rise to the invocation of this paragraph 11.

(e)   The rights and remedies of Company as specified herein are not to the
exclusion of each other or of any other rights or remedies of Company hereunder, at law, in equity or
otherwise; Company may exercise or decline to exercise any of its rights and remedies as Company

14

may deem fit without jeopardizing any other rights and remedies of Company; and all of Company's rights and remedies in connection with this agreement shall survive the expiration of the Term.

12.   Definitions.

(a)   "Advance" – Recording Costs or other recoupable costs hereunder advanced by Company on Artist' behalf.

(b)   "Audiophile Record" - A Record which is (a) of superior sound quality or has other distinct technical characteristics (i.e., 24 Gold Plated CDs or 180 gram + virgin vinyl LPs) or which is marketed as either of the foregoing (e.g., a "Mobile Fidelity" Record), (b) embodied in a new configuration (e.g., DCC, digital audio tape, etc.) and/or (c) made for digital playback.

(c)   "Budget Record" - A Record bearing a primary dealer price (hereinafter the "PDP") in excess of fifty percent (50%) and equal to or less than sixty-seven percent (67%) of the highest PDP of Top-Line Records of the same type (e.g., whether it is an LP, EP, or Single) and in the same configuration (e.g., whether it is a tape cassette compact disc, or vinyl Record) in the territory concerned.

(d)   "Composition" - Words and/or music, whether in the form of instrumental and/or vocal music, spoken word or otherwise, irrespective of length, including, without limitation, medleys.

(e)   "Container Deduction" - Twenty-five percent (25%) of the applicable PDP for the Record concerned except: (a) Fifteen percent (15%) of the applicable PDP for vinyl Records and (b) twenty percent (20%) of the applicable PDP for analog cassette tapes, vinyl LP's in double fold jackets and for vinyl LP jackets which contain an insert.

(f)   "Controlled Composition" – That portion of any Composition which is written, owned or controlled in whole or in part by Artist.

(g)   "Default Event" - Any breach by Artist of this agreement, including, without limitation, the following: (a) Artist' failure or inability to fulfill any of Artist' obligations hereunder for any reason; (b) the occurrence of any of the events set forth in paragraph 11, subject to Artist' right to cure any such Default Event within sixty (60) days from the date of Company's written notice thereof or, in the case of Default Events not susceptible to cure within such time frame, to commence reasonable commercial designed to cure the same within said sixty (60) day period. In either event (cure or commencement of cure, as applicable), the same shall not be deemed to constitute a Default Event on Artist's part.

(h)   "Delivery" or "Delivered" - Company's receipt of Masters satisfactory to Company, the applicable Personnel List and all necessary licenses, consents, approvals and other items required under the agreement (including, without limitation, all such items described in paragraph 3[c]) for the Master(s) concerned.

(i)   "Master", "Recording", "Master Recording" - Any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known.

15

(j)    "Materials" - The Masters hereunder, all Compositions, Artist's Identification, and all other musical, dramatic, artistic and literary materials, ideas and other intellectual properties contained in or used in connection with any Masters hereunder or their packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

(k)    "Mid-Price Record" - A Record bearing an PDP in excess of sixty-seven percent (67%) and equal to or less than eighty percent (80%) of the highest PDP of Top-Line Records of the same type and in the same configuration in the territory concerned.

(l)    "NRC Sales" - Top-Line Records Sold through normal retail distribution channels and specifically excluding, without limitation, any exploitations described in subparagraphs (f)-(j) of paragraph 6, it being understood and agreed that Records Sold in the compact disc configuration shall not be excluded from NRC Sales if all the other requirements of this paragraph 12(l) are met.

(m)    "Offset Right" - Company's right to (i) demand and immediately receive reimbursement from Artist of monies and/or (ii) charge monies against and/or deduct same from any sums accruing or becoming payable under this or any other agreement. In the event that any such deduction is effected against an Advance otherwise payable hereunder, such deduction shall not impair Company's right to charge and recoup, in the manner herein provided, the entirety of the Advance which would otherwise have been payable hereunder.

(n)    "Person" - Any individual, corporation, partnership, association, entity or other organized group or combination of any or all of the foregoing, and their legal successors or representatives.

