# EXHIBIT F

## PERSONAL MANAGEMENT AGREEMENT

**AGREEMENT** made and entered this 7th day of May 2004 by and between a joint venture comprised of Louis J. Pearlman Enterprises, Inc. of 124 West Pine Street, 3rd Floor , Orlando, Florida 32801 and Bob Carter of 9300 Overseas Highway (hereinafter jointly referred to as "Managers") and Aaron Carter, a minor residing at 9300 Overseas Highway , Marathon, Florida 33050 (hereinafter referred to as "Artist").

## W I T N E S S E T H

In consideration of the representations and warranties and the mutual promises hereinafter set forth, it is agreed as follows:

1.       Subject to the terms and conditions in this Agreement, Artist hereby engages Managers and Managers agree to jointly act as Artist's sole and exclusive personal and career managers, representatives and advisors for an initial period of two (2) years from the date of this Agreement (the "Initial Period"). Artist hereby grants to Managers five (5) separate consecutive irrevocable options to extend the term of this Agreement for five (5) additional contract periods of one (1) year each (the "Option Periods"). The Initial Period and each Option Period may sometimes be referred to herein individually as a "Contract Period" and shall collectively be referred to herein as the "Term." Each Contract Period shall commence upon the expiration of the immediately preceding Contract Period, and each option granted to Managers hereunder shall be deemed automatically exercised by Managers (subject always to the condition precedent that the minimum Artist's Gross Receipts specified in paragraph 1[a- i-v] below have been earned) unless Managers provide to Artist written notice prior to 30 days before expiration of the to the contrary at any time prior to the expiration of the immediately preceding Contract Period. Each Contract Period shall commence upon the expiration of the immediately preceding Contract Period. As used herein, the term "Artist" includes all "Controlled Entities", as defined herein.

(a) In consideration of the rights granted by Artist to Managers hereunder, Louis J. Pearlman Enterprises, Inc. on behalf of Managers, shall advance to Artist, concurrently upon full execution, the sum of 30,000 dollars ($30,000.00) ["Advance"], which Advance shall be non-returnable but fully recoupable by Managers against Artist's Gross Receipts during the Term hereof on the following basis:  While any portion of the Advance remains unrecouped and outstanding, Managers shall be entitled to recoup sums equal to 20.% percent of such Gross Receipts, in addition to any Commission (as hereinafter defined in paragraph 8 below) Managers would otherwise be entitled to hereunder, until such time as the Advance is fully recouped.

(b) Notwithstanding anything to the contrary herein contained, Artist and Managers agree that Managers' rights to exercise each of the Option Periods described in the preceding paragraph 1, shall be subject to the express condition precedent that Artist's Gross Receipts for (in each case) the preceding period shall be not less than the following amounts:

1

MF003837

(i) During the Initial Term- $ 100,000
(ii) During the First Option Period- $300.000
(iii) During the Second Option Period- $600.000
(iv) During the Third Option Period- $700.000
(v) During the Fourth Option Period- $1,000.000

(Each hereinafter sometimes referred to as a "Period"). The Advance shall not be deemed Gross Receipts for purposes of determining whether or not Managers may exercise an Option based on such Gross Receipts, all as provided for in this paragraph 1.

(c) In the event elects to terminate due to the above minimal Gross Receipts are not earned in any particular Period, Artist shall have thirty (30) days immediately following the expiration of then current Period (and subject to Artist having been furnished with sufficient accounting information to determine if such Gross Receipts pertaining to a Period have been received) to notify Managers of his election to do so. In the event no notice is provided to Managers by Artist as aforesaid, the Agreement shall be deemed extended as if Managers had exercised its rights concerning the then current Option Period.

2.      During the Term hereof, Managers shall use reasonable efforts to direct, develop and enhance all phases of Artist's career, including, but not limited to, advising and counseling (i) in the selection of literary, artistic and musical material; (ii) in any and all matters pertaining to publicity, public relations and advertising; (iii) in relation to the adoption of proper formats for presentation of Artist's talents; (iv) in the selection of artistic talent to assist, accompany or embellish Artist's presentation; (v) with regard to general practices in the entertainment and amusement industries; and (vi) in the selection of theatrical and employment agents.

3.      Artist will at all times during the Term hereof (subject to devoting a reasonable amount of time to his education and education related activities), use reasonable efforts to devote himself to his professional career in the entertainment industry and do all things necessary and desirable to promote him career and earnings therefrom.

4.      (a)      Artist shall not publicly appear or perform for anyone, directly or indirectly, except in conjunction with and as advised by Managers, as Artist's personal representative, and under Managers' direction, without prior consultation with Managers.

(b)      The foregoing shall not be construed to restrict Artist's right to consult with and utilize the services of attorneys, accountants (business managers) and/or business advisors in matters concerning Artist's activities in the entertainment and related industries, notwithstanding that the areas in which Artist seeks advice from such parties may coincide with the areas of Managers' responsibilities hereunder.

5.      It is understood that Managers are not employment agents or theatrical agents; that Managers have not offered, attempted or promised to obtain employment or engagements for Artist nor are

2

MF003838

Managers obligated or expected to do so. Any such agent employed by Artist shall be paid by Artist alone.

6.      Artist agrees that Managers may render similar services to other artists and that Managers are not required to devote their entire time and energies, nor the entire time and energies of their respective employees, to Artist's affairs.

7.      If at any time Artist fails, for any reason whatsoever, to fulfill or perform any obligation assumed by Artist hereunder, or engages any other person or entity to perform any services which Managers are entitled to perform exclusively on Artist's behalf hereunder, then, without limiting Managers' rights, Managers shall have the right, exercisable at any time by notice to Artist, to extend the expiration date of the then current period of the Term. Such extension shall continue until Artist has fully cured such failure or engagement or terminated any engagement which is in violation of this Agreement and the then current period of the Term shall be extended for a period of time equal to the duration of any such failure or engagement. In no event shall such suspension and extension exceed the period of one (1) year. Artist acknowledges that Managers' exercise of their rights hereunder shall not in any way affect or diminish its right to equitable relief under this paragraph 7.

8.      In consideration for Managers' services hereunder, Artist shall pay to Managers jointly, a sum equivalent to 20% Percent (20%) of Artist's Gross Receipts ("Commission"), as and when received by Artist, Managers or Artist's business manager. The term "Gross Receipts" as used herein shall mean any and all compensation, in whatever form, which is paid, payable, earned or accrued during the Term hereof or subsequent to the expiration or other termination of the Term, in whole or in part (subject to the "sunset clause" set forth hereinbelow), to Artist, Artist's family, heirs, executors, administrators or assigns, or applied for Artist's benefit, directly or indirectly (for example, to any corporation, partnership or other entity in which Artist or any of the foregoing persons have an interest), during the Term hereof, as a result of Artist's activities in the entertainment and related industries, including, without limitation, motion pictures, television, radio, recordings, theater, advertising, promotion, music publishing, song writing, book publishing, video games, multimedia, CD-Rom and all other new technologies now known or hereinafter devised.   Artist shall pay or reimburse Managers, from Artist's Gross Receipts, if Managers have paid, for all expenses that Managers reasonably incur on Artist's behalf upon presentation of proof of payment by Managers.  Upon reaching the age of majority, Artist shall become entitled to, whenever practicable, to consult with Managers in advance, prior to such expenses being incurred.  Gross Receipts shall not include the following: (1) deficit financing tour support which Artist actually uses to pay legitimate tour expenses; (2) Artist's royalties permanently retained by a recording company or other entity in recoupment of recording or video costs, promotional costs and any other costs retained in recoupment of legitimate expenditures made pursuant to or in furtherance of any recording, video or other contract to which Artist is a party; (3) any actual *bona fide* recording costs paid to Artist or on Artist's behalf pursuant to any recording or production agreement for Artist's services (including any fees paid to third party producers or engineers); (4) any actual *bona fide* production costs paid to Artist or on Artist's behalf by any third party in connection with audiovisual or radio broadcast recordings featuring Artist's performances (and fees paid to third party directors or producers) and any monies paid for "sound and lighting" at Artist's live concert engagements; and (5) any monies

3

MF003839

paid for independent promotion or marketing of Artist's recordings. All Commissions hereunder, as and when received or otherwise credited, shall be split evenly (50/50) between Louis J. Pearlman Enterprises, Inc. and Bob Carter.

During the Term of this Agreement, acting alone or in association with others, (but without waiving Artist's right to approve any particular project or production which may become subject of this paragraph 8), Managers may package an entertainment program in which Artist is employed as an artist, or Managers may act as the entrepreneurs or promoters of an entertainment program in which Artist is employed by Managers who may engage Artist in connection with the production. Such activity on Managers' part shall not be deemed to be breach of this Agreement or of Managers' obligations and duties to the Artist. Managers shall not be entitled to the Commission in connection with compensation derived by Artist from any employment or agreement where under Artist is employed by the firm, person or corporation represented by Managers as the package agents for the entertainment program in which Artist is so engaged; and Managers shall not be entitled to the Commission in connection with compensation derived by Artist from sale, license or grant of any rights to Managers or any person, firm or corporation owned by Managers or either of them. In each and every instance Managers propose to package as aforesaid, such packaging activity shall be subject to the prior written consent of Artist, who shall in each instance be advised by independent legal counsel as to the advisability of the same. Managers shall thereupon, *inter alia*, disclose to Artist the financial structure of such proposed package in order to determine the fairness of the arrangement insofar as Artist is concerned.

