UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re ) | |
| ) | |
| LOUIS J. PEARLMAN, et. al., ) | Case No. 6:07-bk-00761-KSJ |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |

# MEMORANDUM OPINION PARTIALLY APPROVING AKERMAN LLP'S FINAL FEE APPLICATIONS

The law firm Akerman LLP ("Akerman") has represented the Chapter 11 Trustee, Soneet R. Kapila, in the bankruptcy case of Louis J. Pearlman and other substantively consolidated debtors since 2007. After recently confirming the Chapter 11 Trustee's plan of reorganization,[1] Akerman seeks final approval of its fees and costs.[2] Bank of America, N.A. objects on multiple grounds, mainly arguing Akerman misallocated billable hours to its hourly fee arrangement with the Trustee that it should have allocated to their contingency fee arrangement.[3]

In 2007, Soneet Kapila was appointed as the Chapter 11 Trustee[4] in these consolidated cases due to Pearlman's fraudulent use of the Debtors to perpetrate a massive Ponzi scheme. The Trustee retained Akerman as primary counsel. Initially, Akerman agreed to work on an hourly basis.[5] Later, in 2009, Akerman agreed to work on a contingency fee basis in avoidance

---

[1] Order Confirming Chapter 11 Trustee's Plan of Liquidation, Doc. No. 4378.
[2] Doc. Nos. 4188, 4190, and 4272.
[3] Doc. No. 4282.
[4] Doc. No. 39.
[5] *E.g.*, Doc. No. 126.  Before substantive consolidation, separate orders were entered in all the separate bankruptcy cases for the now-consolidated Debtors.  All orders were identical in all operative respects.

adversary proceedings.[6]  Eventually, Akerman handled 649 adversary proceedings on a contingency fee basis.[7]

After the Modification Order, Akerman billed services relating to the Contingency Cases under the contingency fee arrangement but still billed all other main case type services under the hourly fee arrangement. To date, the Court has approved six interim fee applications for fees totaling $4,174,474.59 under the hourly fee arrangement.[8] Those orders only approved Akerman's fee applications on an interim basis and specifically provided the awards were subject to further review and possible disgorgement at the final application stage.[9] Under the contingency fee arrangement, the Court approved payment of fee awards totaling $1,042,807.73 based on a 35% contingency percentage.[10]

Presently before the Court are Akerman's Seventh and Final Application For Allowance and Payment of Compensation and Expenses[11] ("Final Fee Application"), Supplement,[12] and Motion for Payment of Contingency Fees ("Contingency Fee Application").[13] Akerman seeks payment of $784,378.01[14] in fees under the Final Fee Application and Supplement, and $564,869.58 in fees under the Contingency Fee Application, in addition to reimbursement of expenses.

---

[6] Doc. No. 1585.

[7] On March 16, 2009, the Court entered an order granting the Trustee's request ("Modification Order"). (Doc. No. 1647.)  Under the Modification Order, Akerman was to file a notice with the Court designating adversary proceedings as subject to the contingency fee arrangement. *Id.* In all, Akerman filed 660 adversary proceedings on behalf of the Trustee, 649 of which were noticed as subject to the contingency fee arrangement ("Contingency Cases"). (Trustee's First (Doc. No. 2416), Second (Doc. No. 2519), and Third (Doc. No. 3306) Notices of Filing Complaints Subject to Contingency Fee Arrangement.)

[8] *See* Doc. No. 4332 (summarizing hourly fee applications and awards). *See also* Doc. Nos. 1445 (first interim fee order); 3347 (second interim fee order); 3716 (third interim fee order); 3780 (fourth interim fee order); 3861 (fifth interim fee order); and 3931 (sixth interim fee order).

[9] *E.g.*, Doc. No. 1445 at 2; Doc. No. 3780 at ¶ 1.

[10] Doc. Nos. 3425, 3716, and 3861.

[11] Doc. No. 4188.

[12] Doc. No. 4272.

[13] Doc. No. 4190.

[14] This sum includes $221,547.50 in fees incurred for the period of September 1, 2012 through July 31, 2013 and $463,830.51 in fees requested under previous interim fee applications but not approved or disapproved—"holdback" fees. (Doc. No. 4188).