(o)    "Personnel List" - A Master-by-Master list that identifies all vocal performers, background vocal performers, instrumental performers, engineers, mixers, programmers, Producers, arrangers and other persons featured on, or rendering services in connection with, each Master.

(p)    "Recording Costs" - All costs incurred in connection with the pre-production and/or production of Masters embodying Artist' performances, including, without limitation, union scale, the costs of all instruments, musicians, vocalists, conductors, arrangers, orchestrators, copyists, programmers, etc., payments to a trustee or fund based on wages to the extent required by any labor organization or trustee (excluding so-called "per-record payments"), sampling costs, all studio costs, tape and disc costs, the costs associated with editing, mixing, remixing, mastering, engineering, travel, dubbing, cartage and trademark searches and registrations, the costs of cutting references, per diems, Producer fees and/or Advances, rehearsal hall rentals, the cost of non-studio facilities and equipment, and all other costs and expenses incurred in producing any Masters hereunder (excluding any travel costs incurred by Company for its employees) which are customarily recognized as recording costs in the record industry as well as vocal, instrument and dance training in connection with Artist' services hereunder.

(q)    "Record" - Any form of reproduction, transmission, and/or communication now or hereafter known, manufactured, distributed, transmitted or communicated primarily for home use, school use, juke box use, or use in means of transportation, including, without limitation, a reproduction of a Video (a "Video Record").

16

(r)    (i)"Single" - A Record embodying no more than two (2) Compositions.

(ii)    "Long Play Single" - A Record embodying more than two (2) Sides that is not an EP.

(iii)    EP" - A Record embodying more than four (4) Sides that is not an LP.

(iv)    "LP" or "Album" - A Record containing no fewer than ten (10) Sides, with at least forty (40) minutes of playing time.

(v)    "Multiple LP" or "Multiple Album" - Two (2) or more LPs packaged together by Company for marketing as a single unit and/or an LP containing sixteen (16) or more Sides.

(vi)    Notwithstanding the foregoing provisions of this paragraph 12(r) above, it is understood and agreed that in the event that Company specifically markets a Record as a certain type of Record (e.g., as a Single, EP, LP, etc.) then such Record shall be deemed such type of Record regardless of whether the Record concerned satisfies the definition set forth above for the Record type concerned.

(s)    (i) "Records Sold", "Record Sales" and "Sales" – One hundred percent (100%) percent of those Records shipped by Company hereunder for which Company is paid and which are neither returned to nor exchanged by Company nor (in the case of any record configuration as to which Company does not identify returns of Records according to selection number) treated as returned to Company under Company's then current policy with respect to the percentage of shipped units so treated. The following are specifically not Records Sold:

(ii)    Standard free or bonus Records given away together with Records Sold for monetary consideration. If Records are shipped subject to a discount or merchandise plan, the number of such Records deemed shipped and Sold shall be determined by reducing the number of Records shipped by the percentage of discount granted. It is understood and agreed that Company shall not exclude from Records Sold standard "free" or "bonus" goods in excess of fifteen percent (15%) unless Company becomes distributed by a so-called "major" record label whose policy is in excess thereof, but in no circumstances more than twenty five percent (25%).

(iii)    Free or bonus Records given away pursuant to special sales plans in addition to free and bonus records specifically provided for in paragraph 13(r)(ii) above.

(iv)    If Records which are shipped subject to a discount or merchandising plan, or respecting which a discount was granted in the form of "free" or" bonus" Records, are returned to Company, the returns will be credited between royalty bearing and non-royalty bearing Records in the same proportion as Company's customer's account is credited.

(v)    "Restricted Composition" - A Composition embodied on a Master made or delivered to Company under this agreement.

17

●                                  ●

(vi)    "Side" - A Master embodying Artist' performance of no less than four (4) minutes of continuous sound (unless a shorter playing time is otherwise approved by Company in writing).

(vii)    "Statutory Rate" - The minimum compulsory license rate applicable to a single musical composition, without regard to playing time, in effect pursuant to the United States Copyright Act (or the recognized equivalent in Canada) as of the earlier of the date the applicable Master initially is "released" in the United States or Canada (as applicable).

(viii)    "Territory" - The Universe.