9.    Subsequent to the expiration of the Term hereof (whether before or after the expiration of the full Term set forth in paragraph 1 herein), Artist agrees to pay to Managers in perpetuity their Commissions due on all Gross Receipts of Artist paid, payable, earned or accrued subsequent to the expiration of the Term which result from any contract entered into or substantially negotiated during the Term hereof and/or in connection with any and all Gross Receipts resulting in whole or in part from any services performed by Managers for Artist during the Term. Notwithstanding the foregoing, the commission payable to Managers in connection with the foregoing subsequent to the expiration or other termination of the Term hereof shall be 10% percent (10%) of Gross Receipts, as opposed to that rate set forth in the first sentence of Paragraph 8 hereof.

10.    Artist will deliver to Managers copies of all agreements and other documents relating to Artist's career in the entertainment industry.

11.    The parties agree that, in the event of a dispute hereunder, the prevailing party shall be entitled to recover the costs incurred in the enforcement hereof, including reasonable attorneys' fees, if the opposing party is found to have materially breached this Agreement.

12.    (a)    Artist and Bob Carter in his capacity as Artist's father, shall execute the letter attached hereto and incorporated herein by reference as Exhibit "A", hereby irrevocably authorizing and jointly appointing Managers as Artist's true and lawful agents and attorneys-in-fact for the purpose of collecting and receiving all monies payable to the Artist and for the purpose of executing documents and contracts for Artist's services, talents and/or artistic, literary and musical materials

4

MF003840

when Artist is not reasonably available to do so personally (within a reasonable period of time). Managers may exercise, on Artist's behalf, any rights to examine and/or audit books and records, which Artist has in connection therewith. Managers shall furnish to Artist monthly itemized accountings of all gross monies or other consideration paid to Managers on Artist's behalf during such period and all expenses and commissions deducted therefrom along with payment to Artist of the balance due Artist remaining in Managers' possession. Managers agree to maintain true and correct books and records relating to the foregoing. All accounting statements not objected to by Artist within two (2) years from the date of delivery of such statement, shall be conclusively binding on Artist.

(b) Notwithstanding the foregoing, in the event Artist retains a mutually approved accountant to collect Artist's income hereunder, Managers' right to do so shall terminate during the period that Artist's mutually approved (by Managers) accountant/business manager is actively engaged to collect Artist's income hereunder. Said accountant/business manager shall maintain true and correct books and records relating to the foregoing and shall account to and pay directly to Managers any and all sums due to Managers hereunder on a monthly basis.

(c) The parties shall have the right to audit each other's books and records in connection with this Agreement only, upon reasonable notice of the same, no more than one (1) time per year. The cost of such audit shall be borne by the party requesting the same and shall be performed by a certified public accountant at the regular place of business and during regular business hours of the party to be audited.

(d) In the event any Gross Receipts (including recoupable amounts under paragraph 1[a] above) which should have been paid to Managers pursuant to the terms and conditions hereof are nonetheless received at any time by Artist or by any other person, firm or corporation or other entity of any kind or nature on Artist's behalf (excluding Artist's accountant as set forth in Subparagraph (b) of this Paragraph 13), the same shall be deemed to be held in trust for Managers, and Artist shall immediately instruct the source of such Gross Receipts to thereafter conform to the provisions of this Paragraph 13 and shall, within forty-eight (48) hours of receipt of such Gross Receipts, remit or direct the remittance of all such Gross Receipts to Managers from the first monies so received prior to the payment of any other monies, and a photocopy of this Agreement shall (and hereby does) serve as an irrevocable letter of direction, authorizing and directing any and all other persons, firms and corporations or other entities to at all times so remit such Gross Receipts as provided herein. Should Artist, notwithstanding the foregoing, receive all of such Gross Receipts (including Managers' Commission), Artist shall not be deemed to be in breach of this Agreement, so long as Artist promptly takes such actions as may be required to pay the Commission to Managers, in accordance with the terms of this Agreement.

13.    (a)    All parties warrant and represent one to the others that (subject to the Artist's minority and required court approval of this Agreement) they have full right and power to execute this Agreement and perform all of its terms and conditions and that neither is under any disability, restriction or prohibition with respect hereto.

5

MF003841

(b)     A waiver by either Artist or Managers of a breach of any provision herein shall not be deemed a waiver of any subsequent breach, nor a permanent modification of such provision.

(c)     Notices hereunder shall be sufficient if sent by registered mail or certified mail, return receipt requested, or personally delivered to the respective party at the address set forth herein above, or such other address as either party may from time to time designate.

(d)     This agreement shall be governed by the laws of the State of California applicable to contracts made and to be wholly performed in the State of California without regard to any conflict of laws provisions of such State. Any claim, dispute or disagreement with respect to this agreement shall be submitted to the courts of the State of California, Orange County or the federal courts within the State of California, located in Orange County which courts shall have exclusive jurisdiction thereof. Any process in any action or proceeding commenced in such courts may, among other methods, be served upon by delivering or mailing the same, via registered or certified mail, return receipt requested (or commercial delivery courier who requires a signature for receipt of its packages), addressed to either party at the address designated herein. Any such service by delivery or mail shall be deemed to have the same force and effect as personal service within the State of California. If any provision hereof shall, for any reason, be illegal or unenforceable, the same shall not affect the validity of the remaining portions and provisions hereof.

14.     (a)     Artist may not assign this Agreement or any of Artist's rights hereunder without the written consent of Managers, which shall not be unreasonably withheld other than to a Controlled Entity, exclusively entitled to provide Artist's services. Managers may assign this Agreement to any entity(ies) in which both (or the applicable, "assigning") Manager(s) has/have a substantial equity interest or to any entity or entities in which Louis J. Pearlman and Bob Carter shall each personally, respectively, remain as employees to, in part, personally and jointly together oversee the management of Artist's career in the entertainment industry. Louis J. Pearlman Enterprises, Inc. and Bob Carter shall be jointly and severally responsible and in control of Managers' performance rendered to Artist hereunder and each shall have a co-equal voice in all management decisions to be made by Managers hereunder.

(b)     This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective successors, personal representatives and, subject to the provisions of this paragraph, their respective assigns.

(c)     This Agreement shall also be binding upon any entity which, directly or indirectly, in whole or in part, through one or more intermediaries, owns or controls, is owned or controlled by, or is under common ownership or control with, Artist (a "Controlled Entity"). Accordingly, this Agreement is hereby accepted by Artist on Artist's behalf and on behalf of each Controlled Entity.

15.     Artist expressly agrees that the Artist's services hereunder are of a special and unique character and that in the event of a material breach by Artist of any term, condition or covenant herein, Managers shall be entitled to injunctive relief in addition to any other remedies available to it.

6

MF003842

16.     In the event of a breach by Managers hereunder, Artist shall give written notice of the breach specifying the facts upon which the breach is claimed. Managers shall have thirty (30) days from their receipt of such written notice to cure such breach. In the event such breach cannot by its nature be cured within said thirty (30) day period, Managers shall use their best efforts to commence to cure such breach within a reasonable time. In the absence of proper notice as set forth herein, no breach by Managers of this Agreement shall be deemed material.

17.     This Agreement shall in no way be construed to create a partnership, joint venture or agency relationship between Artist and Managers, except as otherwise provided herein.

19.     Managers may obtain life insurance on Artist's life during the Term, at Managers' sole expense. Managers shall remain jointly and in equal shares, the sole owners and beneficiaries of such life insurance policy. Artist shall submit to any reasonable physical examinations required by Managers' life insurance carrier, including a blood test, and Artist shall complete and sign any and all reasonable documentation required to obtain such policy of insurance.

20.     This Agreement is the entire agreement between Artist and Managers pertaining to the subject matter hereof. It may not be modified except by a written instrument signed by Artist and both Managers. There is no other agreement, oral or written, between Artist and Managers relating to the subject matter hereof.

21.     Artist has advised Managers that he is under eighteen (18) years of age. Artist shall cooperate with reasonable requests by Managers in connection with any proceedings Managers may institute, at their own cost and expense, to obtain judicial approval of this Agreement. In that regard, Artist and Managers hereby consent to the establishment of any trust fund or savings plan for his benefit as the court to which such petition for approval is submitted deems just and proper. At any time after Artist has reached the age of eighteen (18) years (or such other age as may be deemed the age of majority for purposes hereof), Artist and Bob Carter, in his capacity as Artist's parent and/or guardian, shall, upon Louis J. Pearlman Enterprises, Inc.'s request, reaffirm in writing the validity and enforceability of this Agreement. If Managers are unable to obtain judicial approval of this Agreement, or if Artist and/or Bob Carter fails to reaffirm this Agreement within thirty (30) days after Louis J. Pearlman Enterprises, Inc.'s request therefore, Louis J. Pearlman Enterprises, Inc. shall have the right (but not the obligation, and without limiting Louis J. Pearlman Enterprises, Inc. other rights and remedies) to terminate the Term hereof, in which event Managers shall have no further obligations to Artist and/or Artist hereunder (other than the obligation to pay monies due to Artist and Bob Carter, if any). Artist hereby agrees to cause Bob Carter, in his capacity as Artist's parent or legal guardian to sign the inducement letter/parental agreement attached hereto as Exhibit "A".