Section 330(a)(1) of the Bankruptcy Code allows the Court to award "reasonable compensation for actual, necessary services" rendered by attorneys and paraprofessionals employed by a trustee.[15] Section 331 provides that the Court "may allow" disbursement of fees and expenses under § 330 on an interim basis,[16] but § 330(a)(5) provides that any fees previously awarded on an interim basis are subject to review at the final application stage. Moreover, the Court provided in the interim orders that fees disbursed were subject to final review and possible disgorgement.[17] At this stage, the Court not only reviews the fees requested in Akerman's Final Application, Supplement, and Contingency Fee Application, but also all previously approved interim fee awards.

Bankruptcy courts determine reasonableness of compensation under § 330 upon considering the "nature, the extent, and the value of such services, taking into account all relevant factors, including" those listed in § 330(a)(3).[18] These factors weigh into the court's lodestar analysis, which calculates the reasonable fee by multiplying the attorney's reasonable hourly rate by the number of hours reasonably expended.[19] A bankruptcy court can then make adjustments to the lodestar calculation, upward or downward, after considering the 12 factors laid out in *Johnson v. Georgia Highway Express, Inc.*[20] and explaining how they affect the award.[21]

---

[15] 11 U.S.C. § 330(a)(1)(A).
[16] 11 U.S.C. § 331.
[17] *E.g.*, Doc. No. 1445 at 2; Doc. No. 3780 at ¶ 1.
[18] 11 U.S.C. § 330(a)(3)(A)-(F).
[19] *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 879 (11th Cir. 1990).
[20] 488 F.2d 714 (5th Cir. 1974). The *Johnson* factors are: (1) The time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19. Some of the *Johnson* factors overlap with the factors promulgated by § 330(a)(3).
[21] *Grant*, 908 F.2d at 878-79.

Bank of America, a creditor and adversary defendant, objects to Akerman's pending fee applications on various grounds.[22] At the direction of the Court, Akerman responded[23] and as indicated in Bank of America's reply[24] has since agreed to voluntarily reduce its fee request by $250,000 to resolve Bank of America's objection. Bank of America's objection raises two broad arguments. First, Bank of America objects to Akerman's rates—its blended hourly rate of $266.91 and 35% contingency percentage. Second, Bank of America objects to Akerman's allocation of billable hours between the hourly fee arrangement and the contingency fee arrangement, arguing that certain services billed under the former should have been billed under the latter.

Within the hourly/contingency issue are two distinct concerns. Akerman negotiated settlements in some adversary proceedings that resulted in the defendants waiving substantial claims against the estate. Is a contingency fee appropriate for these "claim waivers," and if so, how much? Bank of America also asserts Akerman's services rendered opposing substantive consolidation is properly allocated as part of contingency fee arrangement and is not compensable on an hourly basis.

### Akerman's Blended Hourly Rate

Bank of America objects to Akerman's blended hourly rate of $266.91 on the grounds that it was higher than the blended hourly rate of professional fees in a different case that concluded around the same time. As discussed above, the lodestar method multiplies an attorney's reasonable hourly rate by the number of hours reasonably expended.[25] "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar

---

[22] Doc. No. 4282. The impetus behind Bank of America's objection was to obtain the appointment of a fee examiner. The Court declines this request, determining that appointment of a fee examiner would place too much of a burden on the estate's scarce financial resources.
[23] Doc. No. 4520.
[24] Doc. No. 4548.
[25] *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 879 (11th Cir. 1990).

services by lawyers of reasonably comparable skills, experience, and reputation."[26] If presenting evidence on the issue of reasonable rates, the party seeking approval usually bears the burden of presenting "satisfactory evidence that the requested rate is in line with prevailing market rates."[27] But, "[a] court, however, is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses."[28]

No evidence was put on by either party as to the reasonableness of Akerman's blended hourly rate. Bank of America references a concurrent bankruptcy case with a blended hourly rate for professionals of $247.51 to support its argument.[29] The difference between this and Akerman's blended hourly rate of $266.91 is not substantial. The Court finds Akerman's hourly rates to be reasonable based on its own independent judgment.