(t)    "Top-Line" Record - A Record bearing an PDP which is greater than eighty percent (80%) of the PDP of the then highest priced Record in of the same type and in the same configuration in the territory concerned.

(u)    "Video" - Any Master reproducing Artist' performance together with visual images.

13.    Miscellaneous.

(a)    This agreement contains the entire understanding of the parties and supersedes any prior agreement, whether written or oral, relating to the subject matter hereof and cannot be changed or terminated except by an instrument signed by the party to be charged. Any instrument purporting to bind Company must be signed by an officer or authorized signatory of Company. No addition, deletion, revision, change or other alteration in or to drafts of this agreement prepared prior to the execution of this agreement shall be referred to by any of the parties in any lawsuit in which the construction, interpretation or meaning of this agreement is in dispute or otherwise be used for purposes of construing or interpreting any of the terms, provisions or language of this agreement in adjudicating or otherwise resolving any such lawsuit. No waiver by any of the parties hereto of any provision of or any default under this agreement shall constitute a waiver by the particular party of compliance thereafter with the same or any other provision of such party's respective right to enforce the same or any other provision thereafter. This agreement has been entered into in the State of Florida, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of Florida applicable to contracts entered into and performed entirely within the State of Florida, except that the law of the jurisdiction in which this agreement is approved pursuant to paragraph 18 below shall control the interpretation of this agreement as to issues of judicial approval of this agreement. Except as set forth in the preceding sentence, all claims, disputes or disagreements, which may arise out of the interpretation, performance or breach of this agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of Florida or the Federal District courts located in Orange County. Artist hereby submits to the jurisdiction of the aforesaid courts and agrees that any process in any such action or proceeding may be served upon Artist by delivery or mail in the same manner as notices pursuant to paragraph 14 below.

(b)    If any part of this agreement, or the application thereof to any party, shall be adjudged by a court of competent jurisdiction to be invalid, such judgment shall not affect the remainder of this agreement, which shall continue in full force and effect, or the application of this agreement to the remaining parties. Headings used herein are for convenience only and shall not be used to interpret or modify this agreement.

18

(c)    In any instance where Company agrees to obtain Artist' prior consent or approval: (i) Artist' consent or approval shall not be unreasonably withheld; (ii) Artist's response to any request by Company for Artist' consent or approval shall be given within ten (10) business days following such request; (iii) any objection or disapproval shall be in writing, stating the specific reason(s) therefore; (iv) Artist' failure to give such written objection or disapproval within such ten (10) business day period shall be deemed Artist's consent or approval; (v) the exercise of such consent or approval right shall not delay the scheduled release of any Records hereunder or otherwise frustrate Company's exercise of its rights hereunder; and (vi) Company's inadvertent failure in any instance to request Artist's approval or consent shall not be deemed a breach of this agreement.

(d)    Artist recognizes that the sale of Records is speculative and agrees that the judgment of Company, as long as exercised responsibly and in good faith, with regard to any matter affecting the sale, distribution and exploitation of Records hereunder shall be binding and conclusive upon Artist. Nothing contained in this agreement shall obligate Company to make, sell, license, or distribute Records manufactured from the Masters recorded hereunder other than as specifically provided herein. The method, manner, frequency, timing and extent of release, packaging, promotion, advertising, distribution and exploitation of Masters and Records shall be within the sole discretion of Company unless otherwise herein specifically provided.

(e)    Neither Company nor Artist shall be entitled to recover damages or to terminate the Term by reason of any breach by the other party of its material obligations hereunder unless the party whose breach is alleged has failed to remedy such breach within sixty (60) days (15 days in the case of payment of monies hereunder) following receipt of the other party's notice thereof, or if such breach cannot be cured in such sixty (60) day period and if the party whose breach is alleged does not commence curing the breach during such sixty (60) day period and diligently completes the same in due course.

(f)    In entering into this agreement, Artist has and shall have the status of an independent contractor and nothing herein contained shall contemplate or constitute Artist as Company's agent or employee.