22.     Managers and Artist acknowledge that since Bob Carter is also Artist's father, Mr. Carter's status as Artist's co-manager hereunder might give rise to actual or perceived conflicts of interest while acting in the dual roles of Artist's father and Artist's co-manager. Understanding the nature and implications of any such actual or perceived conflicts, Artist hereby, having received or knowingly waived his right to seek the advice of independent legal counsel, does knowingly and

7

MF003843

voluntarily irrevocably waive any right to assert the same as a defense to the enforcement of this Agreement.

23.    **ARTIST ACKNOWLEDGES THAT ARTIST HAS READ THIS AGREEMENT AND HAS BEEN ADVISED BY MANAGER OF THE SIGNIFICANT IMPORTANCE OF RETAINING AN ATTORNEY TO REVIEW THIS AGREEMENT ON ARTIST'S BEHALF. IN THE EVENT OF ARTIST'S FAILURE TO OBTAIN AN ATTORNEY, ARTIST HEREBY WARRANTS AND REPRESENTS THAT THEY WILL NOT ATTEMPT TO USE THEIR FAILURE TO OBTAIN AN ATTORNEY AGAINST MANAGER HEREAFTER IN A COURT OF LAW.**

24. A signed fax copy of this Agreement shall be deemed for all purposes to be an original hereof and the execution hereof by a party, which is transmitted by telecopier/facsimile, shall have for all purposes, the same legal effect as if it was signed in ink. This Agreement may be signed in counterpart form, all of which, taken together shall be deemed one and the same instrument.

    **IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals on the date first above written.

Artist
Aaron Carter

Louis J. Pearlman Enterprises, Inc.
Co-Managers

By
  Louis J. Pearlman
  its President

  Bob Carter
  Co-Managers

WITNESSES:

Dated: 5/7/04

Dated: 5/7/04

8

## EXHIBIT "A"

### BOB CARTER

_____, Florida _____

Louis J. Pearlman Enterprises, Inc.
127 West Pine Street, Third Floor
Orlando, Florida 32801

Gentlemen:

I hereby acknowledge my son, Aaron Carter (hereinafter referred to as "Artist") has entered into a personal management agreement dated as of May 6, 2004 with you and me acting as co-managers in a cooperative joint venture arrangement ("the Agreement").

In consideration of your entering into the Agreement with Artist, and as further inducement to you to do so (it being to my benefit that you enter into the same), we hereby agree as follows:

. I am Artist's father and/or legal guardian;

. Artist is presently a minor;

. I will cooperate with you and shall sign such documents as you may reasonably request in connection with any proceeding to obtain judicial approval of the Agreement. As and when my consent is from time to time required under the Agreement, I agree and represent that I may act alone in the Artist's behalf.

Very truly yours,

_____
Bob Carter

9

MF003845

# PARENTAL AGREEMENT

**THIS AGREEMENT** is made on May 6, 2004 between Louis J. Pearlman Enterprises, Inc. (hereinafter referred to as "LJPE"), of 127 W. Pine Street Orlando, Fl 32801 and Bob Carter (hereinafter referred to as "Parent") of Marathon, Florida 33050.

**WHEREAS** the parties enter into this Agreement to induce LJPE to enter into a co-management agreement with Aaron Carter (hereinafter referred to as "Artist") whereby Artist shall be managed by LJPE and Parent ("the Management Agreement"); and

**WHEREAS** Parent acknowledges that LJPE is relying on his consent to the signing of the Management Agreement by Artist under his legal responsibility;

The parties agree as follows:

1. Parent represents and warrants to LJPE that

a. He is the parent of Artist and have not lost or surrendered any parental rights through adoption, court order, or otherwise;

b.   he resides at 9300 Overseas Highway, Marathon, Florida 33050 with Artist, who was born on December 7, 1987.

c. He (i) has read the Management Agreement and is familiar with their terms and conditions; (ii) has had the Management Agreement explained to his by a lawyer of his choice or has had the unrestricted opportunity to do so and has knowingly declined to do so; and (iii) understands the legal effect of the Management Agreement on him and Artist and is satisfied that the Management Agreement is fair and for the benefit of Artist.

2. Parent consents to and approves of Artist's rendering services pursuant to the Management Agreement and hereby grants permission to Artist to enter into the Management Agreement and pursue the business thereof. Parent warrants that such permission shall be deemed sufficient for purposes of any applicable statute or law and shall not be revoked during or after the minority of Artist.

3. Parent warrants that Artist shall not disaffirm the Management Agreement during or after Artist's minority. Parent indemnifies and holds LJPE harmless from all damages, including attorneys' fees, LJPE incurs as a result of a breach of this or any other warranty or due to any other action of Parent or Artist. If Artist disaffirms the Management Agreement at any time, Parent shall promptly reimburse LJPE all amounts not yet recouped as described under the Management Agreement. Parent's liability is absolute, direct, and not conditioned upon LJPE's pursuit of any remedy it may have against Artist. This guaranty shall be valid irrespective of the validity, regularity, or enforceability of the Management Agreement. This guaranty shall not be revocable during or after Artist's minority, and Parent waives all legal defenses to its enforcement. No failure by LJPE to exercise any of its rights will constitute a waiver of those rights or any others. However, if the Management Agreement is ratified by the Court pursuant to California Statutes or if Artist ratifies the Management Agreement in writing after reaching the age of majority, Parent shall have no liability hereunder.

Parental Agreement
Page 1 of 2

MF003846

# EXCLUSIVE RECORDING ARTIST AGREEMENT

AGREEMENT made as of the 7th day of December, 2004, by and between TRANS CONTINENTAL RECORDS, INC., a Florida corporation with its main place of business located at 127 West Church Street, Suite #350, Orlando, Florida 32801 ("hereinafter referred to as Company") and AARON CARTER, an individual minor with a mailing address c/o Robert Carter 9300 Overseas Highway, Marathon, Florida 33050, (hereinafter referred to as "Artist").

In consideration of the mutual promises and covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. **Term.**

   (a)     The term of this agreement (hereinafter, the "Term") shall begin on the date set forth above and continue for an initial period ending on the date twelve (12) months following the initial commercial release of the First Album Delivered in complete satisfaction of the Delivery Obligation for such initial period (the "Initial Period").

   (b)     Artist grants to Company six (6) consecutive separate options (each an "Option Period") to extend the Term for additional periods on the same terms and conditions applicable to the Initial Period. The Initial Period and each Option Period are each sometimes referred to herein as a "Contract Period". Company may exercise its option for a particular Option Period by written notice to Artist prior to the expiration of the Contract Period, which is then in effect (the "Current Period"). If Company exercises its option to extend the Term, the Option Period concerned shall begin immediately after the end of the Current Period and shall continue until the date twelve (12) months following the initial commercial release of the Album Delivered in complete satisfaction of the Delivery Obligation for that Option Period.

   (c)     Notwithstanding anything contained in this agreement, neither the Term nor any Contract Period will end unless and until Artist delivers to Company a notice expressly referring to this paragraph 1(c) and indicating that Company has theretofore failed during the Current Period to exercise its option to extend the Term for the next Contract Period. If Company fails to exercise its option on or before the date that is thirty (30) business days after Company's receipt of such notice from Artist, then the Term will end on such thirtieth (30th) day, as if that date were the original expiration date of the Term, without Company having any liability or additional obligations to Artist in connection therewith.

2. **Delivery Obligation/Television Special.**

   (a)     (i)     During each Contract Period, Artist shall produce and Deliver to Company one (1) LP (sometimes referred to herein as an "LP" or "Album") solely embodying Artist's performances, it being understood and agreed that Artist shall Deliver a minimum of ten (10) Sides and a maximum of twenty (20) Sides recorded during the Current Period in connection with each Album except that during the Initial Period only, Artist shall produce and Deliver to Company at Company's sole option up to and including three (3) "single" recordings in lieu of an Album. The Delivery of such Single(s); each consisting of not more than two (2) individual masters, each embodying one (1) musical

1

composition ("Singles"), satisfying what would otherwise be the Delivery obligation otherwise pertaining to an Album during and for the Initial Period. During such Initial Period only and on or about November 18, 2004 Company shall produce a television special (the "Special") featuring Artist and other guests mutually selected by Company and Artist, to appear with Artist on the Special. All other technical, creative and business matters connected with, related to or derived from the Special shall be treated, as between Artist and Company, as any other Master Delivered by Artist to Company hereunder.

        (ii)    Each Album shall be Delivered to Company prior to the date (the "Due Date") mutually agreed upon by the parties, but in no event later than one hundred fifty (150) days after the commencement of the Current Period. If Artist is delinquent in the Delivery of any Masters hereunder, the next Delivered Masters shall be deemed to satisfy the most delinquent requirements first. Company's exercise of an option shall not constitute a waiver of any of Company's rights to prior recordings hereunder.