### Contingency Fee Percentages

Bank of America similarly objected to Akerman's 35% contingency fee percentage. Nearly all of the adversary proceedings Akerman filed on behalf of the Trustee were brought on a contingency fee basis. The Court, in modifying the original hourly fee agreement, approved a contingency fee framework but never approved a specific contingency fee percentage.[30] It appears, however, that Akerman and the Trustee agreed to a 35% contingency fee percentage outside the purview of the Court.[31]

The Court already has granted three of Akerman's applications for payment of contingency fees based on the agreed-upon 35% and finds no reason why that number is no

---

[26] *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988).
[27] *Id.*
[28] *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (quoting *Norman*, 836 F.2d at 1303).
[29] Bank of America referenced the blended hourly rate for professionals in the F.F. Station bankruptcy case, Case No. 6:07-bk-00575-KSJ. (Doc. No. 4282 at 5.)
[30] Doc. No. 1647.
[31] This agreement was not preapproved by the Court under § 328(a). "Unless a professional's retention application specifically specifies that it seeks approval under § 328, it is subject to review under § 330." *In re Circle K Corp.*, 279 F.3d 669, 671 (9th Cir. 2002).

longer reasonable. Resting again on its independent judgment, the Court finds the 35% contingency fee to be reasonable and in line with similar non-bankruptcy rates.[32]

### Calculation of Contingency Fee on Claim Waivers

A more difficult issue is the treatment of defendant claim waivers for the purpose of calculating Akerman's contingency fee. Akerman, in settling certain adversary proceedings against bank defendants—commonly referred to throughout this case as the "Bank Cases"[33]—dismissed the adversary proceedings not for cash payments but in return for the banks executing waivers of their substantial claims against the estate. In effect, the claim waivers allowed the *pro rata* distribution the banks *would have* received to be distributed to other unsecured creditors. So, although the claim waivers did not bring assets into the estate *per se*, the claim waivers did net a substantial, quantifiable benefit to other creditors.

Similar to the 35% agreement reached between Akerman and the Trustee, they agreed to a separate contingency fee for the bank claim waivers of 20% of the "financial benefit to the estate." As Akerman puts it, the "financial benefit" calculation multiplies the waived claim by the estimated unsecured distribution rate absent the claim waiver—3.31%. Akerman negotiated total bank claim waivers of $62,482,384.02. This sum multiplied by the expected distribution rate of 3.31% results in a "financial benefit" to the estate of $2,068,166.91. In other words, because of the bank claim waivers, the estate will not have to pay the Bank Case defendants their expected distribution of $2,068,166.91, making the estate that much richer.

The claim waivers benefitted the estate in a quantifiable way, and Akerman certainly spent many hours working these cases. Other courts have recognized that the reduction or elimination of a claim against the estate provides a benefit to the estate because it "free[s] up

---

[32] *See Loranger*, 10 F.3d at 781.
[33] The Akerman "Bank Case" are as follows: *Kapila v. First Int'l Bank & Trust, et. al.*, 6:09-ap-00052-KSJ; *Kapila v. American Bank of St. Paul, et. al.*, 6:09-ap-00067-KSJ; *Kapila v. Tatonka Capital Corp.*, 6:09-ao-00716-KSJ; *Kapila v. Northside Community Bank*, 6:09-ap-00068-KSJ; and *Kapila v. MB Financial Bank, N.A.*, 6:09-ap-00071-KSJ.

other funds to be distributed to unsecured creditors."[34] The Court agrees with the Akerman's calculation of "financial benefit."

Akerman requests approval of $325,000 in contingency fees based on the Bank Case claim waivers. This number was derived from applying a lower 20% contingency fee rate, which again was not preapproved by the Court, to the "financial benefit" of $2,068,166.91, resulting in a contingency fee of $413,633.38. After negotiations with the Unsecured Creditor's Committee, Akerman agreed to voluntarily reduce this fee request by $88,633.38. After taking the reduction into account, the $325,000 request amounts to about 16% of the "financial benefit" to the estate.[35]

In light of the concession after negotiation with the Unsecured Creditors' Committee and the otherwise eminently reasonable rate of 16% on the "financial benefit" to the estate, the Court finds an award of $325,000 to be a reasonable fee for Akerman's negotiation of $62,482,384.02 in claim waivers.