(g)    This agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, permitted assigns and representatives. Company may assign, license or otherwise dispose of this agreement or any of its rights hereunder, in whole or in part, to any distributor, subsidiary, affiliate or controlling corporation or to any Person owning or acquiring a substantial portion of the stock or assets of Company or to a record company (label and/or distributor) which is owned or otherwise controlled by an entity controlled in common with any the following: Time-Warner, Universal Music Group, EMI, BMG or Sony Music. Company may also assign its rights hereunder to any of its licensees to the extent necessary or advisable in Company's sole discretion to implement the license granted. Artist shall not have the right to assign this agreement or any of its rights hereunder without Company's prior written consent, except the right to receive payment of monies hereunder to a single payee (i.e., a loan out).

(h)    This agreement shall not be effective or binding until signed by all proposed parties hereto.

14.    Notices.    All notices to Artist shall be sent to Artist at the address first mentioned herein. All notices to Company shall be sent to Company at the address first set forth

19

herein. Each party may hereafter designate any other address by notice in writing to the other party. All notices shall be in writing and shall be sent by personal delivery, courier, or by registered or certified mail, return receipt requested. The date of any notice hereunder shall be deemed the date of the mailing thereof. Royalty statements (and payments) may be sent by Company to Artist by regular mail.

15.    Superseding Terms of Distribution Agreement.    If any provisions of this agreement should conflict with the corresponding terms of any applicable distribution agreement, then the relevant terms of this agreement shall be deemed superseded by the terms of the distribution agreement and the Term, recording commitment and/or any and all other material terms hereunder will be deemed modified to reflect the terms set forth in such distribution agreement, if applicable. Any conflicting terms under this agreement shall be deemed superseded by the terms of such distribution agreement, provided that such superseding provision is not unduly restrictive to Artist and is within reasonable norms of the music industry.

16.    Artist maintains the right to secure competent legal advice and representation in connection with the negotiation and signing of this agreement or to knowingly and voluntarily waive such right. Artist acknowledges that he understands such right and have acted accordingly in connection with the negotiation and signing of this agreement.

17.    Artist and Louis J. Pearlman Enterprises, Inc., a Florida corporation ("LJPE")(which shall execute this agreement solely for the purpose of confirming its agreement to this paragraph 17) hereby agree as follows:

(a)    Neither LJPE nor any person, firm, corporation or other entity claiming rights or an interest in Artist by or under LJPE, shall receive or be credited with any share or portion of royalties or other consideration payable or accruing to the benefit of Artist hereunder, notwithstanding the fact that such interest may increase the profitability of Records sold by or for Company, it being acknowledged by Artist that absent the waiver herein contained, LJPE and/or Louis J. Pearlman could be subject to the appearance of a conflict of interest as between his respective interests and positions in Company and LJPE; and

(b)    Artist further acknowledges that his father Robert Carter has a beneficial interest in the Personal Management Agreement (along with LJPE)(the "PMA") and that such interest, absent the waiver herein contained, might otherwise give rise to an appearance of a conflict of interest. Based on the advice of independent legal counsel, Artist hereby knowingly waives any right he might otherwise have to assert such conflict as a defense to the enforceability of this agreement or the PMA.

18.    Artist's Minority.    Artist has advised Company that he is under eighteen (18) years of age. Artist shall cooperate with reasonable requests by Company in connection with any proceedings Company may institute, at its own cost and expense, to obtain judicial approval of this agreement. In that regard, Company hereby consents to the establishment of any trust fund or savings plan for her benefit as the court to which such petition for approval is submitted deems just and proper. (At any time after Artist has reached the age of eighteen (18) years (or such other age as may be deemed the age of majority for purposes hereof), Artist shall, upon Company's request, reaffirm in writing the validity and enforceability of this agreement. If Company is unable to obtain judicial approval of this agreement, or if Artist fails to reaffirm this agreement within a reasonable period of time after Company's request therefore, Company shall have the right (but not the obligation, and without limiting Company's other rights and remedies) to terminate the Term hereof, in which event

20

Company shall have no further obligations to Artist hereunder (other than the obligation to pay monies due to Artist, if any).

IN WITNESS WHEREOF, the parties hereto have executed this agreement effective as of the date and year first set forth above.

**COMPANY**

TRANS-CONTINENTAL RECORDS, INC.
A Florida Corporation ("Company")

By: _____
Greg McDonald, President

**AGREED TO AND ACCEPTED BY:**

_____
Aaron Carter

Agreed to as to paragraph 17 herein.

Louis J. Pearlman Enterprises, Inc.