        (b)    Subject to your prior written consent, and good faith negotiations between the parties for an advance, during the Term, Company shall have one (1) option (a "Greatest Hits Sides Option"), to require Artist to record and Deliver up to two (2) Sides recorded after Company's exercise of the Greatest Hits Sides Option (the "New Greatest Hits Masters"). Each such New Greatest Hits Master shall embody a Composition not previously recorded by Artist and shall be intended for initial release on the "Greatest Hits" or "Best Of" LP (a "Greatest Hits LP"). Artist shall Deliver such New Greatest Hits Masters on a date mutually agreed upon by the parties, but in no event later than ninety (90) days after Company's exercise of a particular Greatest Hits Sides Option. New Greatest Hits Masters shall not be deemed to fulfill any of Artist's obligations hereunder with respect to Committed LPs.

        (c)    Neither Multiple LPs, "theme" Masters (e.g., Christmas Masters), nor Masters consisting of "live", instrumental or joint recordings shall be Delivered hereunder without Company's prior written consent, which may be withheld by Company in good faith. If Artist Delivers and Company accepts Masters constituting a Multiple LP, such Masters shall be deemed to be one LP for the purposes of Artist's Delivery obligations under this agreement. If Artist Delivers and Company accepts Masters consisting of "live", "theme", instrumental or joint recordings, then such Masters shall not be deemed to be in partial or complete fulfillment of any of Artist's obligations hereunder.

    3.    General Procedures.

        (a)    Each Master Delivered hereunder shall be subject to the approval of Company as being commercially and technically satisfactory. At Company's request, Artist shall (and/or Company, at its election, may) re-record Masters in order to obtain Masters satisfactory to Company in its reasonable commercial judgment.

        (b)    Company shall determine and prepare, in meaningful consultation with Artist, the recording budget for each prospective Album hereunder and shall inform Artist of the amount of said budget prior to commencement of recording. Notwithstanding the foregoing, the recording budget shall be no less than the following amounts with respect to the corresponding Album:

2

| Album Number | Minimum Recording Budget |
|---|---|
| 1 | $100,000.00 |
| 2 | $100,000.00 |
| 3 | $100,000.00 |
| 4 | $100,000.00 |
| 5 | $100,000.00 |
| 6 | $100,000.00 |

Company and Artist shall mutually designate each Composition to be recorded under this agreement. Company and Artist shall designate, after meaningful consultation with Artist, the producer of each Master (each, a "Producer") and the studio(s) to be used for recording and mastering. Company shall be responsible for engaging and paying all Producers. Company shall have the right to have a representative attend each recording session, at Company's sole cost and expense.

(c)   (i)   Artist shall at all times cooperate with producers so that producers are able to provide Company with union contract forms, all necessary payroll forms and such other required documents on a timely basis.

(ii)   Company shall own and control from the inception of their creation, each and every original session tape, each multi-track master, a non-equalized copy of the Masters and each and every mother, roaster, acetate copy or other derivative of the Masters.

(d)   Nothing in this agreement shall obligate Company to permit the continuation of any recording project, even if previously approved hereunder, if Company reasonably anticipates that (i) the Recording Costs will exceed the Approved Budget; or (ii) the Masters being produced will not be satisfactory to Company.

4.   Recoupable and Reimbursable Costs.

(a)   All recording costs incurred by Company at any time in connection with the Recording of Committed LP's, Singles (if recorded during the Initial Period separate and apart from any Committed LP) and the Television Special hereunder will be deemed Recording Costs hereunder and shall be recoupable from any and all royalties accruing to Artist, excluding mechanical royalties, under this agreement.

(b)   Upon Company's receipt of invoices therefore, Company shall pay all Recording Costs incurred in connection with the Masters required to be Delivered as well as the Television Special, subject to this agreement in accordance with an approved written recording budget

3

[and in the case of the Television Special; the Television Special production budget] (each, the "Approved Budget"), all of which shall be deemed Recording Costs hereunder. Company shall have no obligation to pay any Recording Costs incurred, which, exceed such Approved Budget, if such excess costs are solely Artist's fault ("Excess Costs"). Company shall have the right, in its sole discretion, to pay such Excess Costs, which shall be recoupable from any and all sums due Artist, excluding mechanical royalties.

(c)        One hundred percent (100%) of all out of pocket third party costs paid or incurred by Company in connection with (i) Recording Costs hereunder (it being understood that Company shall re-credit to Artist's royalty account hereunder any Recording Costs so recouped from royalties otherwise payable to Artist if and to the extent same are subsequently recouped from royalties otherwise payable to an individual producer of a Master) and (ii) "deficit tour support" and personal appearance costs, shall constitute Advances. Fifty percent (50%) of all out of pocket third party costs paid or incurred by Company in connection with (y) the production of Videos (it being acknowledged and understood that the Television Special is not a Video for purposes hereof) embodying Artist's performances and (z) independent promotion shall constitute Advances. Company shall be entitled to recoup as Advances hereunder any amounts that are recoupable against Company by Distributor under any Distribution Agreement. Company may recoup Advances from any and all record royalties accruing to Artist under this agreement.

5:        Advances/Royalties.

(a)        Company agrees to pay Artist fifty percent (50%) of each Net Advance paid to Company under a Distribution Agreement, if any. "Net Advance" shall mean a gross advance paid to Company under a Distribution Agreement during the term of this agreement less (i) all costs incurred by Company in promoting Artist for purposes of securing a Distribution Agreement as well as all costs incurred by Company in securing a Distribution Agreement, including the costs of showcasing Artist and reasonable outside legal fees in connection with the negotiation of a potential Distribution Agreement, (ii) all Recording Costs paid by Company or the Distributor to the extent such costs have not been previously deducted by Company from a prior Advance paid by a Distributor or recouped from royalties otherwise payable to Artist hereunder, and (iii) all other charges and costs deducted from Advances payable by the Distributor to the extent such charges and costs have not been previously deducted by Company from a prior Advance paid by a Distributor or recouped from royalties otherwise payable to Artist hereunder. "Distribution Agreement" shall mean each agreement entered into by Company to effectuate the distribution of one (1) or more Records through normal retail channels;

(b)        With respect to Net Sales for which Company receives royalties or is credited with royalties against an advance under a Distribution Agreement, Company agrees to credit to Artist's account hereunder a royalty in the amount of fifty percent (50%) of the Net Receipts paid or credited to Company under a Distribution Agreement, or otherwise. "Net Receipts" shall mean all gross monies actually received by or credited to Company in connection with the exploitation of Artist's services hereunder under a Distribution Agreement or otherwise. "Net Sales" shall mean Records sold by Company or by a Distributor (or its distributor(s)) to independent third parties, for which Company has been paid or credited, less records returned and reserves against returns.

(c)        Company will accrue to Artist's royalty account the royalties set forth in this paragraph 5. Such royalties shall include all royalties due Artist (but excluding mechanical royalties, except as otherwise set forth herein or royalties due to third parties such as record producers,

4

who shall be paid separately and directly by Company, which payments shall not reduce or otherwise effect Artist' royalties hereunder).

6. **Accounting.**

(a) Royalties will be accrued semi-annually and paid, less all Advances and any other recoupable costs charges, within ninety (90) days following the last day of February and August, in accordance with Company's regular accounting practices. Company shall have the right to establish reasonable reserves for returns and exchanges not to exceed thirty percent (30%). After the first full semi-annual accounting period following the release of a Album, the royalty reserve established for the particular Album shall not be in excess of thirty percent (30%) (fifty percent [50%] with respect to Singles) of the aggregate number of units of that Album [or Single] shipped. Each royalty reserve will be liquidated no later than the end of the fourth (4th) full semi-annual accounting period following the period during which such reserve is initially established. If Company makes any overpayment of royalties (e.g., by reason of an accounting error or by paying royalties on Records returned later), Company shall have the Offset Right with respect to such overpayment.

(b) Royalties shall be computed in the same national currency as Company is accounted to, at the rate of exchange in effect at the time of payment to Company for such Records, and shall not accrue until payment has been received by Company in the United States or credited to Company against an earlier advance made to Company. If Company is paid for exploitations outside the United States but cannot receive such payment in the United States, then Company's only royalty obligation to Artist in respect of any such exploitations shall be to deposit, but only at Artist' written request and expense, subject to prior notice by Company to Artist, the royalties payable to Artist for such exploitations in the currency in which Company receives payment, and such deposit shall be made to Artist' account in a depository selected by Artist and located in the country in which payment to Company is made for such exploitations.

(c) Each royalty payment shall be accompanied by a statement in accordance with Company's regular accounting practices. Each statement shall become binding on Artist and Artist shall not make any claim against Company with respect to such statement, unless Artist advises Company, in writing, of the specific basis of such claim within two and one-half (2¹/₂) years after the date the statement is received by Artist.

(d) Artist shall not have the right to sue Company in connection with any royalty accounting or to sue for royalties accrued by Company during the period a royalty accounting covers, unless Artist commence the suit within three (3) years after the date when the statement in question was received by Artist. If Artist commences suit with respect to any royalty accounting due Artist, the scope of the proceeding shall be limited to determination of the amount of royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Artist' recovery of any such royalties will be the sole remedy available to Artist by reason of any claim related to Company's royalty accountings. Without limiting the generality of the preceding sentence, Artist shall not have any right to seek termination of this agreement or avoid the performance of their obligations by reason of any such claim.