In all, Akerman states it spent 11,251.77 hours working on contingency fee matters.[36] Upon approval of the requested contingency fees, it will be paid $1,500,522.98 for this work. This averages out to an hourly rate of $133.36 per hour. The Court finds Akerman's fee requests under the contingency fee arrangements to be reasonable under § 330. If anything, Akerman is very modestly paid for its work on the contingency cases.

### Contingency Fee Work Mistakenly Billed as Hourly

In its objection, Bank of America identifies certain instances where Akerman improperly

---

[34] *In re Fleming Packaging Corp.*, 2007 WL 4556985, *6 (Bankr. C.D. Ill. December 20, 2007). *See also In re Telesphere Communications, Inc.*, 179 B.R. 544, 564-65 (Bankr. N.D. Ill. 1994) (reasoning that a creditor's claim waiver, in the context of a settlement agreement, would provide "the non-settling creditors with a larger distribution than they would otherwise have received.").
[35] Doc. No. 4190.
[36] Doc. No. 4329, at 2.

billed work related to the contingency fee cases under its hourly fee arrangement.[37] The Modification Order provided that Akerman would be compensated on a contingency fee basis for the "investigation of, discovery on and, if determined by the Trustee to be appropriate, prosecution of certain claims and causes of action available to these bankruptcy estates, including, without limitation, claims and causes of action under Chapter 5 of the Bankruptcy Code" the Trustee designates.[38] The order further provided:

> And any all hourly fees billed prior to the date thereof by [Akerman] in respect to the investigation and discovery of the potential targets/defendants in the Contingency Case shall be included in and not compensated separately from the contingency fee arrangement approved herein.[39]

In all, 649 of the 660 adversary proceedings Akerman filed for the Trustee were taken under the contingency fee arrangement.

In its response to Bank of America's objection, Akerman examined these allegations and admitted that it did indeed bill some services under the hourly fee arrangement that related to contingency adversary proceedings, most notably in the Bank Cases. Akerman identified between $140,000 and $175,000 of services improperly billed with respect to the Bank Cases before the entry of the Modification Order. Accordingly, the Court will deduct $175,000 from Akerman's fee award under the Final Fee Application.

Akerman identified a similar misallocation in the Integra adversary proceeding.[40] Akerman originally represented the Trustee in this adversary proceeding, but, after the defendant was taken over by the FDIC, the Trustee assigned the case to another law firm due to conflicts. Akerman admits that between $25,000 and $38,000 of Integra services it billed under the hourly arrangement should have been allocated to the contingency fee arrangement. Based on

---

[37] Doc. No. 4282, at 3-4.
[38] Doc. No. 1647 at ¶ (i).
[39] *Id.* at ¶ (v).
[40] Doc. No. 4520 at ¶ 51; Adversary Proceeding No. 6:09-ap-00715-KSJ.

Akerman's averments, the Court will deduct an additional $38,000 from Akerman's fee award under the Final Fee Application.

Lastly, in addition to all previously discussed contingency services admittedly billed as hourly, Akerman submits it probably billed some general contingency work under hourly codes by mistake. In its response, Akerman states that a reduction of $75,000 is reasonable based on these mistaken entries.[41] Accordingly, the Court deducts $75,000 from Akerman's Final Fee Application.

### Substantive Consolidation Fees are Included in Contingency Fees

The major remaining dispute is the proper allocation of Akerman's services to the Trustee relating to his opposition to substantive consolidation of the Debtors. Akerman argues that the fees incurred defending substantive consolidation were properly billed as hourly because the issue was centered on the main bankruptcy case rather than the individual adversary proceedings. I disagree.