By: _____
Louis J. Pearlman, Chairman

21

## EXHIBIT "A"

### ROBERT CARTER
9300 Overseas Highway
Marathon, Florida 33050

Trans Continental Records, Inc.
127 W. Church Street, Suite 350
Orlando, Florida 32801

Gentlemen:

I have been advised that my son, Aaron Carter (hereinafter referred to as "Artist") has entered into an exclusive recording artist agreement dated as of December 7, 2004 with you ("the Agreement").

In consideration of your entering into the Agreement with Artist, and as further inducement to you to do so (it being to my benefit that you enter into the same), I hereby agree as follows:

. I am Artist's parent and/or legal guardian;

. Artist is presently a minor;

. I will cooperate with you and shall sign such documents as you may reasonably request in connection with any proceeding to obtain judicial approval of the Agreement. As and when my consent is from time to time required under the Agreement, I agree that I will act in the Artist's behalf.

Very truly yours,

_Robert Carter_

Robert Carter

Acknowledged as to form:

HARLAN DEREK SALTZMAN, ESQ
FL BAR No.: 0313050

# EXHIBIT B

*Holland and Knight Letter #1*



**Holland+Knight**

Tel  305 374 8500
Fax 305 789 7779

Holland & Knight LLP
701 Brickell Avenue, Suite 3000
Miami, FL 33131-2847
www.hklaw.com

Jorge L. Hernandez-Toraño
305 789 7721
jorge.hernandez-torano@hklaw.com

VIA Federal Express and First Class Mail

March 6, 2006

Louis J. Pearlman
Transcontinental Companies
127 West Church Street
Orlando, Florida 32801

        Re: Aaron C. Carter

Dear Mr. Pearlman:

On January 25, 2006, we sent you a letter requesting "all agreements, documents and/or instruments in your possession that purport to legally bind Aaron Carter to you or any other third party known to you." To this date, we have not heard from you or received any response to our request. We thus assume that no such agreements, documents, or instruments exist and that Mr. Carter is not legally bound to you, or any entities known to you, in any manner whatsoever.

In any event, Mr. Carter has asked us to inform you that he hereby disaffirms, cancels, and voids any and all such agreements, documents and/or instruments that may have been signed by Mr. Carter, or that may have been signed by others on his behalf, at the time he was a minor.

Please let us know if you have any questions or concerns regarding the above matter.

Very truly yours,

HOLLAND & KNIGHT LLP

By _____
Jorge Hernandez-Toraño

EXH  C

# EXHIBIT C

*Holland and Knight Letter #2*



Holland+Knight

Tel  305 374 5500
Fax  305 759 7799

Holland & Knight LLP
701 Brickell Avenue, Suite 3000
Miami, FL 33131-2847
www.hklaw.com

Jorge L. Hernandez-Toraño
305 789 7721
jorge.hernandez-torano@hklaw.com

January 25, 2006

Louis J. Pearlman
Transcontinental Companies
127 West Church Street
Orlando, Florida 32801

Re:  Aaron C. Carter

Dear Sir/Madam:

We write on behalf of our client, Mr. Aaron C. Carter.

For purposes of this letter, the term "Carter Documentation" shall mean all agreements, documents and/or instruments in your possession that purport to legally bind Mr. Carter to you or any other third party known to you.

As you may be aware, Mr. Carter recently attained adulthood.  Please take note that Mr. Carter reserves all his rights relating to the Carter Documentation, including, but not limited to, his rights to cancel or void any of the Carter Documentation to which Mr. Carter's signature was affixed at the time he was a minor.

Kindly furnish to us all Carter Documentation in your possession.  Please include a certification, signed by your records custodian, that the records you are providing are a complete and accurate copy of all the Carter Documentation in your possession. If you will kindly advise us of the cost of duplicating and certifying these records, we will promptly remit payment.

Your prompt attention to this request will be greatly appreciated.

Mr. Carter has co-signed this letter below to evidence his agreement with its reservation of rights and instructions.  All further communication to Mr. Carter from you or on your behalf should be in writing and addressed to the undersigned.

Very truly yours,

HOLLAND & KNIGHT LLP

By
Jorge Hernández-Toraño

Aaron C. Carter

EXH  D