5

(e)    Royalties accruing hereunder shall be less any taxes of any applicable jurisdiction require to be withheld in connection with such royalties.

(f)    If, on any date, the performances embodied on any Master become property of the public domain in any territory of the world so that Persons may reproduce and/or exploit in such territory Records of such performances without license from and payment to Company, then, notwithstanding anything herein to the contrary, no monies whatsoever shall accrue hereunder in connection with Records Sold in such territory on and after said date insofar as such performances are concerned.

(g)    Artist may only once during any calendar year, and only once with respect to any statement due hereunder, audit Company's books and records to determine the accuracy of Company's statements. Artist shall notify Company at least thirty (30) days prior to the date Artist' plans to commence the audit. Company shall have the right to postpone the commencement of Artist' audit by notice to Artist no later than five (5) days prior to the commencement date specified in Artist' notice; if Company does so, the running of the time within which the audit may be made will be suspended during the postponement. If an audit is not completed within thirty (30) days from the time it began, Company shall have the right to require Artist to terminate it on five (5) days' notice to Artist at any time; Company will not be required to permit Artist to continue the examination after the end of that five (5) day period. Artist shall not be entitled to examine any manufacturing records or any other records which do not specifically report sales of Records or calculation of net receipts on which royalties are accruable hereunder. All audits shall be made during regular business hours, and shall be conducted by an independent Certified Public Accountant, but not if he or his firm has begun an examination of Company's books and records for any Person (except Artist), unless the examination has been concluded and any applicable audit issues have been resolved. Each examination shall be made at Artist' own expense at Company's regular place of business in the United States where the books and records are maintained.

7.    Videos.  Company shall pay, as an Advance, the production costs of the Television Special (the "Television Special Costs") as well as each Video (the "Video Costs") Company shall produce the Television Special pursuant to a written budget (the "Television Special Budget") and may elect to produce, pursuant to a written budget (the "Video Budget") each approved by Company prior to each production. Costs paid by Company in excess of such Television Special Budget and/or such Video Budget, to the extent such excess costs are caused solely by Artist, as determined by Company in its sole discretion, shall result in Company having an Offset Right (including, but not limited to, the right to recoup such costs from any and all sums payable to Artist under this or any other agreement) with respect thereto. Company and Artist shall mutually approve the Compositions to be embodied in the Television Special and each Composition to be embodied in each Video (any Composition embodied on a Single is hereby deemed approved by Artist insofar as Videos are concerned), the director, concept and storyboard of each Video, however, in the event of a dispute Company's decision shall be final. All decisions of Company in regard to the Television Special other than the selection of support acts (if any) and the songs to be performed, shall be in the sole discretion of Company. Company shall recoup fifty percent (50%) of all Video Costs from audio-only Record royalties accruing hereunder, and one hundred percent (100%) of such costs from Video royalties accruing hereunder, except that the Video Costs for any Video in excess of Fifty Thousand Dollars ($100,000) shall be one hundred percent (100%) recoupable from audio-only Record royalties. Artist warrant that Artist shall (a) be available to perform for Videos on such dates and at such locations selected by Company and (b) fully cooperate with all production personnel in the

6

production of any Video. Company shall recoup one hundred percent (100%) of the Television Special Costs prior to dividing all net sums derived therefrom, evenly (50/50) with Artist on the same basis as any other royalties, as if received from the sale and exploitation of sound recordings derived from Masters hereunder except that Television Special Costs shall not be cross-collateralized with or recouped against any other sums advanced by Company in connection with any matter of thing other than the Television Special. Accountings and payments of any sums owing to Artist by Company in connection with, arising out of or resulting from the Television Special, shall be furnished to Artist concurrent with all other royalty statements to be otherwise furnished to Artist under paragraph 6 hereinabove and except as otherwise specifically provided for herein, Artist's and Company's rights and obligations concerning the Television Specials, shall be identical to such rights and obligations as pertain to Videos hereunder.

    **8.**     <u>Mechanical Royalties</u>. Artist hereby grant to Company an irrevocable license under copyright to reproduce each Controlled Composition on Records and distribute such Records in the United States and Canada, subject to the following terms:

    (a)     (i) Mechanical royalties for Controlled Compositions in the United States and Canada will be payable at one hundred percent (100%) of the Statutory Rate at the time of recording of such Controlled Composition, with respect to Top-line Records sold through normal retail distribution channels ("NRC Sales") as defined in paragraph 13. It is understood and agreed that solely for the purposes of this paragraph 8(a)(i), Multiple LP Albums and Audiophile Records shall not be excluded from NRC Sales if all other requirements of paragraph 13(i) are met. All Compositions shall be published fifty percent (50%) by Artist's designated publishing firm and fifty percent (50%) by Company's designated publishing firm; net of any third party interests mutually agreed upon by Artist and Company, each of which shall reduce their interests on a pro-rata basis.

    (ii)     (A) Mechanical royalties for Controlled Compositions in the United States and Canada will be payable at seventy five percent (75%) of the Statutory Rate with respect to Records Sold through record clubs.

    (B)     Mechanical royalties for Controlled Compositions in the United States will be payable at seventy five percent (75%) of the Statutory Rate with respect to Mid-Price Records.

    (iii).     For all exploitations of Records other than those described in paragraphs 8(a)(i) or (ii) above and 8(c) and (d) below, mechanical royalties will be payable at one hundred percent (100%) of the Statutory Rate.

    (b)     Artist warrant and represents that all Compositions will be available for licensing hereunder and that the maximum amount that Company shall pay with respect to any Record will be one hundred percent (100%) of the Statutory Rate multiplied by the following applicable amounts: (A) LPs, ten (11); (B) EPs, five (5); (C) Long-Play Singles, three (3) and (D) other Singles and other Records not specified herein, two (2). Without limiting Company's rights, it is agreed that Company may exercise its Offset Right with respect to mechanical royalties in excess of the above amounts.

7

(c)   Controlled Compositions are hereby licensed to Company at no cost for use in and in connection with all exploitations of promotional, non-commercial Videos.

(d)   No copyright payments shall be payable for any more than one use of any Composition on a particular Record or for Controlled Compositions which are (A) non-musical; (B) arrangements of selections in the public domain; and/or (C) embodied in Records which are not Records Sold.

(e)   Company shall issue statements with respect to all mechanical copyright royalties payable hereunder on a quarterly basis within forty-five (45) days after the end of the applicable three-month period. Company shall withhold a portion of such royalties, not to exceed twenty five percent (25%) as a reasonable reserve for returns and exchanges. The provisions of subparagraphs (c) through (g) of paragraph 6 shall be applicable to accountings rendered pursuant to this subparagraph 8(e).

(f)   During the Term, neither Artist nor any Person deriving rights from Artist will authorize the use of any Controlled Composition in a radio or television commercial, a motion picture or television production or any other advertising or promotion unless the licensor first requires the licensee to agree, in writing, for Company's benefit, that the Composition will not be used in a "sound-alike" Master. A "sound alike" Master is a Master embodying the performance of a Composition embodied on a Master Delivered hereunder that imitates or simulates the performances embodied on the Master concerned hereunder by using a substantially similar music arrangement, vocal performance or otherwise. If Artist or any Person deriving rights from Artist shall determine to grant any rights in any Controlled Composition to any music publisher or any other Person or to authorize the use of any music or lyrics written by Artist in a Composition together with material written by anyone else, or if Artist shall determine to collaborate with any other Person in the authorship of any Composition, Artist will first require the other parties to the transaction or collaboration concerned to enter into a written agreement, for Company's benefit, requiring compliance with this paragraph.

9.   **Rights.**

(a)   All Masters furnished to Company hereunder or created during the Term, including without limitation the First Album hereunder, are hereby deemed "works made for hire" and Company shall own all right, title and interest in and to the Masters and all copies thereof and the performances contained thereon throughout the Territory in perpetuity from the inception of their creation, including the worldwide copyrights thereto and all renewals thereof. If, for any reason, any Master is not deemed a work made for hire, Artist hereby assign to Company in perpetuity all rights in and to each such Master, including, without limitation, all copyrights and renewal rights thereto. Company shall have the exclusive right to use the Masters hereunder in perpetuity in any manner, including, without limitation, the exclusive right to:

(i)   Manufacture, distribute and exploit all and/or any portions of the Masters, in any or all fields of use, by any method and through any media and by any means now or hereafter known, upon such terms and conditions and under any trademark or label as Company may elect or, in its sole discretion, to refrain therefrom;

(ii)   Use the approved names (including all professional, assumed or fictitious names), approved likenesses, approved photographs and approved biographical material of

8

Artist rendering services in connection with the Masters (sometimes referred to herein as "Artist' Identification") for the purpose of publicizing, exploiting and marketing Masters hereunder and in general goodwill advertising for Company in the entertainment industry; and

(iii)    Publicly perform or permit the public performance of the Masters by means of radio broadcast, television broadcast or any other method of public performance now or hereafter known.