Numerous adversary defendants filed motions to substantively consolidate the cases of Pearlman and the Debtors as well as non-debtors used in perpetrating the extensive Ponzi scheme. Ultimately, the Court granted substantive consolidation of the Debtors and denied it as to the non-debtors.[42] The Trustee's efforts in opposing the substantive consolidation were entirely focused on preserving the Trustee's "wrong payor" claims in Contingency Cases. The Trustee even agreed substantive consolidation of the debtors was warranted, but spent substantial time urging the Court to order only "partial" substantive consolidation to preserve his "wrong

---

[41] Doc. No. 4520 at ¶ 61.
[42] Second Amended Memorandum Opinion Granting substantive Consolidation of the Joint Debtors' Estates (Doc. No. 3489); Memorandum Opinion Denying Motion for Substantive Consolidation of Non-Debtor Entities (Doc. No. 3676).

payor"[43] claims. The Court denied piecemeal relief and granted wholesale substantive consolidation of the Debtor entities.[44] In denying substantive consolidation of the non-debtor entities, I wrote "[t]he trustee opposes any substantive consolidation of Non-Debtors largely because it would render the trustee's fraudulent conveyance adversary proceedings moot."[45]

Every single proponent of substantive consolidation was a defendant in a "wrong payor" adversary proceeding, which were *all* Contingency Cases.[46] Granted, the substantive consolidation litigation technically took place in the main case, but this was only done to combine all similar issues and reduce the administrative toll on the estate's scarce resources. Thus, as illustrated further in the prior memorandum opinions on substantive consolidation,[47] the Trustee's sole reason to oppose substantive consolidation of the Debtor entities was to preserve the avoidance actions, nearly all of which were Contingency Cases.

Consequently, the Court finds that the services rendered for opposing substantive consolidation should be properly allocated to the contingency fee arrangement, not the hourly fee arrangement. Akerman stated it provided $190,000 to $210,000 in services for Trustee in defending the creditors' substantive consolidation efforts. Given Akerman's other substantial, voluntary reductions to its fee requests and its extremely low hourly billable rate for its contingency work, however, the Court will deduct only $50,000 from Akerman's Final Fee Application for hours billed under the hourly agreement relating to substantive consolidation.

In sum, the Court deducts a total of $338,000 from Akerman's Final Fee Application: $175,000 for contingency work on Bank Cases improperly billed as hourly; $38,000

---

[43] "In general, these claims allege one joint debtor made transfers in repayment of another joint debtor's preexisting debts; thus, the paying entity arguably received no value in exchange for its payment, one of the crucial prongs of a constructive fraudulent transfer claim." (Doc. No. 3489.)
[44] Doc. No. 3489.
[45] "The trustee opposes any substantive consolidation of Non-Debtors largely because it would render the trustee's fraudulent conveyance adversary proceedings moot." Doc. No. 3676 at 3.
[46] Doc. No. 3676 at 3 ("All of the requests to substantively consolidate the Non-Debtors with the Debtors are made by defendants of the trustee's fraudulent conveyance proceedings . . . .").
[47] Doc. Nos. 3489 and 3676.

for contingency work on the Integra case improperly billed as hourly; $50,000 from work opposing substantive consolidation improperly billed as hourly; and $75,000 for general contingency work mistakenly billed as hourly.

The Court awards Akerman $446,378.01 in fees under the Final Fee Application and Supplement, representing Akerman's requested $784,378.01[48] minus the $338,000 reduction explained above. The Court also awards Akerman reimbursement of all expenses, totaling $145,955.52. The Court approves Akerman's Contingency Fee Application, awarding the requested $564,869.58 in fees, consistent with the reasoning above. The Court denies Akerman's request to preapprove payment of further contingency fees as they become earned. Akerman will need to apply to the Court for approval of compensation consistent with the Modification Order.

DONE AND ORDERED in Orlando, Florida, March 20, 2014.

KAREN S. JENNEMANN
Chief United States Bankruptcy Judge

Attorney Sam Miller is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of the order.

---

[48] In its Final Fee Application, Akerman requests an award of $221,547.50 in fees and reimbursement of $83,122.90 in expenses for the period of September 1, 2012 through July 31, 2013. (Doc. No. 4188.) Akerman also requests an award of $463,830.51 in holdback fees from prior hourly fee applications. (*Id.*) In its Supplement, Akerman requests an award of $99,000 in fees and reimbursement of $62,232.62 in expenses for the period of August 1, 2013 through September 24, 2013. (Doc. No. 4272.) In total, under its Final Fee Application and Supplement, Akerman requests an award of $784,378.01 in fees and reimbursement of $145,955.52 in expenses.