(b)    Company's payment of any monies shall not constitute a waiver of any of Company's rights hereunder or of any of Artist' obligations, including but not limited to, the obligation to Deliver Masters. In addition, Company's acceptance and/or use of Masters, materials or other items delivered by Artist shall not constitute a waiver of any of Artist' representations, warranties or agreements in respect thereof.

(c)    It is understood and agreed that during the Term, in the United States.

(i)    No Side delivered hereunder shall be released on any Record sold embodying Sides recorded hereunder coupled with Sides not recorded hereunder ("Coupled Records(s)"), without Artist' prior written consent, not to be unreasonably withheld, provided, however, that the foregoing restriction shall not apply with respect to (A) up to two (2) Sides delivered hereunder with respect to each Album and (B) so-called "sampler Records", the coupling of Masters hereunder for jukeboxes or "Personics®"-type uses, or use of Masters in Videos or Records used in connection with public transportation carriers or facilities or promotional Records.

(ii)    The provisions of paragraphs 9(c)(i) above shall not apply if Artist have not fulfilled Artist' Delivery obligations with respect to any Masters hereunder within the time periods set forth herein, or any of Artist' other material obligations hereunder.

(d)    It is understood and agreed that, without limitation of the license set forth in paragraph 8 above, that nothing contained in paragraph 9(a) above shall be deemed to grant Company any ownership interest in the Compositions embodied on Masters hereunder.

(e)    During the Term, Company shall submit to Artist or Artist's representative (whom Artist shall designate in writing for this purpose), for Artist's prior written approval, any photographs, likenesses or biographical material of Artist not furnished by Artist to Company, which Company intends to use in the United States. Such approval shall not be unreasonably withheld, and shall be deemed granted unless Company is advised in writing to the contrary within ten (10) business days after submission of such photographs, likeness or biographical material to Artist or Artist' representative, specifying the reasons for such disapproval. Any inadvertent failure of Company to comply with this sub-paragraph shall not be deemed a breach of this agreement, provided, however, that Company shall use reasonable best efforts to cure such failure after notice from Artist.

(f)    (i)  Provided Artist has fulfilled all of Artist' material obligations under this agreement, Company shall commercially release each Album in the United States within five (5) months after the date of Delivery in accordance with the provisions hereof of such Album. If Company fails to do so Artist may notify Company that Artist intends to terminate the Term unless Company releases such Album within sixty (60) days (the "Cure Period") after Company's receipt of Artist' notice. If Company fails to release such Album before the end of the Cure Period, Artist shall have the

9

right, by giving Company notice thereof (the "Termination Notice"), to terminate the Term. On receipt by Company of the Termination Notice, and provided that Company has not released the applicable LP prior to the end of the Cure Period, the Term will end and all parties will be deemed to have fulfilled all of their obligations under the agreement except those obligations which survive the Term (e.g., warranties, audit rights, re-recording restrictions and obligation to pay royalties and other monies). Artist' only remedy for failure by Company to release an Album in the United States will be termination in accordance with this subparagraph 9(f)(i).

        (ii)    The running of the five (5) month and sixty (60) day periods referred to in this paragraph 10(f) will be suspended (and the expiration date of each of those periods will be postponed) for the period of any suspension or extension of the Term.

      10.    <u>Warranties and Representations</u>.

Artist warrants and represents the following:

        (a)    Artist is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to (i) Artist's right to enter into this agreement, and (ii) Artist's right to grant the rights granted to Company hereunder, to fully perform each and every term and provision hereof, and to record each and every Master hereunder. Artist's shall cause his father and guardian Robert Carter to execute and deliver to Company herewith, the letter of parental consent attached hereto and incorporated herein by reference as Exhibit "A".

        (b)    (i)  During the Term: (A) Artist shall record Masters exclusively for Company embodying Compositions not previously recorded by Artist and (B) Artist warrants that Artist will not perform or render any recording services for the purpose of making, promoting, or marketing Masters or Records for any Person other than Company.

        (ii)   Notwithstanding anything to the contrary contained in subparagraph 10(b)(i) above, Artist shall be permitted to perform as a non-featured "sideman" at recording sessions for other record company(ies), provided that:

        (A)   Neither the Records embodying such performances nor the exploitation of said Records shall feature Artist's likenesses;

        (B)   Artist shall receive credit only as sidemen on the back cover and/or in the liner notes of such Record(s), provided that Artist's name shall not appear on the cover of any Record if Artist is performing as a sidemen;

        (C)   Such credit shall not be larger than the credit accorded to other non-featured sidemen or producers (as applicable), but in no event shall any such credit be larger than that customary in the recording industry;

        (D)   A courtesy credit shall be included where Artist appear as sidemen to the effect that Artist "appears courtesy of [Company]"; and

        (E)   Such performances do not interfere with the timely completion of Artist's services rendered hereunder.

10

(iii)    Without limiting the generality of the provisions of paragraph 10(a)(i) above, Company agrees that Artist may perform in theatrical and/or television motion pictures and in other television productions, provided that such performances are substantially non-musical and that the agreement pursuant to which such performances are rendered expressly prohibits the release by any Person of Videos (other than Videos embodying substantially the entire motion picture or television production, unless such Videos embody promotion, marketing or a different version, or "cut" of the Picture or is related to the Picture, i.e., a prequel, sequel, remake, etc.).

(c)    (i) Artist will not perform for the recording or production of any Master embodying any Restricted Composition for any Person prior to the later of: (A) five (5) years after the date of Delivery to Company of the last Master embodying the Restricted Composition concerned or (B) two (2) years after the expiration of the Term.

(d)    Artist has not entered into and will not enter into, any agreement, which will interfere in any manner with the full and prompt performance of Artist' obligations under this agreement. Artist is not and shall not come under or subject to, any disability, restriction or prohibition with respect to Artist's rights to enter into, and to fulfill all of Artist' obligations under this agreement. Neither Artist nor any other Person deriving any rights from Artist shall at any time do, or authorize any Person to do, anything inconsistent with, or which might diminish, impair or interfere with any of Company's rights hereunder or the full and prompt performance of Artist's obligations hereunder.

(e)    Artist hereby irrevocably and unconditionally waives any and all moral and like rights that Artist have or may have in the Master Recordings and the performances and/or the material embodied therein, and Artist hereby agrees not to make any claim against Company or any of Company's assignees, Licensees or designees based on moral or like rights.

(f)    Artist has the right to grant to Company the right to use Artist's Identification. During the Term, neither Artist nor any other Person deriving rights from Artist, shall use Artist's Identification, or authorize or permit any Person other than Company to use Artist's Identification, in connection with the exploitation of Masters.

(g)    (i) Artist, is the sole owner of any professional name and such mark as is used by Artist. Artist is now and shall be the sole owner of such name at any time hereafter (the "Name"), and no other Person has or will have the right to use the Name in connection with Records during the Term. During the Term, Artist shall not change the name by which Artist is professionally known without Company's prior written consent, such consent not to be unreasonably withheld. If any Person challenges Artist's right to use a professional name or mark, Company may, at its election and without limiting its rights, require Artist to adopt another professional name approved by Company, such approval not to be unreasonably withheld, without awaiting a determination of the validity of such challenge.

(ii)    During the Term, Artist shall at all times maintain a valid registration for the Name or any other name used by Artist hereunder in the Patent and Trademark Office of the United States, and promptly following the complete execution of this agreement, Artist shall furnish Company with a certified copy of such registration. In the event that such registration is not filed, Company shall have the right to conduct a trademark or other related search with respect to the Name and may register the Name on behalf of Artist with the Patent and Trademark Office or any

11

other applicable authority, the costs of which shall be treated as recoupable expenses hereunder. If, in Company's discretion, the search indicates that the Name should not be used, Company and Artist will mutually agree upon a substitute name for Artist. Nothing contained herein shall release Artist from its indemnification of Company in respect of Company's use of the Name.

(h)  During the Term, Artist shall, in connection with the release of each Album, (A) reasonably render musical performance before live audiences and/or on television and (B) shall, upon Company's reasonable request, appear at photo sessions, interviews and perform other promotional activities in support of Albums released hereunder. Company shall reimburse Artist for all reasonable and direct expenses incurred by Artist in connection with the items set forth in this paragraph 10(h)(B), provided such expenses are properly documented.

(i)  Subject to this agreement, no Person other than Company has any right to use, and during the Term no Person other than Company will be authorized to use, any Masters of Artist's performances for making, promoting, or marketing Records.

(j)  The Masters made and/or Delivered hereunder shall be produced in accordance with the rules and regulations of the American Federation of Musicians, the American Federation of Television and Radio Artist and all other unions or guilds having jurisdiction. All Persons, including Artist, rendering services in connection with such Masters shall fully comply with the provisions of the Immigration Reform Control Act of 1986 and complete and execute all forms as may be prescribed by the United States Immigration and Naturalization Service or other government agency regarding citizenship, permanent residency or so-called "documented worker" status.

(k)  Neither the Materials supplied by Artist nor any use thereof will violate any law or infringe upon the rights of any Person and Artist have (or shall have at all times herein mentioned) shall have obtained all necessary licenses, approvals, consents and permissions with respect to the same. All Personnel Lists furnished by Artist hereunder are and will be true, accurate and complete.

(l)  (i) Company shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Company pursuant to this agreement, except as specifically provided herein.

(ii)  Without limitation of the foregoing provisions of paragraph 10(l)(i) above, it is understood and agreed that Artist shall promptly make all payments as set forth in this agreement and in the event that Company exercises the Offset Right, Artist shall immediately make the reimbursement pursuant to Company's exercise of the Offset Right or allow Company to withhold other monies due Artist hereunder.

(m)  If Artist owns or controls, as of the date hereof, any Masters of Artist' performances recorded prior to the date hereof ("Prior Masters") or if Artist shall, during the Term, acquire ownership of any Prior Masters, Artist hereby warrants and represents that Artist shall not exploit any such Prior Masters, and no exploitation rights in or to such Prior Masters shall be assigned, transferred, conveyed or otherwise granted to any third party, during the Term. Additionally, in the event that Company exploits any Prior Masters, such Prior Masters shall be deemed recorded during the Initial Period. Artist hereby warrants and represents that there are no Prior Masters except as specifically set forth in Exhibit "C", which is attached hereto and incorporated herein by this reference.

12

      (n)   As of the date hereof, Artist warrants that Artist is not a resident of the State of California. Artist shall notify Company immediately in the event that any of Artist becomes a resident of the State of California. As of the date hereof, Artist is a minor and this agreement, is acknowledged by both Artist and Company as being conditioned upon and subject to the approval of the state courts of Florida having jurisdiction in the premises.

Company warrants and represents the following:

      (o)   Company is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to (i) Company's right to enter into this agreement, and (ii) Company's right to grant the rights granted to Artist hereunder and to fully perform each and every term and provision hereof.

      (p)   The parties hereto hereby indemnify, save and hold harmless the other from any and all loss and damage (including reasonable outside attorneys' fees and costs) arising out of or connected with any claim by any third party or any act by the indemnifying party which is inconsistent with any of the warranties, representations or agreements made by the indemnifying party in this agreement, provided the said claim has been dismissed, settled with the indemnifying party's consent, not to be unreasonably withheld, or reduced to a final judgment by a court of competent jurisdiction, and agree to reimburse the indemnified party on demand for any payment made or loss suffered with respect to any claim or act to which the foregoing indemnity applies. Notwithstanding anything to the contrary contained herein, the indemnified party shall have the right to settle without the indemnifying party's consent any claim involving sums of Five Thousand Dollars ($5,000) or less, and this indemnity shall apply in full to any claim so settled; if the indemnifying party does not consent to any settlement proposed by the indemnified party for an amount in excess of Five Thousand Dollars ($5,000), the indemnified party shall have the right to settle such claim without the indemnifying party's consent, and this indemnity shall apply in full to any claim so settled, unless the indemnifying party obtains a surety bond acceptable to the indemnified party in its sole discretion, with the indemnified party as a beneficiary, to assure the indemnified party of prompt payment of all expenses, losses and damages (including reasonable outside attorneys' fees and costs) which the indemnified party may incur as a result of said claim. If the amount of any such claim or loss has not been determined, Company, as the indemnified party in a particular instance, may withhold sums due Artist hereunder in an amount consistent with such claim or loss pending such determination, unless Artist obtains a surety bond to Company in its sole discretion, with Company as a beneficiary, to assure Company for Artist' full potential liabilities hereunder. If no action is filed within one (1) year following the date on which such claim was first received by Company, Company shall release all sums withheld in connection with such claim, unless Company, in its reasonable business judgment, believes an action will be filed; Notwithstanding the foregoing, if after such release by Company of sums withheld in connection with a particular claim, such claim is reasserted, then Company's rights under this paragraph 10(p) will apply *ab initio* in full force and effect. The indemnified party shall notify the indemnifying party promptly in writing of any such claim and the indemnifying party shall have the right to participate in the defense of any such claim with counsel of the indemnifying party's own choice and at the indemnifying party's own expense; provided that the indemnified party shall have the right at all times, in its sole discretion, to retain or resume control of the conduct thereof.

11. <u>Company's Rights and Remedies</u>.

(a)   (i) In the event of any material breach or default by Artist in the performance of any obligations, warranties or representations hereunder, including, without limitation, a Default Event, or in the event Artist is unable to perform her obligations hereunder due to illness of Artist or Artist fails or refuse to perform their obligations hereunder, Company may, by notice to Artist: (A) terminate the Term; (B) suspend Company's obligations hereunder; and/or (C) extend the Term for the duration of Artist's breach or default, or Artist's inability to perform hereunder.

(ii)   Company may also extend the Term for the duration of an act of God or a "force majeure" contingency, including, without limitation, labor disputes, earthquakes, fire or the unavailability of materials. If any of the foregoing contingencies shall affect Company and if Company suspends its obligations for a period in excess of six (6) months, then, provided that such contingency does not affect the entire music industry as a whole, at any time after such six (6) month period, Artist may request Company in writing to terminate such suspension. If Company shall not within thirty-(30) days following its receipt of such request notify Artist in writing of its termination of such suspension, Artist may at any time during the continuance of such suspension terminate the Term. If Artist terminates the Term, only those obligations of the parties, which would have continued after the Term, shall survive such termination. Company shall be obligated to continue to pay royalties to Artist pursuant to this agreement unless the cause of such suspension shall affect Company's ability to make such payments.

(iii)   Without limitation of the foregoing, any incapacity preventing Artist from fully performing hereunder or any material change in Artist's physical appearance or voice from those which existed on the date of execution hereof shall be deemed a breach by Artist of this agreement for purposes of this subparagraph 11(a).

(b)   Artist acknowledges that Artist's services rendered hereunder are unique and extraordinary and that Company may be entitled to equitable relief to enforce the provisions of this agreement.

(c)   Company shall have the right during any Contract Period, by written notice to Artist, to elect without cause not to record any or all of the Master Recordings constituting the Album for such Contract Period, and the Term shall automatically terminate as of the date of any such notice pursuant to this subparagraph 11(c), and Company shall have no further obligation to Artist, other than it's continuing obligation to pay royalties if any, which may become due and owing, and the balance of the reasonably calculated "in-pocket" portion of the applicable Advance in connection with such Album.

(d)   If any Default Event shall occur, then, without limitation of Company's rights at law, in equity, under this agreement or otherwise, that portion of monies which would otherwise have become due and payable to Artist hereunder shall be held in escrow pending resolution of any matters, which gave rise to the invocation of this paragraph 11.

(e)   The rights and remedies of Company as specified herein are not to the exclusion of each other or of any other rights or remedies of Company hereunder, at law, in equity or otherwise; Company may exercise or decline to exercise any of its rights and remedies as Company

14

may deem fit without jeopardizing any other rights and remedies of Company; and all of Company's rights and remedies in connection with this agreement shall survive the expiration of the Term.

12.   Definitions.

(a)   "Advance" – Recording Costs or other recoupable costs hereunder advanced by Company on Artist' behalf.

(b)   "Audiophile Record" – A Record which is (a) of superior sound quality or has other distinct technical characteristics (i.e., 24 Gold Plated CDs or 120 gram + virgin vinyl LPs) or which is marketed as either of the foregoing (e.g., a "Mobile Fidelity" Record), (b) embodied in a new configuration (e.g., DCC, digital audio tape, etc.) and/or (c) made for digital playback.

(c)   "Budget Record" – A Record bearing a primary dealer price (hereinafter the "PDP") in excess of fifty percent (50%) and equal to or less than sixty-seven percent (67%) of the highest PDP of Top-Line Records of the same type (e.g., whether it is an LP, EP, or Single) and in the same configuration (e.g., whether it is a tape cassette compact disc, or vinyl Record) in the territory concerned.

(d)   "Composition" – Words and/or music, whether in the form of instrumental and/or vocal music, spoken word or otherwise, irrespective of length, including, without limitation, medleys.

(e)   "Container Deduction" – Twenty-five percent (25%) of the applicable PDP for the Record concerned except: (a) Fifteen percent (15%) of the applicable PDP for vinyl Records and (b) twenty percent (20%) of the applicable PDP for analog cassette tapes, vinyl LP's in double fold jackets and for vinyl LP jackets which contain an insert.

(f)   "Controlled Composition" – That portion of any Composition which is written, owned or controlled in whole or in part by Artist.

(g)   "Default Event" - Any breach by Artist of this agreement, including, without limitation, the following: (a) Artist' failure or inability to fulfill any of Artist' obligations hereunder for any reason; (b) the occurrence of any of the events set forth in paragraph 11, subject to Artist' right to cure any such Default Event within sixty (60) days from the date of Company's written notice thereof or, in the case of Default Events not susceptible to cure within such time frame, to commence reasonable commercial designed to cure the same within said sixty (60) day period. In either event (cure or commencement of cure, as applicable), the same shall not be deemed to constitute a Default Event on Artist's part.

(h)   "Delivery" or "Delivered" - Company's receipt of Masters satisfactory to Company, the applicable Personnel List and all necessary licenses, consents, approvals and other items required under the agreement (including, without limitation, all such items described in paragraph 3[c]) for the Master(s) concerned.

(i)   "Master", "Recording", "Master Recording" - Any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known.

15

(j)       "Materials" - The Masters hereunder, all Compositions, Artist's Identification, and all other musical, dramatic, artistic and literary materials, ideas and other intellectual properties contained in or used in connection with any Masters hereunder or their packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

(k)       "Mid-Price Record" - A Record bearing an PDP in excess of sixty-seven percent (67%) and equal to or less than eighty percent (80%) of the highest PDP of Top-Line Records of the same type and in the same configuration in the territory concerned.

(l)       "NRC Sales" - Top-Line Records Sold through normal retail distribution channels and specifically excluding, without limitation, any exploitations described in subparagraphs (f)-(j) of paragraph 6, it being understood and agreed that Records Sold in the compact disc configuration shall not be excluded from NRC Sales if all the other requirements of this paragraph 12(l) are met.

(m)      "Offset Right" - Company's right to (i) demand and immediately receive reimbursement from Artist of monies and/or (ii) charge monies against and/or deduct same from any sums accruing or becoming payable under this or any other agreement. In the event that any such deduction is effected against an Advance otherwise payable hereunder, such deduction shall not impair Company's right to charge and recoup, in the manner herein provided, the entirety of the Advance which would otherwise have been payable hereunder.

(n)       "Person" - Any individual, corporation, partnership, association, entity or other organized group or combination of any or all of the foregoing, and their legal successors or representatives.

(o)       "Personnel List" - A Master-by-Master list that identifies all vocal performers, background vocal performers, instrumental performers, engineers, mixers, programmers, Producers, arrangers and other persons featured on, or rendering services in connection with, each Master.

(p)       "Recording Costs" - All costs incurred in connection with the pre-production and/or production of Masters embodying Artist' performances, including, without limitation, union scale, the costs of all instruments, musicians, vocalists, conductors, arrangers, orchestrators, copyists, programmers, etc., payments to a trustee or fund based on wages to the extent required by any labor organization or trustee (excluding so-called "per-record payments"), sampling costs, all studio costs, tape and disc costs, the costs associated with editing, mixing, remixing, mastering, engineering, travel, dubbing, cartage and trademark searches and registrations, the costs of cutting references, per diems, Producer fees and/or Advances, rehearsal hall rentals, the cost of non-studio facilities and equipment, and all other costs and expenses incurred in producing any Masters hereunder (excluding any travel costs incurred by Company for its employees) which are customarily recognized as recording costs in the record industry as well as vocal, instrument and dance training in connection with Artist' services hereunder.

(q)       "Record" - Any form of reproduction, transmission, and/or communication now or hereafter known, manufactured, distributed, transmitted or communicated primarily for home use, school use, juke box use, or use in means of transportation, including, without limitation, a reproduction of a Video (a "Video Record").

(r)     (i) "Single" - A Record embodying no more than two (2) Compositions.

         (ii)     "Long Play Single" - A Record embodying more than two (2) Sides that is not an EP.

         (iii)     EP - A Record embodying more than four (4) Sides that is not an LP.

         (iv)     "LP" or "Album" - A Record containing no fewer than ten (10) Sides, with at least forty (40) minutes of playing time.

         (v)     "Multiple LP" or "Multiple Album" - Two (2) or more LPs packaged together by Company for marketing as a single unit and/or an LP containing sixteen (16) or more Sides.

         (vi)     Notwithstanding the foregoing provisions of this paragraph 12(r) above, it is understood and agreed that in the event that Company specifically markets a Record as a certain type of Record (e.g., as a Single, EP, LP, etc.) then such Record shall be deemed such type of Record regardless of whether the Record concerned satisfies the definition set forth above for the Record type concerned.

         (s)     (i)     "Records Sold", "Record Sales" and "Sales" -- One hundred percent (100%) percent of those Records shipped by Company hereunder for which Company is paid and which are neither returned to nor exchanged by Company nor (in the case of any record configuration as to which Company does not identify returns of Records according to selection number) treated as returned to Company under Company's then current policy with respect to the percentage of shipped units so treated. The following are specifically not Records Sold:

         (ii)     Standard free or bonus Records given away together with Records Sold for monetary consideration. If Records are shipped subject to a discount or merchandise plan, the number of such Records deemed shipped and Sold shall be determined by reducing the number of Records shipped by the percentage of discount granted. It is understood and agreed that Company shall not exclude from Records Sold standard "free" or "bonus" goods in excess of fifteen percent (15%) unless Company becomes distributed by a so-called "major" record label whose policy is in excess thereof, but in no circumstances more than twenty five percent (25%).

         (iii)     Free or bonus Records given away pursuant to special sales plans in addition to free and bonus records specifically provided for in paragraph 13(r)(ii) above.

         (iv)     If Records which are shipped subject to a discount or merchandising plan, or respecting which a discount was granted in the form of "free" or" bonus" Records, are returned to Company, the returns will be credited between royalty bearing and non-royalty bearing Records in the same proportion as Company's customer's account is credited.

         (v)     "Restricted Composition" - A Composition embodied on a Master made or delivered to Company under this agreement.

17

(c)    In any instance where Company agrees to obtain Artist' prior consent or approval: (i) Artist' consent or approval shall not be unreasonably withheld; (ii) Artist's response to any request by Company for Artist' consent or approval shall be given within ten (10) business days following such request; (iii) any objection or disapproval shall be in writing, stating the specific reason(s) therefore; (iv) Artist' failure to give such written objection or disapproval within such ten (10) business day period shall be deemed Artist's consent or approval; (v) the exercise of such consent or approval right shall not delay the scheduled release of any Records hereunder or otherwise frustrate Company's exercise of its rights hereunder; and (vi) Company's inadvertent failure in any instance to request Artist's approval or consent shall not be deemed a breach of this agreement.

(d)    Artist recognizes that the sale of Records is speculative and agrees that the judgment of Company, as long as exercised responsibly and in good faith, with regard to any matter affecting the sale, distribution and exploitation of Records hereunder shall be binding and conclusive upon Artist. Nothing contained in this agreement shall obligate Company to make, sell, license, or distribute Records manufactured from the Masters recorded hereunder other than as specifically provided herein. The method, manner, frequency, timing and extent of release, packaging, promotion, advertising, distribution and exploitation of Masters and Records shall be within the sole discretion of Company unless otherwise herein specifically provided.

(e)    Neither Company nor Artist shall be entitled to recover damages or to terminate the Term by reason of any breach by the other party of its material obligations hereunder unless the party whose breach is alleged has failed to remedy such breach within sixty (60) days (15 days in the case of payment of monies hereunder) following receipt of the other party's notice thereof, or if such breach cannot be cured in such sixty (60) day period and if the party whose breach is alleged does not commence curing the breach during such sixty (60) day period and diligently completes the same in due course.

(f)    In entering into this agreement, Artist has and shall have the status of an independent contractor and nothing herein contained shall contemplate or constitute Artist as Company's agent or employee.

(g)    This agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, permitted assigns and representatives. Company may assign, license or otherwise dispose of this agreement or any of its rights hereunder, in whole or in part, to any distributor, subsidiary, affiliate or controlling corporation or to any Person owning or acquiring a substantial portion of the stock or assets of Company or to a record company (label and/or distributor) which is owned or otherwise controlled by an entity controlled in common with any the following: Time-Warner, Universal Music Group, EMI, BMG or Sony Music. Company may also assign its rights hereunder to any of its licensees to the extent necessary or advisable in Company's sole discretion to implement the license granted. Artist shall not have the right to assign this agreement or any of its rights hereunder without Company's prior written consent, except the right to receive payment of monies hereunder to a single payee (i.e., a loan out).

(h)    This agreement shall not be effective or binding until signed by all proposed parties hereto.

14.    **Notices.**    All notices to Artist shall be sent to Artist at the address first mentioned herein. All notices to Company shall be sent to Company at the address first set forth

19

Company shall have no further obligations to Artist hereunder (other than the obligation to pay monies due to Artist, if any).

IN WITNESS WHEREOF, the parties hereto have executed this agreement effective as of the date and year first set forth above.

COMPANY

TRANS-CONTINENTAL RECORDS, INC.
A Florida Corporation ("Company")

By: _____
Greg McDonald, President

AGREED TO AND ACCEPTED BY:

_____
Aaron Carter

Agreed to as to paragraph 17 herein.

Louis J. Pearlman Enterprises, Inc.

By: _____
Louis J. Pearlman, Chairman

21

## EXHIBIT "A"

**ROBERT CARTER**
9300 Overseas Highway
Marathon, Florida 33050

Trans Continental Records, Inc.
127 W. Church Street, Suite 350
Orlando, Florida 32801

Gentlemen:

I have been advised that my son, Aaron Carter (hereinafter referred to as "Artist") has entered into an exclusive recording artist agreement dated as of December 7, 2004 with you ("the Agreement").

In consideration of your entering into the Agreement with Artist, and as further inducement to you to do so (it being to my benefit that you enter into the same), I hereby agree as follows:

. I am Artist's parent and/or legal guardian;

. Artist is presently a minor;

. I will cooperate with you and shall sign such documents as you may reasonably request in connection with any proceeding to obtain judicial approval of the Agreement. As and when my consent is from time to time required under the Agreement, I agree that I will act in the Artist's behalf.

Very truly yours,

Robert Carter

Acknowledged as to form:

HARLAN DEREK SAUTMAN, ESQ
FL BAR No.: 0719050